**E-FILED**
Thursday, 12 February, 2009  02:21:52 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

FILED

FEB 1 2 2009

PAMELA E. ROBINSON, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DONALD J. TOMPKINS | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO.  09-4004 |
| | ) | |
| | ) | |
| CENTRAL LABORERS' | ) | |
| PENSION FUND | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Donald J. Tompkins ("Plaintiff"), complains as follows:

### JURISDICTION

1.   This Court has federal question jurisdiction under 28 U.S.C. § 1331 in that Plaintiff

alleges that the Defendant, Central Laborers' Pension Fund ("Fund") suspended Disability Pension

"benefits due to him under the terms of his plan." Specifically, section 502 (a)(1)(B) and § 502 (a)(3)

of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, "empower[s]"

Plaintiff "to bring a civil action" in order to provide a plan "participant" the ability "to recover

benefits due  to him . . . , to enforce his rights . . . , or to clarify his rights to future benefits under the

terms of the plan" and "to enjoin any act . . . , which violates . . . the terms of the plan" or "to obtain

other appropriate equitable relief . . . to enforce . . . the terms of the plan."  Additionally, this Court is

given "exclusive jurisdiction" over this dispute under ERISA, 29 U.S.C.  § 1132 (e)(1).

1

**VENUE**

2.  Venue is proper pursuant to 28 U.S.C. §1391(b)(2)  and  ERISA  § 502 (e)(2), 29 U.S.C. § 1132(e)(2),  in that the alleged "breach took place" in Rock Island County, Illinois.

**PARTIES**

3.  The Plaintiff, born on 10/29/56, is a resident of Rock Island, Illinois and is a "Participant" under the Fund's Pension Plan. He began working as a laborer in Laborers' Local 309, Rock Island, Illinois, in November of 1978.

4.  According to the Fund's Summary Plan Description "Effective July 1. 1995," the "Pension Fund  is a trust fund set up to provide Retirement benefits [including Disability Pension benefits] to employees working under the jurisdiction of the local unions which participate in the Central Laborers' Pension Fund." "The Agreement and Declaration of Trust, originally dated January 1, 1965, and since amended, establishes the Pension Fund. The Trust Agreement and the Pension Plan ["Plan" / referencing the Restated Plan "Effective October 1, 1994"] govern the operation of the Fund." "A Board of Trustees ["Board" or "Fund"] . . . acts on behalf of" the employees "in managing the Pension Fund's operations" and "is made up of an equal number of Union and Employer representatives. . . ."

5.  The Fund is headquartered in Jacksonville, Illinois. The "Participating Local Union" is the Rock Island, Illinois Local No.309 where Plaintiff's membership is based and the only local where Plaintiff had membership throughout his 20 plus years as construction worker. Approximately 55 local unions, located throughout Illinois, currently participate in the Fund.

2

## PLAN'S BACKGROUND REGARDING THE BOARD'S DISCRETION

6.  Given the provisions of Plan Section 6.3, quoted below, the Board is a "fiduciary" under ERISA §402 (a)(1), (29 U.S.C. 1102(a)(1). Although the most current Restated Plan provides that it became "Effective October 1, 1999," it was signed "September 9, 2002." Due to the fact that the Fund found Plaintiff eligible for a Disability Pension in August of 1999, reference here is made to Section 6.3 of the "Restated Plan Effective October 1, 1994" which provides as follows:

**Section 6.3.  Action of Trustees**.

The Trustees shall, subject to the requirements of the law, be **the sole judges of the standard of proof required in any case and the application and interpretation of this Plan,** and decisions of the Trustees shall be final and binding on all parties.

Wherever in the Plan the Trustees are given discretionary powers, the Trustees shall exercise such powers in a uniform nondiscriminatory manner.

All questions or controversies of whatsoever character arising in any manner or between any parties or persons in connection with this Plan or its operation, whether as to any claim for benefits, as to the construction of the language of this Plan or any rules and regulations adopted by the Trustees, or as to any writing, decision, instrument or account in connection with the operation of the Plan or otherwise, shall be submitted to the Board of Trustees for decision.  In the event a claim for benefits has been denied, no lawsuit or other action against the Fund or its Trustees may be filed until the matter has been submitted for review under the ERISA-mandated review procedure set forth in **Section 6.4**. The decision on review shall be binding upon all persons dealing with the Plan or claiming any benefit hereunder, **except to the extent that such decision may be determined to be arbitrary or capricious by a court or arbitrator having jurisdiction over such matter.**  [*Emphasis added; in this instance, the above provision is identical to Section 7.2 of the Restated Plan "Effective October 1, 1999," save the internal reference to "Section 6.4."*].

7.  The Plaintiff exhausted his appeal rights under Plan Section 6.4, as the Fund issued its letter of April 25, 2008 denying his appeal, the details of which are more fully addressed below.

3

**A DEFERENTIAL STANDARD OF REVIEW:  IF THE FIDUCIARIES CONTROVERT
THE PLAIN MEANING OF THE PLAN, THEIR ACTIONS ARE
"ARBITRARY OR CAPRICIOUS."**

8.  Because the Plan gives the Board, as Plan fiduciaries, discretionary powers to determine "the application and interpretation of this Plan," the appropriate standard of review by this Court of the Fund's determination to suspend Plaintiff's Disability Pension benefits and declare an overpayment, is "arbitrary or capricious." (Quoting Section 6.3 above).

9.  If the Fund did controvert the plain meaning of the Plan, then its actions were "arbitrary or capricious." In this case, the Fund did controvert the plain meaning of the Plan; its June 1, 2007 suspension decision is totally void of any reasoned explanation as is its appeal denial letter of April 25, 2008, all of which is addressed below.

## SUMMARY  INTRODUCTION

10.  In August of 1999, the Fund determined Plaintiff eligible for a Disability Pension paying a benefit of $2,115.43/mo. Thereafter, Plaintiff engaged in "non-Laborer or other non-Building Trades Crafts employment" which resulted in 2001 earnings of $7,144.00 and 2002 earnings of $4,037.50 for which his Disability Pension **was not** suspended. Without having received the proper notice in 1999 mandated by the Plan Section 6.7 (e)(1), Plaintiff again engaged in "non-Laborer. . . non-Building Trades Crafts  employment" which resulted in 2005 earnings of $10,550.00 and 2006 earnings of $22,100.00 for which his Disability Pension **was** suspended on June 1, 2007. The suspension included a determination of a 23 month overpayment "totaling $48,654.89." Plan Section 1.31 defines "Total and Permanent Disability" and presents a question of law regarding the plain meaning of Plan Section 1.31, *including but not limited to*:

4

**For such non-Laborer or other non-Building Trades Crafts employment, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled.**

## FACTUAL BACKGROUND

11.  On November 27, 1978, at age 22, Plaintiff first joined Local 309 of the Laborers' International Union of North America, AFL-CIO at Rock Island, Illinois. On July 16, 1999, Plaintiff filed his application for a Disability Pension with the Fund which included his completed disability form and the "Statement of the Attending Physician" documenting his "Chronic Asthmatic Bronchitis" which Plaintiff attributed to working with "cement dust" for 22 years. See attached Ex. No. 1 (*Exhibits referenced below will also note the Bates stamped page # located in lower rt. corner*).

12.  On July 19, 1999 the Fund sent a letter to Plaintiff's attending physician which acknowledged Plaintiff's application and diagnosis. The letter then defined "Total and Permanent Disability" and requested the physician to "mark the appropriate box in regard to [Plaintiff's] condition" which the physician did, thereby representing that:

> I find that Donald Tompkins meets the above definition of Total and Permanent Disability and this disability is of such a nature that it is expected to be permanent and continuous for the balance of his lifetime.

See attached Ex. 2 at #5.

13.  On August 19, 1999 the Fund sent a letter to Plaintiff approving a Disability Pension retroactive to January 1, 1999 and determining that Plaintiff's monthly benefit was $2,115.43 ($1,955.43 + $160 supplemental). See attached Ex. 3 at #7.

14.   On January 5, 2004 the Plaintiff executed at the Fund's request, a "Request for Social Security Earnings Information" for years 2001-2002. See attached Ex. 4 at #8.

15.   On June 15, 2004, the Fund sent Plaintiff a copy of the 3/11/04 Social Security Administration disclosed earnings of $7,144.00 for 2001 and $4,037.50 for 2002 and requested that Plaintiff "provide a written explanation regarding the service provided by and type of work" "performed for Packaging Incorporated."  See attached Ex. 5 at #s 9-11.

16.   On June 28, 2004, Plaintiff sent a reply to the Fund stating:

> I work 8-10 hours a week in a climate controlled workshop repairing *Paslode* nail guns. I also perform light office duties which include filing, answering the telephone, and faxing work orders.

See attached Ex. 6 at #12.

17.   Following Plaintiff's June 28, 2004 "explanation of the type of work" he had performed **resulting in earnings of $7,144.00 for 2001 and $4,037.50 for 2002, his Disability Pension *was not* suspended.**

18.  On May 21, 2007, the Fund's accountant, Romolo & Associates, sent a letter to the Fund disclosing that the Plaintiff was working for Willman Construction and specifically noted in part that the "Employer stated that this employee worked in the shop" (not "in a job classification of any type specified and covered in" the Laborer or other Building Trades Crafts' collective bargaining agreement).

19. On June 1, 2007, the Fund sent Plaintiff a letter informing him of Romolo & Associates' "Fringe Benefit Compliance audit of Willman Construction" and attaching the Romolo letter and itemized statements entitled "Contractor Inquiry" reflecting 2005 gross earnings of $10,550.00, for approximately 25 weeks (July 8 – Dec. 30) and 2006 gross earnings of $22,100.00,

6

for 52 weeks. The letter is totally void of any reasoned explanation and provided in part:

> The information received from Romolo and Associates **leads us to believe that you no longer meet the Fund's definition of "total and permanent disability" as set forth in Plan Section 1.31, a copy of which is enclosed. Accordingly, your Disability Pension will be suspended effective June 1, 2007**. The Disability Pension payments of $1,955.43/month and Temporary Supplemental Benefit payments of $160.00/month that you received for the period July, 2005 through May, 2007, totaling $48,654.89, are considered to be overpaid and subject to the Fund's recovery process. [*Emphasis added; that period covers a total of 23 months (6 in '05, 12 in '06 and 5 in '07) or 23 x $2,115.43 = $48,654.89*].

And that suspension of Plaintiff's Disability Pension benefit of $2,115.43 / month continues to date.  See attached Ex. 7 at #s 13-17 for a copy of the Fund's June 1, 2007 suspension letter, the attached Romolo letter and itemized statements for 2005 and 2006 earnings entitled "Contractor Inquiry."

## FIRST CAUSE OF ACTION

### THE "PLAIN MEANING" OF PLAN SECTION 1.31 MANDATES APPLICATION OF:

**"For such non-Laborer or other non-Building Trade Crafts employment . . . the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled."**

20.  ERISA §404 (a)(1)(D), 29 U.S.C. §1102 (a)(1)(D), provides in relevant part:

> (a) Prudent man standard of care
>      (1) Subject to sections 1103(c) and (d) [*re assets of plan*], 1342, and 1344 [*re termination of plan*] of this title, a **fiduciary shall discharge his duties** with respect to a plan solely in the interest of the participants and beneficiaries and ---

* * *

>      (D) **in accordance with the documents governing the plan** insofar as such documents are consistent with the provisions of this subchapter and subchapter III of this chapter. [*Emphasis added; referenced as the "plan document rule"*].

21.  ERISA §502 (a)(1)(B) and (a)(3)(B)(ii), 29 U.S.C. §1132 (a)(1)(B) and (a)(3)(B)(ii),

confirms the above §404 reference with its provision that a participant may bring a cause of

action "to recover benefits due to him under the terms of his plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the plan" and "to obtain

other appropriate equitable relief . . . to enforce any provision of . . . the terms of the plan."

22.  Plan Section 1.31 ("§1.31"), referenced above in the Fund's suspension letter of June 1,

2007, is provided in the Restated Plan "Effective October 1, 1999" and signed "September 9, 2002."

§1.31 is unambiguous and provides in relevant part at the first and third paragraphs, as follows:

**Total and Permanent Disability**

A "Total and Permanent Disability" shall mean that, in the opinion of a licensed
medical practitioner selected or approved by the Trustees, the Employee is totally and
permanently unable as a result of bodily injury or disease to engage in any further
employment or gainful pursuit as a Laborer or other Building Trades Crafts
employment in the construction industry for remuneration or profit, regardless of the
amount, or unable to engage in further employment or gainful pursuit of non-Laborer
or other non-Building Trades Crafts employment for which the employment is
considered full-time and a primary source of income. **For such non-Laborer or other
non-Building Trades Crafts employment, notwithstanding the restrictions of
Section 7.8, the Participant may earn up to $14,000 per calendar year in non-
Laborer or other non-Building Trades Crafts employment and be considered
totally and permanently disabled.** Such disability must be considered total and
permanent and will continue during the remainder of the Participant's life. The
Trustees shall be the full and final judges of Total and Permanent Disability and of
entitlement to a Disability Pension hereunder.
[*Emphasis added noting that the bolded sentence is* h*ereinafter sometimes referred to
as the "$14,000" provision for convenience; Section 7.8 is entitled "Suspension of
Benefits" and defines "Disqualifying Employment" for Pensions other than the
Disability Pension*].
                              *  *  *
If disability benefits were **paid for a month for which benefits were later
determined should not have been paid, the overpayment shall be recoverable**
through deductions from future pension payments in an amount not to exceed 25% of
the monthly pension amount (before deductions), except that the Plan may withhold up
to 100% of the first monthly pension payment made upon beginning future pension

payments. If a participant dies before recovery of overpayments has been completed, deductions shall be made from the benefits payable to his Beneficiary or Spouse, subject to the 25% limitation. [*Emphasis added*].

See attached Ex. 8 at # 18 for the full text of §1.31 as referenced in and attached to the Fund's suspension letter of June 1, 2007.

23.  The following Plan language from §1.31 first appeared, as then §3.10, in Amendment No. 5 ("**effective October 1, 1996**") to the "Restated Plan Effective October 1, 1994":

. . . the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled.

24.  At the time the above quoted "$14,000" provision first became effective on October 1, 1996, the Federal Minimum Hourly Wage was increased on October 1, 1996 to $4.75 (from $4.25 4/1/91). Accordingly, said "$14,000" Plan provision was $4,120.00 / year greater than "**full-time**" employment at the minimum wage (52wks x 40hrs = 2,080 hrs x $4.75 = $9,880.00/yr). In October of 1996, the full amount of "$14,000 per calendar year" was the "**full-time**" equivalent of 2,080 hours per year at the rate of $6.73/hr which amounted to $1.98 above minimum wage.  *Therefore, the "$14,000" provision was the equivalent of "full-time" employment in October of 1996 and at a rate almost two dollars above the Federal Minimum Hourly Wage.  Focusing on the opening three words to the "14,000" provision namely, "For such non-Laborer,"* the word "such" is defined as "of the kind mentioned." Accordingly, *§1.31's $14,000" provision is not limited to part-time employment.* See attached Ex. 9 at #s 19-20 for a U.S. Dept. of Labor Minimum Hourly Wage table.

25.  Said "$14,000" Plan provision was significantly below the Local 309 Collective Bargaining Agreement's "Classification 1" wage rate of "$16.55/hr." and the "Total Package" rate of "$20.76" (with fringe benefits) for the period 5/1/95 thru 4/30/98.  The Peoria Laborers' Local

Union No. 165's Collective Bargaining Agreement for the period 5/1/03 thru 4/30/06 provided a

"Basic Labor Rate" of $20.31/hr and a "Total Package" of "$32.64/hr."

**There was no "$14,000" provision in the 1994 Restated Plan as the "$14,000" provision was added by Amendment No. 5 in 1996. And in 2004's Amendment No. 5 to the 1999 Restated Plan, the "$14,000" provision was deleted and a new category of Disability Pension entitled "Occupational Disability Benefit" was established.**

26.  In the Restated Plan Effective October 1, 1994, "Total and Permanent Disability" was

defined (at then Section 3.10) *without* any reference to "non-Laborer or other non-Building Trades

Crafts employment" or the related "may earn up to $14,000 per calendar year" language and

provided in pertinent part as follows:

> A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit **whether as a Laborer or in any other occupation or employment of any kind.** The Trustees shall be the final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder. [*Emphasis added*].

> See attached Ex. 10 at # 21.

27.  In 2004's Amendment No. 5 to the 1999 Restated Plan, "Total and Permanent

Disability" is defined at §1.31 *without* any express reference to a Participant's ability to "earn up to

$14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be

considered totally and permanently disabled." However, §1.31(b) and §3.3 (b) of that Amendment

No. 5 establish a new category of Disability Pension entitled "Occupational Disability Benefit,"

which has *no* dollar limitation *and no apparent prohibition* for non-laborer or other non-building

trades crafts employment as long as the Participant "has suffered an Occupational Disability . . . on

or after October 1, 2004 while working as a laborer or in other building trades crafts . . . ." (Quoting

§3.3 (b) (1) at Ex. 11, #24). §3.3 (b) is also unique in that it purports to exempt the Occupational

Disability Benefit from ERISA's anti-cutback rule by providing:

> The Occupational Disability Benefit is not part of the Participant's Accrued Pension, is not a protected benefit under Code Section 411 (d)(6), and may be reduced or eliminated at any time in the sole discretion of the Trustees. [Ex. 11 at #25].

In any event, assuming Plaintiff did suffer an "Occupational Disability" in 1999 from "Chronic

Asthmatic Bronchitis" which Plaintiff attributed to working with cement dust for 22 years (Ex. 5 at

#3), §3.3 (b)(1) of Amendment No. 5 requires that such a disability must have been "...suffered...

on or after October 1, 2004 while working as a laborer or in other building trades crafts."

Accordingly, had Plaintiff first suffered and discovered the very same condition approved in 1999

by the Fund *after* October 1, 2004, he presumably would *not* have been suspended for the same

"non-laborer or other non-building trades crafts employment" he performed in 2005 and 2006.

See attached Ex. No. 11 at #s 22-27 for  §1.31 and §3.3 as provided in 2004's Amendment No. 5

(not to be confused with 1996's Amendment No. 5 referenced at paragraph 23 above). Such an

amendment supports the very interpretation presented in this Complaint. In other  words, in 2004

the Fund goes further and allows the Participant injured while doing the work of a "laborer or in

other building trades crafts" to continue receiving his "Occupational Disability Benefit" as long as

his employment is non-laborer or other non-building trades crafts employment. That is confirmed

by §3.3(e) (3) (A) (i) & (ii). See Ex. 11 at #26.

**Plaintiff's "non-Laborer or other non-Building Trades Crafts employment" duties.**

28.   On February 25, 2008 Plaintiff sent his "'written petition addressed to the Board of

Trustees' pursuant to Plan Section 7.8(f) and its reference to Section 7.4." That petition established

that his 2005 and 2006 work duties in the "shop"/warehouse of Willman Construction qualified as

"non-Laborer . . . non-Building Trades Crafts employment" when he was quoted (in a reproduced

e-mail to his counsel dated June 19, 2007) stating:

> *Here is a list of daily duties performed for Willman Construction; Mon.-Fri. 6:45*
> *am -3:30pm.*
>
> *Upon arrival I unlock the gates to the warehouse yard. I check my phone messages*
> *for requests to order any supplies needed; I place all orders with various suppliers,*
> *and pick up the ordered materials.*
> *It is my responsibility to make sure all ordered / purchased materials are reported*
> *to the company book keeper, and the supply orders are properly recorded & filed.*
> *When I am not out picking up supplies I am at the warehouse repairing tools,*
> *taking inventory, and organizing the inventory in the shop.*

The Plaintiff offered this job description in affidavit form (Ex. 13 at # 35).  However, the Fund did

not request such an affidavit.  Approximately 4 months after the Fund's June 1, 2007 suspension

letter (Ex. 7 at #13), and after attempting to claim that the Plaintiff was performing collectively

bargained work and demanding reimbursement from Plaintiff's employer, Wellman Construction,

the Fund, through its counsel's letter of September 28, 2007, reversed itself and "accepted Local

No. 309's verification letter regarding [Plaintiff] and his employment capacity falling outside of the

collective bargaining agreement's scope of work." See Ex 12 at #s 28-31 for the letter exchange.

See attached Ex. 13 at #s 32-41 for the Plaintiff's above referenced 10-page "written petition

addressed to the Board of Trustees" dated 2/25/08.

No longer able to claim that Plaintiff was *ineligible* as a "Laborer" under §1.31, the Fund,

by the time of Plaintiff's April 21, 2008 appeal hearing before the Board, instead relied upon a §1.31

interpretation that simply determined that the "$14,000" provision did not apply to "full time"

employment despite the fact that $14,000 was $1.98 above the minimum "full time" wage in 1996

12

and despite the fact that §1.31 provides:

> For such non-Laborer or other non-Building Trades Crafts employment, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled. [*See Ex. 8 at #18 for full text of §1.31*].

**Given the Fund's ultimate admission that Plaintiff's employment status was "non-Laborer or other non-Building Trades Crafts," the plain meaning of the "$14,000" provision must be applied annually, on a month by month basis, to Plaintiff's 2005 and 2006 earnings.**

29.   The following Plan language excerpts from the first and third paragraphs of §1.31, quoted at paragraph 22 above, must be read together. Together the language establishes the necessity of an annual evaluation, on a month by month basis, of Plaintiff's earnings from "non-Laborer or other non-Building Trades Crafts employment." The relevant §1.31 language provides:

> **For such** non-Laborer or other non-Building Trades Crafts employment . . . the Participant **may earn up to** $14,000 **per calendar year** in non-Laborer or other non-Building Trade Crafts employment **and be considered totally and permanently disabled** . . .
>
> and
>
> If disability benefits were paid **for a month** for which benefits were **later determined** should not have been paid, **the overpayment** shall be recoverable through deductions from future pension payments . . . [*Emphasis added; full text §1.31 at Ex. No. 8*].

30.   Additionally, Plan Section 7.8 entitled "Suspension of Benefits" at subparagraph (e) ("Restated Plan Effective October 1, 1999") provides at Ex. 14, #s 42-45:

> 'Suspension of pension benefits' for a month **means non-entitlement to pension benefits for that month**. If pension benefits were paid for any month for which pension benefits were later determined should have been suspended, the overpayment shall be recoverable through deductions from future pension benefit payments. [*Emphasis added; See same provision effective in 1998 (Ex 15 at #48); the latter sentence identical to the sentence quoted above from the third paragraph of §1.31.*].

13

31.  The Fund, in its June 1, 2007 suspension letter (Ex. 7 at #13), simply stated in part, *without any specific reasoning or analysis*:

> The information received from Romolo and Associates **leads us to believe that you no longer meet the Fund's definition of 'total and permanent disability' as set forth in Plan Section 1.31**, a copy of which is enclosed. Accordingly, your Disability Pension will be suspended effective June 1, 2007. [*Emphasis added*].

However, the Fund's total claimed overpayment of "$48,654.89" for the 3 periods noted in the next 3 paragraphs, totally ignores the "may earn up to $14,000 per calendar year" provision for Plaintiff's "non-Laborer . . . non-Building Trades Crafts employment" thus violating the plain meaning of §1.31. Rather, **the plain meaning of §1.31 results in a total overpayment of $10,577.15** ($48,654.89 minus the erroneously claimed overpayments of $12,692.58 (2005), $14,808.01 (2006) and $10,577.15 (2007)).

32.  Plaintiff's 2005 employment was of the "non-Laborer . . . non-Building Trades Crafts" type. Furthermore, the resulting 2005 earnings of $10,550.00 did not exceed §1.31's "may earn up to $14,000 per calendar year." Accordingly, the Fund's June 1, 2007 suspension letter claiming that Plaintiff was "overpaid" "$48,654.89," must *first* be corrected to exclude the 6 month period from July '05 through December '05. That correction amounts to 6 months at $2,115.43/month or a reduction of $12,692.58. Therefore, prior to an analysis of 2006 earnings, the Fund's claimed overpayment should reflect $35,962.31 ($48,654.89 minus $12,692.58).

33.  Plaintiff's 2006 employment was also of the "non-Laborer . . . non-Building Trades Crafts" type. The resulting 2006 earnings of $22,100.00 did not exceed §1.31's "may earn up to $14,000.00 per calendar year" until mid-August of 2006. Accordingly, the Fund's June 1, 2007

suspension letter claiming that Plaintiff was "overpaid" "$48,654.89," must *next* be corrected to exclude the 7 month period from January 2006 through July 2006. That correction amounts to 7 months at $2,115.43/month or a reduction of $14,808.01. Therefore, the Fund's claimed overpayment for 2006 should only reflect $10,577.15, namely, the Disability Pension payments for the period August 2006 through December 2006 ($2,115.43 x 5). Accordingly, the overpayment following the 2006 computation analysis is further reduced to $21,154.30 ($35,962.31 minus $14,808.01).

34. The Fund's June 1, 2007 suspension letter finally includes in its claimed overpayment of $48,654.89 *(covering a total of 23 months (6 in '05, 12 in '06 and 5 in '07) or 23 mo. x $2,115.43 = $48,654.89)* the 5 months worth of Disability Pension payments for the period January 2007 through May 2007, namely $10,577.15 ($2,115.43 x 5 mo.). However, the Fund's claimed overpayment for the first 5 months of 2007 was not supported with any earnings report and is therefore premature because §1.31's "may earn up to $14,000.00 per calendar year" could not be ascertained as of June 1, 2007. Accordingly, the overpayment is finally reduced to $10,577.15 ($21,154.30 minus $10,577.15). However, if Plaintiff's non-Laborer employment for the first 5 months of 2007 exceeds $14,000, then that overpayment should also be accurately assessed in this case.

35. Accordingly, Plaintiff's suspension pursuant to the "$14,000" provision should only determine an "overpayment" on a month by month basis within a particular "calendar year" and not pursuant to an 'all or nothing' full 12 month basis. In other words, should a Participant earn $14,00**1.50** in a given "calendar year," the Fund cannot determine that the overpayment consists of 12 months worth of Disability Pension payments. §1.31 <u>does not</u> state: *"in the event Participant*

*earns more than $14,000 in any calendar year, any disability benefit payments for the entire*

*calendar year (12mo.) shall be deemed an overpayment and recoverable by the Fund."*

36.   The Fund's June 1, 2007 letter determination and interpretation of the Plan, under the guise of "discretionary powers" controverts the "plain meaning of the plan;" the Fund's decision is totally void of a reasoned explanation. That equates to a breach of its fiduciary duties and constitutes "arbitrary or capricious" action as provided in Section 6.3 (par. 6 above).   And that action resulted in the Fund's suspension of Plaintiff's Disability Pension and an incorrect calculation of an overpayment. (ERISA § 404 (a)(1)(D) , 29 U.S.C. § 1104 (a)(1)(D)). Accordingly, the Plaintiff has damages including:

**1)** the correction of the claimed "overpayment" amounting to a net benefit of $38,077.74 (the $48,654.89 claimed overpayment minus $10,577.15, the revised calculation);

**2)** the monthly benefit arrearage since the June 1, 2007 suspension at the rate of $2,115.43 / month or $44,424.03, excluding interest (21 months suspended since June 1, 2007 thru February 2009 and thereafter continuing to the date of potential judgment); and

**3)** make whole relief of floating prime rate pre-judgment interest on the arrearage.


### SECOND CAUSE OF ACTION

### THE FUND FAILED TO FOLLOW PLAN LANGUAGE IN 1999 BY *INCORRECTLY* NOTIFYING THE PLAINTIFF OF "THE PLAN RULES GOVERNING SUSPENSION." THAT FAILURE VOIDS THE FUND'S SUSPENSION AND THE FULL AMOUNT OF THE CLAIMED OVERPAYMENT OF $48,654.89.

37.   ERISA §404(a)(1)(D), 29 U.S.C. §1102 (a)(1)(D), provides at relevant part as  follows:

16

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d) [*re assets of plan*], 1342, and 1344 [*re termination of plan*] of this title, a **fiduciary shall discharge his duties** with respect to a plan solely in the interest of the participants and beneficiaries and ---

* * *

(D) **in accordance with the documents governing the plan** insofar as such documents are consistent with the provisions of this subchapter and subchapter III of this chapter. [*Emphasis added; referenced as the "plan document rule"*].

38.  ERISA §502 (a)(1)(B) and (a)(3)(B)(ii), 29 U.S.C. §1132 (a)(1)(B) and (a)(3)(B)(ii), confirms the above §404 reference with its mandate that a participant may bring a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" and "to obtain other appropriate equitable relief . . . to enforce any provision of . . . the terms of the plan."

39.  In August of 1999, an unambiguous Plan provision regarding "Notices" under the Section title "Suspension of Benefits" was provided at Section 6.7 (e) (1) and stated in relevant part:

Upon commencement of pension benefit payments, the Trustees <u>shall notify the Pensioner of the Plan rules governing suspension of pension benefits</u>, including identity of the industries and area covered by the Plan.  [*Emphasis added; See attached Ex.15 at #48 for Section 6.7(e)(1) as provided in Plan Amendment No. 7, "effective October 1, 1998."*].

40.  Given the Fund's ultimate admission (Ex. 12 at # 28) that Plaintiff's employment in 2005 and 2006 was of the "non-Laborer . . . non-Building Trades Crafts" type as provided in §1.31, the Fund's suspension and claimed overpayment is entirely void because the Fund failed in 1999 to give Plaintiff the correct written notice of the "Plan rules governing suspension" which define "Total and Permanent Disability," including the applicable "$14,000" provision.

17

41. Just days prior to the Funds August 19, 1999 letter (Ex. No 3) which determined that the Plaintiff was eligible for a Disability Pension, the Plaintiff signed a packet of Fund documents on August 16, 1999 that included a two-page "RETIREMENT DECLARATION." The Fund acknowledged receipt of that declaration on August 18, 1999. See attached Exhibit 16 at #s 51-52.

42. That "RETIREMENT DECLARATION" is the typical "Disqualifying Employment" post-October 1998 notice for a Service-Only or Regular Pension (Section 6.7 of Amendment No. 7 effective 10/1/98). That notice *did not* provide "the Plan rules governing suspension" of Plaintiff's Disability Pension nor any information unique to the Disability Pension, specifically alerting Plaintiff to a $14,000 annual limitation for "non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled." In contrast, the Fund did give Plaintiff a copy of §1.31 with its June 1, 2007 suspension letter. See attached Ex. 15 at #s 47-48 for the related provisions of Section 6.7(a) thru (e) of Amendment No. 7, effective October 1, 1998.

43. Accordingly, the Fund did controvert the plain meaning of the plan and breached its fiduciary duties when it failed to give Plaintiff the correct "Plan rules governing suspension" which are rules unique to the Disability Pension including the "$14,000" provision.

44. As alleged in paragraphs 14 through 17 above, a Social Security earnings verification for 2001 and 2002 was conducted by the Fund in June of 2004. The resulting Social Security earnings statement **disclosed earnings of $7,144.00 for 2001 and $4,037.50 for 2002 and did not result in a suspension**. Accordingly, *combining* the Fund's failure to give Plaintiff the correct notice in 1999 *along with* the lack of a suspension for those 2001 and 2002 earnings, *misled* the Plaintiff to justifiably rely upon the fact that his performance of "non-Laborer or other non-Building Trades Crafts employment" was permitted without jeopardizing any portion of his Disability

Pension. Therefore, in 2004 the Plaintiff could reasonably conclude that he had earnings as noted above and that those earnings did not interfere with his disability checks from the Fund.

45.  Additionally, in the Fund's June 1, 2007 suspension letter (Ex. No. 7 at # 13) it failed to make a critical distinction between an *initial denial* of a Disability Pension and a *suspension* of a Disability Pension. At the last paragraph of that letter is a reference to an appeal "set forth in Pension Plan Section 7.6 . . . ." However, Section 7.6 provides for "Review of Denied Disability Pension Claim," not the suspension of benefits already being paid.  As noted in paragraph 28 above, Plaintiff's February 25, 2008 "written petition addressed to the Board of Trustees" (Ex. 13 at #32-41) was an Appeal of a *suspension* of disability pension benefits "pursuant to Plan Section 7.8(f) and its reference to Section 7.4."

46.  The Fund's 1999 incorrect notice to Plaintiff of "Plan rules governing suspension" establishes that the Fund has breached its fiduciary duties by failing to "discharge [its] duties with respect to a plan . . . in accordance with the documents governing the plan and by breaching its fiduciary duties of "care, skill, prudence and diligence." (ERISA §404 (a) (1) (B) and (D), 29 U.S.C. § 1104(a) (1) (B) and (D)). Accordingly, the Plaintiff has damages including:

1) the *complete discharge* of the claimed "overpayment" amounting to a net benefit of $48,654.89;

2) the monthly benefit arrearage since the June 1, 2007 suspension at the rate of $2,115.43 / month or $44,424.03, excluding interest (21 months suspended since June 1, 2007 thru February 2009) and thereafter continuing to the date of potential judgment; and

3) make whole relief of floating prime rate pre-judgment interest on the arrearage.

47.   The same facts presented above in this Complaint were presented to the full Board on April 21, 2008. See Ex.13 at #s 32-41 for the 10-page "written petition addressed to the Board of Trustees" dated February 25, 2008. On April 25, 2008, the Board, through its counsel, issued its appeal denial letter, which included issues not raised in the Fund's June 1, 2007 suspension letter. See Ex. 17 at   #s 53-59.

WHEREFORE, the Plaintiff, Donald J. Tompkins, prays that this Court enter judgment in his favor and against defendant, Central Laborers' Pension Fund and requests the following relief:

(a)   per the first cause of action:   that the Court declare the Fund's suspension of Plaintiff's Disability Pension did controvert the plain meaning of the Plan and correspondingly determine the correct 2006 overpayment to be $10,577.15 which is to be repaid by the Plaintiff from future monthly benefit payments pursuant to the Plan and order the Fund to immediately reinstate Plaintiff's Disability Pension, pay the benefit arrearage since June 1, 2007 and continue to pay Plaintiff the Disability Pension benefit each month thereafter according to the terms of the Plan;

or alternatively

(b)   per the second cause of action: that the Court declare the Fund's suspension of Plaintiff's Disability Pension to be void on account of the Fund's breach of it fiduciary duties by giving Plaintiff an erroneous notice which did controvert the plain meaning of the Plan and declare totally void the Fund's determination of an overpayment and order the Fund to immediately reinstate Plaintiff's Disability Pension, pay the benefit arrearage since June 1, 2007 and continue to pay Plaintiff the Disability Pension benefit each month thereafter according to the terms of the Plan;

(c)   that the Court enter judgment for Plaintiff and against the Fund for the amount of arrearage plus floating prime rate pre-judgment interest from June 1, 2007 through the date of payment and any applicable post judgment interest;

(d)   that the Court award Plaintiff discretionary attorney's fees and costs under Section 502 (g) of ERISA  (29 U.S.C.§1132(g)).

(e)  that the Court award Plaintiff such further relief as this Court deems just and equitable.

Respectfully Submitted,

BY:  _____

Gery R. Gasick, Attorney for Plaintiff
Donald J. Tompkins

GERY R. GASICK
Attorney at Law
411 Hamilton Blvd., Suite 1600
Peoria, IL 61602
IL Bar # 0922021
Telephone: (309) 674-0202
Fax: (309) 674-7303
e-mail: atty.g.gasick@comcast.net

21