UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DONALD J. TOMPKINS | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO.  09-cv-4004 |
| | ) | |
| | ) | |
| CENTRAL LABORERS' | ) | |
| PENSION FUND | ) | |
| Defendant. | ) | |

**Plaintiff's Motion for Summary Judgment on the issue of liability only and
concerning only Counts I and II,
(Fed. R. Civ. P. 56 & CDIL Local Rule 7.1 (D))**

The Plaintiff, Donald J. Tompkins, respectfully moves for Summary Judgment on the

issue of liability only and concerning only Counts 1 and 2 (excluding Count 3) pursuant to

Fed. R. Civ. P. 56, CDIL Local Rule 7.1 (D) and the 11/30/2010 Text Order resetting

2/1/2011 as the deadline for dispositive motions. In support Plaintiff states:

## I. Introduction

(Summary of the legal and factual basis and the exact relief sought)

### A. Procedural Note

Plaintiff limits this motion to the issues of liability only for the pragmatic reason that in

the event Plaintiff prevails in his ERISA claims on either Count 1 or 2, the parties themselves

can likely resolve any mathematical computations associated with liability. Additionally, in

this Introduction, Plaintiff will pragmatically lead with a summary of Count 2. The reason

being, should Plaintiff's argument on Count 2 prevail, Count 1 would be rendered moot along

with the Fund's Counterclaim. Additionally, Count 3 is not the subject of this motion. Count 3

seeks injunctive relief under ERISA in the event specific Plan provisions (unrelated to Counts

1 and 2) are found to work a forfeiture of Plan benefits and/or violate the anti-cutback rule under ERISA.

## B. Factual and Legal Basis

The Plaintiff, currently age 54, began working as a laborer in Laborers' Local 309, Rock Island, Illinois, in November of 1978. As a result of such employment, Plaintiff was a Participant in Central Laborers' Pension Fund (Fund or CLPF).

In July of 1999, Plaintiff filed his application for a "Disability Pension" with the Fund. That process (Doc. 1, ¶11, Attach#2, Bates #s1-4) included his completed disability form ("Employee's Statement") and the "Statement of the Attending Physician" documenting Plaintiff's "Chronic Asthmatic Bronchitis. The Physician statement also documented "Degree of Disability" with a form question regarding Plaintiff's ability to do any regular work "as a Laborer." The response was "Never – not in construction field (dusty environment)." In his Employee's Statement, Plaintiff attributed his disability to working with "cement dust" for 22 years.

In August of 1999, the Fund determined that Plaintiff was eligible for a "Disability Pension" paying a benefit of $2,115.43/mo but did not, "upon commencement of pension benefit payments," notify Plaintiff of "the Plan rules governing suspension" of his "Disability Pension" benefits.

Thereafter, Plaintiff engaged in "non-Laborer or other non-Building Trades Crafts employment" (non-Laborer) which resulted in 2001 earnings of $7,144.00 and 2002 earnings of $4,037.50 for which his "Disability Pension" *was not* suspended.

Plaintiff further engaged in non-Laborer employment which resulted in 2005 earnings of $10,550.00 and 2006 earnings of $22,100.00 for which his "Disability Pension" *was*

"suspended" pursuant to a suspension letter the Fund sent to Plaintiff dated June 1, 2007. At

that time the Fund found that Plaintiff had engaged in "full-time" employment without regard

to Plan §1.31's "*may earn up to $14,000 per calendar year in non-Laborer*" full time

employment (the "$14,000" provision) and still "*be considered totally and permanently*

*disabled.*" The Fund's suspension letter dated June 1, 2007 provided in part:

> A copy of Romolo and Associates' "Contractor Inquiry" is enclosed which indicates that you received compensation for *full-time* employment from Willman Construction during calendar years 2005 and 2006.
>
> The information received from Romolo and Associates leads us to believe that you no longer meet the Fund's definition of "total and permanent disability" as set forth in Plan Section 1.31, a copy of which is enclosed. Accordingly, your *Disability Pension* will be *suspended* effective June 1, 2007. The Disability Pension payments of $1,955.43/month and Temporary Supplemental Benefit payments of $160.00/month that you received for the period July, 2005 through May, 2007, totaling $48,654.89, are considered to be *overpaid and subject to the Fund's recovery process. This overpayment will be recovered through deductions from future benefit payments* in an amount not to exceed 25% of the monthly pension amount (before deductions), except that the Fund may withhold up to 100% of the first monthly pension payment after you meet the Fund's age requirement and become eligible to receive another type of pension payment from the Fund.
>    *  *  *
> You are entitled to appeal *the suspension of your Disability Pension* pursuant to.... [Emphasis added in italics; full text attached here at Exhibit 1].

The Fund's claimed overpayment "totaling $48,654.89" is the subject of the Fund's

Counterclaim seeking a judgment, interest and attorney fees, all of which are inconsistent with

the Plan's "recovery process" noted above in the Fund's suspension letter dated June 1, 2007.

As simply a prior reference, Counts 1 and 2 were before this Court on a procedural issue

under Rule 10(b) regarding the Complaint's format. On June 1, 2009, Magistrate Judge

Cudmore issued an R&R recommending that the Fund's Motion to Dismiss be denied (Doc.

12). On November 16, 2009, this Court adopted the R&R and denied the Fund's motion (Doc.

16). Should this Court find it a convenient reference, there at footnote 2, page 2, this Court

noted the "crux of this lawsuit" "[i]n simplified form."  A more detailed summary is necessary at this stage.

### Count 2 / Fund failed to follow ERISA's "plan document rule" by not notifying Plaintiff in August, 1999 of "the Plan rules governing suspension" of his "Disability Pension" benefits.

At ¶¶ 41 and 42 of Count 2, Plaintiff alleged that *at the time the Fund approved Plaintiff's application for a Disability Pension in August of 1999*, the Fund did not notify Plaintiff of "the Plan rules governing suspension" of his "Disability Pension" benefits. In August of 1999, the Plan's following provision regarding "Notices," under the section entitled "Suspension of Benefits," was provided, in part, at §6.7 (e) (1):

> Notices.
> Upon commencement of pension benefit payments, the Trustees shall notify the Pensioner of the Plan rules governing suspension of pension benefits, including identity of the industries and area covered by the Plan.

In the Fund's Answer to ¶42 of the First Amended Complaint (Complaint), it responded in part with an admission "that it did not provide a notice regarding suspension of disability benefits . . . ." (Doc. 20, p.10). Furthermore, at ¶15 of its Response (Doc. 34, p. 11) to Plaintiff's Motion (Doc. 31) to Determine the Sufficiency of an Answer or Objection Pursuant to Rule 36(a)(6), the Fund responded in part:

> However, notwithstanding such error [Fund erroneously stating the "$14,000" provision had not yet been made a part of the Plan in August, 1999], the essential fact of Plaintiff's Request To Admit was directly and expressly answered by the Fund:  the Fund admitted that the Fund did not give Plaintiff documents containing the $14,000 provision in August, 1999.

At ¶22 of the First Amended Complaint, Plaintiff characterized the relevant portion of Plan §1.31 as the "$14,000" provision which is more fully quoted in the summary of Count 1 below. In short the "$14,000" provision provides that "the Participant may earn up to $14,000 per calendar year in non-Laborer" full time employment and still "*be considered totally and*

4

*permanently disabled*." Along with the admissions noted above, the Fund has made

distinctions inconsistent with Plan language applicable to the time period (pre-August, 1999)

in which Plaintiff earned his accrued benefits (Pension Credits).

### Count 1 /  The Fund "controverts the plain meaning" of Plan §1.31's "$14,000" provision by failing to apply it to Plaintiff's *full-time* employment as a "non-Laborer."

At Count 1, Plaintiff alleges that the Fund's "suspension" of Plaintiff's "Disability

Pension" pursuant to the Fund's letter to Plaintiff dated June 1, 2007 (Ex. 1), controverts the

plain meaning of Plan §1.31 by failing to apply the "$14,000" provision to Plaintiff's *full-time*

employment as a "non-Laborer." Given those allegations, Count 1 presents a question of law.

Plaintiff will refer to Plan §1.31 because it is relied upon in the Fund's "suspension" letter

dated June 1, 2007.

Plan §1.31 defines "Total and Permanent Disability" including the "$14,000"

provision (in italics below) in relevant part as follows:

> A "Total and Permanent Disability" shall mean that, in the opinion of a licensed medical practitioner selected or approved by the Trustees, the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, *or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled.*[Emphasis in italics added and referenced as the "$14,000" provision].

First, the *plain meaning* of the opening three words to the sentence containing the

"$14,000" provision noted above, namely, "[f]or such non-Laborer" employment, the word

"such" is customarily defined as "of the kind mentioned." The kind mentioned is "full-time"

non-Laborer employment.

5

If necessary, further support for the plain meaning of the Plan language noted above is found in the documents that were produced, pursuant to subpoena, by the Fund's actuary, The Segal Co., on March 31, 2010. Those documents *include* a May, 2005 "DRAFT" Amendment No. 5 to the 1999 Restated Plan evidencing that the Fund considered the need to add language to §1.31 so that the "$14,000" provision was applicable to "employment that is not considered full-time" non-Laborer employment. The Fund's consideration of the May, 2005 "DRAFT" Amendment No. 5 took place 8 years after the "$14,000" provision was initially adopted into the Plan. As noted more fully in Plaintiff's Argument below, the May, 2005 "DRAFT" Amendment No. 5 was not adopted. Instead the Plans Disability Pension was bifurcated and restructured in November 2005, rendering the May, 2005 "DRAFT" Amendment No. 5 moot.

That 2005 "DRAFT" Amendment was never acknowledged or revealed to Plaintiff during Plaintiff's April 21, 2008 Appeal hearing before the Fund's full Board of Trustees (an ERISA fiduciary). Rather the Fund, through its then Executive Director, Barry McAnarney, continued to insist that the "$14,000" provision was irrelevant and did not apply to Plaintiff's *full-time* non-Laborer employment in 2005 & 2006. That April 21, 2008 Appeal hearing before the Fund's full Board of Trustees, included the presence of  two Fund attorneys, including lead counsel here, who were copied on the May 2005, 12:04 PM e-mail from the Fund's actuary, The Segal Co., concerning the attached "DRAFT" Amendment No. 5 to the Plan. That "DRAFT" Amendment No. 5 evidences that the Fund itself interpreted the plain meaning of the "$14,000" provision just as Plaintiff does here, namely, it applies to "full time" non-Laborer employment.

**The legal basis for Plaintiff's motion rests upon one or more of the following:**

**1)** Although the standard of review in this case c*ommences* with deference to the Board's

6

actions, three distinct limitations of deference apply, namely:

**a)** The Fund cannot "controvert the plain meaning of" the Plan's unambiguous "$14,000" provision;

**b)** The Fund's bad faith in failing to reveal or acknowledge the May 2005 "DRAFT" Amendment No. 5 strips the Fund of deference; and

**c)** The Fund has a conflict of interest which must be weighed – the Fund's Board of Trustees "both evaluated claims" (here a "suspension" of a "Disability Pension") and at the same time was concerned with its asset value which in 2004 was "$223.9 million less than what it would have been had the return been 8% since October 1, 2000."

**2)** Furthermore the Fund violated ERISA's "plan document rule" when it failed to notify Plaintiff of "the Plan rules governing suspension" of his Disability Pension benefits in August of 1999.

**3)** The often successive Plan provisions are subject to ERISA's anti-cutback rule, namely, an amendment to a pension plan placing materially greater restrictions on the receipt of the benefit cannot apply to pension benefits which have already *accrued.*

### C. Exact Relief Sought in Count 2 and 1 Respectively

Count 2 relief consists of:

**1)** The complete discharge of the Fund's claimed "overpayment" of $48,654.89;

**2)** The monthly benefit arrearage since the Fund's June 1, 2007 suspension at the rate of $2,115.43 / month and continued like payments each month to Plaintiff according to the terms of the Plan;

7

**3)** Make whole relief of floating prime rate pre-judgment interest on the arrearage;

**4)** Discretionary attorney's fees and costs under ERISA.

Count 1 relief consists of:

**1)** A finding and declaration that Plan Section 1.31's "$14,000 per calendar year" provision, quoted above, applies to Plaintiff's "non-Laborer" employment that is "full-time and a primary source of income."

**2)** A finding and declaration that the Fund's 6/1/2007 "suspension" letter, applying language of Plan §1.31, requires that any potential overpayment is "subject to the Fund's recovery process," defined as follows: "overpayment will be recovered through deductions from future benefit payments in an amount not to exceed 25% of the monthly pension amount (before deductions), except that the Fund may withhold up to 100% of the first monthly pension payment after you meet the Fund's age requirement and become eligible to receive another type of pension payment from the Fund."

**3)** The monthly benefit arrearage since the Fund's June 1, 2007 suspension at the rate of $2,115.43 / month and continued like payments each month to Plaintiff until such time as the Fund gives Plaintiff the correct notice of "the Plan rules governing suspension" of his Disability Pension benefits;

**4)** The make whole relief of floating prime rate pre-judgment interest on the arrearage; and

**5)** Discretionary attorney's fees and costs under ERISA

### D.  Argument Table of Contents & Authorities

III. Argument

#### A.  Standard of Review

Swaback v. American Information Technologies Corp., 103 F.3d 535, 540
(7th Cir.1996)                                                                  page *16*

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).                 *16*

#### B. Deference is not a "rubber stamp;" the Fund cannot "controvert the plain meaning of a plan."

Marrs v Motorola, Inc., 577 F.3d 783, 786 (7th Cir. 2009)                       *16-17*

#### C. Nor does deference wholly ignore the Fund's bad faith.

Conkright v. Frommert, 130 S. Ct. 1640, 1651 (U.S. No. 08-810, 4/21/2010)       *17*

#### D.  Applying the above two limitations of deference to Count 1:     *17-22*

1. The Fund controverts the plain meaning of Plan §1.31 by failing to apply the "$14,000" provision to Plaintiff's "full-time" employment as a "non-Laborer;" and
2. That plain meaning is supported by the Fund's bad faith in failing to reveal or acknowledge the May 2005 "DRAFT Amendment No. 5, during Plaintiff's April, 2008 Administrative Appeal.

#### E. A third limitation of deference is the Fund's conflict of interest – the Fund's Board of Trustees "both evaluated claims" (here a "suspension" of a "Disability Pension") and at the same time was "concerned about the cost of its retirement plan."

Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 111, 112 & 115 (2008)    p. *22*

Marrs v Motorola, Inc., 577 F.3d 783, 788 (7th Cir. 2009)                        *23*

Bandak v. Eli Lilly and Company Retirement Plan, 587 F.3d 798, 802 (7th Cir. 2009)  *23*

**F.  Count 2 and ERISA's "plan document rule" – the Fund failed to follow the Plan's notice provision in August of 1999.**

Kennedy v. Plan Administrator for DuPont Savings and Invest. Plan,                *pp. 25-26*
129 S. Ct. 865, 875, 877, (07-636, Jan. 26, 2009)

29 U.S.C. §1104(a)(1)(D) (ERISA §404(a)(1)(D))                                    *26*

Trustees of So. Ill. Carp. Welfare Fund v. RFMS, 401 F.3d 847, 850 (7th Cir. 2005)   *28*

Bowerman v. Wal-mart Stores, 226 F.3d 574, 590 (7th Cir. 2000)                    *28*

29 U.S.C. §1022(a) & (b)

**G.  A "suspension" of a "Disability Pension" not a "cessation" of "disability benefits" and the effect of the Heinz case.**

                                                                                 *29*

Central Laborers' Pension Fund v.  Heinz, 541 U.S. 739 (2004)                    *30-31*

Schneider v. Sentry Group Long Term Disability Plan, 422 F.3d 621, 629-30 (2005)   *32*

## II. Undisputed Material Facts

**1.** In July of 1999, Plaintiff filed his application for a "Disability Pension" with the Fund which included the "Statement of the Attending Physician" documenting his "Chronic Asthmatic Bronchitis" and an "Employee's Statement" which attributed Plaintiff's Disability to working with "cement dust" for 22 years. (Comp. Doc. 1, Attach 2, #s 1-4, 1st Amend Comp. Doc. 19, ¶11; Answer Doc. 20, ¶11).

**2.** On August 19, 1999 the Fund sent a letter to Plaintiff approving a Disability Pension retroactive to January 1, 1999 and determining that Plaintiff's monthly benefit was $2,115.43 ($1,955.43 + $160.00 Supplemental Pension).  (Comp. Doc. 1, Attach 2, #7, 1st Amend Comp. Doc. 19, ¶13; Answer Doc. 20, ¶13; further noting that the Fund previously admitted "the genuineness" of "Exhibits 1 thru 17 (*Bates stamp numbers 1 thru 59*) of the Complaint filed 2/12/2009 and incorporated by reference in the First Amended Complaint filed 12/21/2009."). See ¶ 1(O) of Plaintiff's Request for Admissions and the Fund's Response at Exhibit 6.

**3.** Plaintiff received his "Disability Pension" of $2,115.43 per month thru May of 2007 and in June of 2007 Plaintiff received a letter from the Fund dated June 1, 2007, along with stated attachments, including statements of full time employment reflecting 2005 gross earnings of $10,550.00, for approximately 25 weeks (July 8 – Dec. 30) and 2006 gross earnings of $22,100.00 for 52 weeks. (Comp. Doc. 1, Attach 2, #s 13-18, 1st Amend Comp. Doc. 19, ¶19; Answer Doc. 20, ¶19). The Fund's letter dated June 1, 2007 is attached to this Motion for Summary Judgment as Exhibits 1 for convenience.

**4.**  In the Restated Plan "Effective October 1, 1999," ('99 Plan) (adopted September 9, 2002)

the definition of "Total and Permanent Disability" was provided at §1.31, a copy of which

was referenced in and enclosed with the Fund's letter to Plaintiff dated June 1, 2007. (Comp.

Doc. 1, Attach 2, #s 13-18, 1st Amend Comp. Doc. 19, ¶22; Answer Doc. 22, ¶22). Said §1.31

is attached to this motion as Exhibit 2 for convenience.

**5.** The Fund received (but did not prepare) the following:

   a)  the May 21, 2007 internal memo from the Fund's actuary, The Segal Company's

   David Dean, Benefits Consultant;

   b)  the May 22, 1997 letter from The Segal Company's David Dean, to attorney

   William K. Cavanagh, Jr. of  Cavanagh and O'Hara; and

   c)  the May 24, 2005, 12:04 PM e-mail from David Dean to identified recipients,

   including  Bill Cavanagh and Patrick O'Hara, concerning the attached "DRAFT"

   Amendment No. 5 to the Pension Plan of the Central Laborers' Pension Fund.

   Said documents are attached to this motion as Exhibits 3 for convenience.

**6.**  In the 1999 Restated Plan, the definition of "Total and Permanent Disability" ("[f]or

purposes of §3.3(a) ("Disability Pension")) was amended with a §1.31(a) in Amendment No.

5 (adopted November 28, 2005) *without* any reference to "Participant may earn up to $14,000

per calendar year in non-Laborer or other non-Building Trades Crafts employment and be

considered totally and permanently disabled."  (Comp. Doc. 1, Attach 2, #s 22-24, 1st Amend

Comp. Doc. 19, ¶27; Answer Doc. 20, ¶27). Said §1.31(a) & (b)) are attached to this motion

as Exhibit 4 for convenience.

**7.**  In the 1999 Restated Plan, at Amendment No. 5 (adopted November 28, 2005), §§1.31(b) and §3.3 (b) of said Amendment No. 5 established a new and *additional* category of disability benefits entitled "Occupational Disability Benefit," with its own eligibility requirements, as stated therein, which *do not* include any dollar limitation or prohibition for non-laborer or other non-building trades crafts employment as long as the Participant "has suffered an Occupational Disability . . . on or after October 1, 2004 while working as a laborer or in other building trades crafts . . . ." (Comp. Doc. 1, Attach 2, #s 22-27, 1st Amend Comp. Doc. 19, ¶27; Answer Doc. 20, ¶27). Said §1.31(b) and §3.3 (b) are attached to this motion as Exhibit 4 for convenience.

**8.**  In 2005 and 2006 the Plaintiff was engaged in "non-Laborer or other non-Building Trades Crafts employment," since the Fund "determined that no fringe benefit contributions would be sought from Plaintiff's employer . . . inasmuch as said work, as represented to the Fund, was accepted as work which was not 'covered work' under the Laborers' Local #309 collective bargaining agreement . . . ." (Comp. Doc. 1, Attach 2, #s 28-31, 1st Amend Comp. Doc. 19, ¶28; Answer Doc. 20, ¶28). Said documents are attached to this motion as Exhibit 5 for convenience.

**9.**  The Fund has admitted the genuineness of documents 1 (H) thru (M) of Plaintiff's Request for Admissions "to the extent that it is a genuine copy of an e-mail received (but not prepared) by the Fund."  See ¶¶ 1(H) thru (M) of Plaintiff's Request for Admissions and the Fund's Response at Exhibit 6. The referenced documents are attached hereto as Exhibit 7.

**10.**  The Fund has admitted the genuineness of the August 17, 2004 e-mail and all of its attached power point pages from The Segal Company's Debbie Bojchuk, Staff Assistant to David Dean, to Fund's then Exec. Dir. Barry McAnarney and the Fund's Sharon West, "to the extent that it is a genuine copy of an e-mail received (but not prepared) by the Fund."  See ¶ 1(D) of Plaintiff's Request for Admissions and the Fund's Response attached hereto as Exhibit 6. The referenced documents are attached as Exhibit 8.

**11.**  The Fund has admitted the genuineness of a January 28, 2010 letter from the Fund's Board of Trustees to Participants, Beneficiaries etc. and its attached "Annual Funding Notice for the 2008 Plan Year…" and "posted to its website (www.central-laborers.com) under the link to "Departments/Pensions/ CLPF Annual Funding Notice for 2008-2009." See ¶ 1 (N) of Plaintiff's Request for Admissions and the Fund's Response attached hereto as Exhibit 6. The referenced documents are attached as Exhibit 9.

**12.**  In August of 1999, the Plan's following relevant part of a provision regarding "Notices," under the section entitled "Suspension of Benefits," was provided at Section 6.7 (e) (1) of Amendment No. 7 (adopted 11/10/98) of the 1994 Restated Plan:

> Notices.
> Upon commencement of pension benefit payments, the Trustees shall notify the Pensioner of the Plan rules governing suspension of pension benefits, including identity of the industries and area covered by the Plan.

(Comp. Doc. 1, Attach 2, #s 46-50 (at 48), 1st Amend Comp. Doc. 19, ¶39; Answer Doc. 20, ¶39). Said documents are attached to this motion as Exhibit 10 for convenience.

**13.**  A Fund form, entitled "Retirement Declaration" (signed by Plaintiff on August 16, 1999 & stamped Received "Aug 18 1999") "refers to '[D]isqualifying [E]mployment' for non-disability retirement and is not applicable to the Pension Fund's disability benefit requirements." (Comp. Doc. 1, Attach 2, #s 51-52, 1st Amend Comp. Doc. 19, ¶¶41-42; Answer Doc. 20, ¶¶41-42). Said "Retirement Declaration" is attached to this motion as Exhibit 11 for convenience.

**14.**  The "Fund did not give Plaintiff documents containing the $14,000 provision in August, 1999." (Fund's Response at Doc. 34, p. 11, ¶15 to Plaintiff's Rule 36(a)(6) Motion at Doc. 31, p. 13).

## III. Argument

### A.  Standard of Review

In <u>Swaback v. American Information Technologies Corp</u>., 103 F.3d 535, 540 (7th Cir.1996), the court noted the customary basis for summary judgment as follows:

> Summary judgment is proper only when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' *Cox v. Acme Health Servs*., 55 F.3d 1304, 1308 (7th Cir.1995) (quoting Fed.R.Civ.P. 56(c) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986)). A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

But the standard of review in this ERISA case is subject to the following distinction:

> Principles of trust law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).

And in this case the Plan *does* provide to the contrary. The Parties agree that the Fund's Board of Trustees ("Board") is a "fiduciary" under ERISA. Pursuant to Section 6.3 of the "Restated Plan Effective October 1, 1994," ('94 Plan) the Fund has discretion to interpret and apply the Pension Plan (Doc. 19, ¶6 & Answer Doc. 20, ¶¶6 & 8, p.2). Accordingly, the standard of review in this case c*ommences* with deference to the Board's actions. However, the Fund's Answer, at the pages noted above, does not recognize that deference has limitations. Accordingly, the application of three distinct limitations of deference must first be addressed.

### B. Deference is not a "rubber stamp;"
### the Fund cannot "controvert the plain meaning of a plan."

In <u>Marrs v Motorola, Inc</u>., 577 F.3d 783, 786 (7th Cir. 2009), the 7th Circuit put deference in the context of the plan language itself:

> But when an ERISA plan gives the plan administrator discretion to interpret its terms as well as to determine eligibility for benefits under terms *the meaning of which is not questioned*, the court can, as the parties to this case agree, reject the administrator's interpretation only if it is unreasonable ("arbitrary and capricious"). *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); [Emphasis added; citation omitted].

> \* \* \*

> The administrator is not by virtue of such a grant of authority free to disregard unambiguous language in the plan, id. [475 F.3d 816] at 822-23; *Swaback v. American Information Technologies Corp*., 103 F.3d 535, 540 (7th Cir.1996) ("if fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious")—that would be unreasonable.

Looking closer at what <u>Swaback</u>, at pp. 540-541, provided:

> Although we review the committees' actions in a deferential light, we shall not rubber stamp their decisions. See *Donato v. Metro. Life Ins. Co*., 19 F.3d 375, 380 (7th Cir.1994).

> \* \* \*

> In addition, we note that, because the case was brought pursuant to ERISA, federal common law principles of contract interpretation govern. [10] These principles require us to interpret terms of ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience. [11] 'Extrinsic evidence should not be used where the contract is unambiguous.' [Citations omitted].

### C. Nor does deference wholly ignore the Fund's bad faith.

In 2010, the Supreme Court, in <u>Conkright v. Frommert</u>, 130 S. Ct. 1640, 1651 (U.S. No. 08-810, 4/21/2010), noted another limitation of deference:

> Under trust law, a trustee may be stripped of deference when he does not exercise his discretion "honestly and fairly." 3 *Scott and Ascher* 1348.

### D.  Applying the above two limitations of deference to Count 1:

**1. The Fund controverts the plain meaning of Plan §1.31 by failing to apply the "$14,000" provision to Plaintiff's "full-time" employment as a "non-Laborer;" and**
**2. That plain meaning is supported by the Fund's bad faith in failing to reveal or acknowledge the May 2005 "DRAFT Amendment No. 5, during Plaintiff's April, 2008 Administrative Appeal.**

At Count 1, Plaintiff alleges that the Fund's "suspension" of Plaintiff's "Disability Pension," pursuant to the Fund's letter to Plaintiff dated June 1, 2007 (Ex. 1), "controverts the plain meaning" of Plan §1.31 by failing to apply the "$14,000" provision to Plaintiff's *full-time* employment as a "non-Laborer." See Exhibit 5  establishing Plaintiff's "non-Laborer" employment in 2005 & 2006. See also Doc. 19, ¶28 & Doc. 20, ¶28. Given the plain meaning allegations, Count 1 presents a question of law. Plaintiff will refer to Plan §1.31 of the 1999 Restated Plan (adopted 9/9/2002) because it is relied upon in the Fund's suspension letter dated June 1, 2007 (Exhibit 1).

Plan §1.31 defines "Total and Permanent Disability" including the "$14,000" provision (in italics below) in relevant part as follows:

> A "Total and Permanent Disability" shall mean that, in the opinion of a licensed medical practitioner selected or approved by the Trustees, the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, *or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled.*[Emphasis in italics added and referenced as the "$14,000" provision; full text at Ex. 2].

First, the *plain meaning* of the opening three words to the sentence containing the "$14,000" provision noted above, namely, "[f]or such non-Laborer" employment, must focus on the word "such" which is customarily defined as "of the kind mentioned." The kind mentioned is "full-time" non-Laborer employment. *Webster's New World Dictionary* (3rd College Edition, p. 1337; see also *Black's Law Dictionary*  (9th ed., p. 1570). And in the event it is determined that Plaintiff "*may earn up to $14,000 per calendar year in non-Laborer*"

"full time" "employment," he is still "*considered totally and permanently disabled.*"

*If necessary*, further support for the plain meaning of the Plan language noted above, as well as the Fund's bad faith related to the May 2005 "DRAFT" Amendment No. 5, is found in the documents that were produced, pursuant to subpoena, by the Fund's actuary, The Segal Co., on March 31, 2010. The first two documents, identified at (A) & (B) below, reference the first incorporation of the "$14,000" provision into the Pension Plan by an amendment adopted May 19, 1997 but provided as "effective October 1, 1996." (Comp. at Doc. 19, ¶23 & Answer at Doc. 20, ¶23). The third document, (F), sent 8 years later, evidences the Fund's consideration of a change to the language of Plan §1.31's "$14,000" provision in a way that would have supported the Fund's interpretation in this case, namely that the "$14,000" provision only applies to part-time non-Laborer employment. That May, 2005 "DRAFT" Amendment No. 5 (Exhibit 3) was not adopted by the Fund's Board. Instead, the Disability Pension was bifurcated and significantly restructured by way of Amendment No. 5 to the 1999 Restated Plan adopted in November of 2005. That restructure was accomplished *without* a provision prohibiting a Participant, who suffered an "Occupational Disability" "while working as a laborer" after "10/1/2004," from working as a non-laborer, *regardless of the amount*. More specifically, Fund Amendment No. 5 to the 1999 Restated Plan "established a new category of disability benefit entitled 'Occupational Disability Benefit'. . ." in a revised §1.31(a) & (b). See Fund's Response (at Exhibit 6, ¶2(B)(v) at p. 4) to Plaintiff's Request for Admissions and Exhibit 4 for §1.31(a) & (b). The November, 2005 version of §1.31 is further discussed with regard to Count 2 at Argument sections F & G below.

More specifically regarding the "$14,000" provision, the following quote was selected and 'pasted' from Plaintiff's August 20, 2010 Request for Admissions under Rule 36 (Exhibit 6).

The Fund's Response (also at Exhibit 6) "admits the genuineness" of each of the documents identified at 1(A), (B) and (F) below "to the extent that it is a genuine copy" of the respective document "received (but not prepared) by the Fund." Said 1(A), (B) and (F) are as follows:

> **1. (A)**  The May 21, 1997 internal memo from The Segal Company's David Dean, Benefits Consultant, stating that he attended the May 19, 1997 Executive Committee meeting of the Central Laborers' Fringe Benefit Funds and further stating, in part, at paragraph number one, that:

> The Trustees discussed the definition of totally and permanently disabled in terms of the Pension Plan. * * * I feel that the general consensus is that the current definition is too restrictive, even with the change that allows a participant to work in non-construction employment and earn up to $14,000 per year.

> **(B)**  The May 22, 1997 letter from The Segal Company's David Dean, to attorney William K. Cavanagh, Jr. of Cavanagh and O'Hara, stating in part:

> Enclosed is a "clean copy" of Amendment No. 5 to the Pension Plan of the Central Laborers' Pension Fund. This amendment makes the following changes to the Pension Plan:

> 1. Changes the definition of total and permanent disability such that a disabled participant can earn up to $14,000 per year in non-construction type of work and continue to be eligible to receive disability benefits from the Pension Plan.

> [*8 years later*]

> **(F)**  The May 24, 2005, 12:04 PM e-mail from David Dean to identified recipients, including [attorneys] Jeff Wilday and Bill Cavanagh [and Patrick O'Hara], concerning the attached "DRAFT" . . . Amendment No. 5 to the Pension Plan of the Central Laborers' Pension Fund.
> [Documents referenced above at Exhibit 3].

The May, 2005 "DRAFT" Amendment No. 5 to the 1999 Restated Plan (not to be confused with a 1997 Amendment No. 5 to the 1994 Restated Plan at Doc. 19, ¶23) reads in pertinent part as follows, with the proposed amended language bolded for convenience:

> . . . or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment **that is not considered full-time**

> **and a primary source of income**, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled. [Bolded emphasis added; see attached Exhibit 3].

As noted above, the referenced May, 2005 "DRAFT" Amendment No. 5 was never adopted by the Fund's Board. Instead, the Disability Pension was bifurcated and significantly restructured in November of 2005 (Exhibit 4). Accordingly, the above bolded language of the proposed "DRAFT" Amendment No 5 was rendered moot but none the less supports the Plaintiff's plain meaning of the "$14,000" provision, namely, it applies to "full time" non-Laborer employment. Once satisfied and applied, a Participant still is "*considered totally and permanently disabled*" pursuant to §1.31.

Furthermore, that 2005 "DRAFT" Amendment No. 5 was never acknowledged or revealed to Plaintiff during Plaintiff's April 21, 2008 Appeal hearing before the Fund's full Board of Trustees (an ERISA *fiduciary*). Rather the Fund, through its then Executive Director, Barry McAnarney, repeatedly insisted during the hearing that the "$14,000" provision was irrelevant and did not apply to Plaintiff's *full-time* employment in 2005 & 2006. The Fund's April 25, 2008 decision letter to Plaintiff's counsel is consistent. (Comp. Doc. 1, Attach 2, Bates #s 53-59, at 55).  That April 21, 2008 Appeal hearing included the presence of two Fund attorneys, including lead counsel here. They were both copied on the May 24, 2005, 12:04 PM e-mail (Exhibit 3) from the Fund's actuary, The Segal Co., concerning the attached "DRAFT" Amendment No. 5 noted above in Plaintiff's paragraph 1(F) reference. See Plaintiff's August 20, 2010 Request for Admissions at Exhibit 6.

Whether the May, 2005 "DRAFT" Amendment No. 5 was intentionally ignored or simply overlooked at the April 21, 2008 Appeal hearing, it remains as support, if necessary, for the plain meaning of the "$14,000" provision and its application to Plaintiff's *full-time* non-

laborer employment in 2005 & 2006. It is also noteworthy that the "$14,000" amount was

"adopted" on May 19, 1997 shortly after "the Federal Minimum Hourly Wage was increased

on October 1, 1996 to $4.75." Accordingly, said "$14,000" Plan provision "was $4,120.00 /

year greater than "full-time" employment at the minimum wage (52wks x 40hrs = 2,080 hrs x

$4.75 = $9,880.00/yr). That is not consistent with part-time employment as a non-Laborer.

See Doc. 19 ¶¶24 & 25. The May, 2005 "DRAFT" Amendment No. 5 also supports Plaintiff's

allegations (Doc. 19, ¶¶ 29-35) that the Fund, in finding the "$14,000" irrelevant to full time

non-Laborer employment, also erroneously calculated an overpayment "totaling $48,654.89."

### E. A third limitation of deference is the Fund's conflict of interest – the Fund's Board of Trustees "both evaluated claims" (here a "suspension" of a "Disability Pension") and at the same time was "concerned about the cost of its retirement plan."

In the event the first two limitations of deference, noted above, fail to get beyond

deference and reach *de novo* review, the Fund's conflict of interest must be addressed. That

conflict arises when the Fund's Board "both evaluated claims" (here a "suspension" of a

"Disability Pension") and at the same time was "concerned about the cost of its retirement

plan." In 2008, the Supreme Court, in <u>Metropolitan Life Insurance Co. v. Glenn</u>, 554 U.S.

105, 111, 112 & 115 (2008), noted:

> (4) If 'a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest,* that conflict must be *weighed as a `factor* in determining whether there is an abuse of discretion.' *Firestone, supra,* at 115 (quoting Restatement §187, Comment *d;* emphasis added; alteration omitted).
>
> * * *
>
> The first question asks whether the fact that a plan administrator both evaluates claims for benefits and pays benefits claims creates the kind of "conflict of interest" to which *Firestone's* fourth principle refers. In our view, it does.
>
> * * *

Indeed, *Firestone* itself involved an employer who administered an ERISA benefit plan and who both evaluated claims and paid for benefits. See 489 U. S., at 105. And thus that circumstance quite possibly was what the Court had in mind when it mentioned conflicted administrators. See *id.,* at 115. The *Firestone* parties, while disagreeing about other matters, agreed that the dual role created a conflict of interest of some kind in the employer.

* * *

Conceding these differences, [*insur co vs employer as trustee*] we nonetheless continue to believe that for ERISA purposes a conflict exists.

* * *

We turn to the question of 'how' the conflict we have just identified should 'be taken into account on judicial review of a discretionary benefit determination.' 552 U. S. 1161 (2008). [554 U.S. at 115].

In August of 2009 the 7th Circuit in <u>Marrs v Motorola, Inc</u>., 577 F.3d 783, 788 (7th Cir. 2009), cited and quoted above at III B, also addressed <u>Glenn</u> and the economic conflict of interest, including the "how," noted above. Although the court in <u>Marrs</u> did not favor a "balancing test in which unweighted factors mysteriously are weighed," it acknowledged "[i]f that's the test the Supreme Court has adopted, we must bow." Specifically, the 7th Circuit noted:

But especially when a firm is struggling (which may or may not be the case here— there is nothing in the record bearing on the question), an opportunity for short-run economies may dominate decision making by benefits officers. In any event, a majority of the Supreme Court Justices consider the potential conflict of interest of a plan administrator (or its staff) serious enough to be given weight in judicial review of the denial of benefits.

Just 3 months after <u>Marrs,</u> the 7th Circuit in <u>Bandak v. Eli Lilly and Company Retirement Plan</u>, 587 F.3d 798, 802 (7th Cir. 2009), analyzed a conflict of interest as follows:

Lilly reminds us that a plan administrator's judgment is entitled to deference when as in this case (as in almost every case) the plan document vests the administrator with discretion in interpreting and applying the plan. But the entitlement is diminished by indications that the conflict of interest inherent when benefits determinations are made by a plan funded by the employer has infected the administrator's consideration of the application for benefits. As we explained in *Marrs v. Motorola, Inc*., 577 F.3d 783, 789 (7th Cir. 2009), elaborating on the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn*, [554] U.S. [105],

23

> 128 S. Ct. 2343 [citation omitted] (2008), 'If the circumstances indicate that probably the decision denying benefits was decisively influenced by the plan administrator's conflict of interest, it must be set aside.... The likelihood that the conflict of interest influenced the decision is therefore the decisive consideration, as seems implicit in the majority opinion's [in Glenn] reference to indications of `procedural unreasonableness' in the plan administrator's handling of the claim in issue, id. at 2352 (emphasis in original), and its suggestion that efforts by the plan administrator to minimize a conflict of interest would weigh in favor of upholding his decision. Id. at 2351.'

> We know that the chairman of Lilly's board of directors was concerned about the cost of its retirement plan. And the disingenuousness of Lilly's arguments suggests that the conflict of interest was indeed gnawing at the administrator.

Here, unlike <u>Marrs</u> and consistent with <u>Bandak,</u> there is a record of the Fund's conflict of interest. Subpoenaed documents produced on March 31, 2010 by the Fund's actuary, The Segal Co., disclosed the Fund's conflict of interest. That conflict is established by the fact that the Fund's full Board on Appeal both evaluated the "suspension" of Plaintiff's "Disability Pension" and supervised the "poor investment performance" of the Fund. Specifically, an August 17, 2004 e-mail (Exhibit 8) from The Segal Company to the Fund's then Executive Director, Barry McAnarney, and the Fund's Sharon West, forwarded power point pages which provided, in part, the following excerpts at pages numbered 12, 15 & 25:

> As discussed at the June 21, 2004 Board Meeting, the July 19, 2004 Executive Committee meeting and the August, 2, 2004 Board meeting:

> Primarily due to poor investment performance, the Fund needs to adjust benefits until the investment loss has been funded.

> The market value of assets was $223.9 million less than what it would have been had the return been 8% since October 1, 2000.

> [At page 15:]
> Q: What do the assets have to return to get the Plan back on track?
> A: Seven years at 12.5%.

And at Exhibit 8, page 25, the power point, included the adoption of "tighter" "administrative procedures" regarding "disability pensioners" including an effort to

24

"[c]onduct follow-up reviews."

The Fund's conflict of interest noted above is also established by the Fund's January 28, 2010 letter to Participants, Beneficiaries etc. and its attached "Annual Funding Notice for the 2008 Plan Year .…" At page 2 of Exhibit 9, The Fund gave notice (including the following excerpt) that due to <u>declines in the financial markets in recent years</u>," the Fund was in the "Yellow Zone" or "endangered status" "for the 2009 Plan Year." (Emphasis added). See ¶1 (N) of Plaintiff's Request for Admissions and the Fund's Response at Exhibit 6. The referenced documents are attached at Exhibit 9 which provides in pertinent part, as follows:

*Notice of Plan Status*

Starting with the 2008 Plan Year, Plans that are not in the Green Zone must notify all plan participants, unions, and contributing employers of the Plan's status. The attached Notice of Plan Status for the 2009 Plan Year shows the zone status along with why our Plan is in a particular zone. The declines in the financial markets in recent years have negatively affected most pension plans, including our own. As a result of these investment losses, and the resulting financial condition as of October 1, 2009, our Plan has been certified as being in the "Yellow Zone" for the 2009 Plan Year. In accordance with the requirements of the PPA, this means that the Trustees will have to adopt a Funding Improvement Plan to improve the financial status of our Plan over a ten-year period. This Funding Improvement Plan could involve increases in the rate of employer contributions to our Plan, benefit changes, or both.

The Fund's January 28, 2010 letters and attachments also appear on the Fund's webpage (www.central-laborers.com) under the link to "Departments/Pensions/ CLPF Annual Funding Notice for 2008-2009."

Accordingly, if this Court finds that the plain meaning and bad faith issues discussed above at Argument sections III B, C & D above, do not get beyond deference, the Fund's conflict of interest must be weighed before deference, *if any*, can be afforded the Fund's Board.

### F.  Count 2 and ERISA's "plan document rule" – the Fund failed to follow the Plan's notice provision in August, 1999.

In <u>Kennedy v. Plan Administrator for DuPont Savings and Investment Plan</u>, 129 S. Ct.

865, 875, 877, (07-636, Jan. 26, 2009), the Court explained, in part, why the Fund must act in

accordance with the terms of its Plan:

> ERISA requires '[e]very employee benefit plan [to] be established and maintained pursuant to a written instrument,' 29 U. S. C. §1102(a)(1), 'specify[ing] the basis on which payments are made to and from the plan,' §1102(b)(4). The plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [Title I] and [Title IV] of [ERISA],' §1104(a)(1)(D), and the Act provides no exemption from this duty when it comes time to pay benefits.
>
> * * *
>
> The Estate's claim therefore stands or falls by 'the terms of the plan,' §1132(a)(1)(B), a straightforward rule of hewing to the directives of the plan documents that lets employers `establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits.' [11] *Egelhoff* v. *Egelhoff,* 532 U. S. 141, 148 (2001) (quoting *Fort Halifax Packing Co.* v. *Coyne,* 482 U. S. 1, 9 (1987)); see also *CurtissW-right Corp.* v. *Schoonejongen,* 514 U. S. 73, 83 (1995) (ERISA's statutory scheme "is built around reliance on the face of written plan documents").
>
> * * *
>
> And this case does as well as any other in pointing out the wisdom of protecting *the plan documents rule*. [129 S. Ct. at 877; emphasis added].
>
> * * *
>
> The plan administrator therefore did exactly what §1104(a)(1)(D) required: "the documents control, and those name [the ex-wife]." [129 S. Ct. at 877; citation omitted].

A fuller context to the above reference to 29 U.S.C. §1104(a)(1)(D) (ERISA §404(a) (1)

(D)) is in relevant part as follows:

> (a) Prudent man standard of care
> (1) Subject to sections 1103(c) and (d) [*re assets of plan*], 1342, and 1344 [*re termination of plan*] of this title, a **fiduciary shall discharge his duties** with respect to a plan solely in the interest of the participants and beneficiaries and ---
> * * *
>
>  (D) **in accordance with the documents and instruments governing the plan** insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter. [Bolded emphasis added; referenced here as the "plan document rule"].

26

At Document 19, ¶¶ 41 and 42 of Count 2, Plaintiff alleges that *at the time the Fund approved Plaintiff's application for a Disability Pension in August of 1999*, the Fund did not notify Plaintiff of "the Plan rules governing suspension" of his Disability Pension benefits. In August of 1999, the Plan's following provision regarding "Notices," under the section entitled "Suspension of Benefits," was provided at §6.7 (e) (1) of Amendment No. 7 (adopted 11/10/98) of the 1994 Restated Plan. It provides in relevant part:

> Notices.
> Upon commencement of pension benefit payments, the Trustees shall notify the Pensioner of the Plan rules governing suspension of pension benefits, including identity of the industries and area covered by the Plan.

See Doc. 1, Attach 2, #s 46-50 (at #48), Doc. 19, ¶39; Answer Doc. 20, ¶39. Said §6.7 (e) (1) of Amendment No. 7 is attached at Exhibit 10 for convenience. A complete copy of the Fund's 1994 Restated Plan and its 8 Amendments will be filed separately due to its length at approximately 205 pages.

In the Fund's Answer to ¶42 of the Complaint, it responded in part with an admission "that it did not provide a notice regarding suspension of disability benefits . . . ." (Doc. 20, p.10).

Furthermore, at ¶15 of its Response (Doc. 34, p.11) to Plaintiff's Motion (Doc. 31) to Determine the Sufficiency of an Answer or Objection Pursuant to Rule 36(a)(6), the Fund responded in part:

> However, notwithstanding such error [Fund erroneously stating that the "$14,000" provision had not yet been made a part of the Plan in August, 1999], the essential fact of Plaintiff's Request To Admit was directly and expressly answered by the Fund:  the Fund admitted that the Fund did not give Plaintiff documents containing the $14,000 provision in August, 1999.

As noted above, that "$14,000" provision provides that "the Participant may earn up to $14,000 per calendar year in non-Laborer" full time employment and still "*be considered*

*totally and permanently disabled."* (Exhibit 2).

Here, the Fund cannot say that it "did exactly what §1104(a)(1)(D)" and its own Plan document "required" regarding "Notices" "upon commencement of pension benefit payments" in August of 1999. Additionally, in 2005, before Plaintiff's June 1, 2007 "suspension," the Fund's lead counsel here, was personally well aware that the 7 Circuit "will enforce the plans as written." See <u>Trustees of So. Ill. Carp. Welfare Fund v. RFMS</u>, 401 F.3d 847, 850 (7th Cir. 2005) (Carpenters Trustees were unsuccessful in their contention "that their interpretation of their own plan's coordination-of-benefits provision requires. . . ."). And the "plan document rule" likewise trumps the Fund's claim here that ". . . inasmuch as the Trustees of the Plan have always interpreted the '$14,000 provision' to apply only to part time work." See the Funds Amended Response to Plaintiff's Request for Admissions at Exhibit 6, quoting, in part, ¶2 (E).

And beyond the plan document rule and the Fund's failure to give notice in August 1999, the "2000 Edition" of the Fund's Summary Plan Description (SPD) has also failed in the same fashion as described in <u>Bowerman v. Wal-mart Stores</u>, 226 F.3d 574, 590 (7th Cir. 2000), which noted the following additional statutory requirements:

> As we already have noted, an ERISA plan's SPD must be "written in a manner calculated to be understood by the average plan participant" and must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. sec. 1022(a). Moreover, the SPD must contain, among other items, information regarding "the plan's requirements respecting eligibility for participation and benefits" and also a description of the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. §1022(b).

See also 29 C.F.R. § 2520.102-3(k)(1) and attached Exhibit 12 consisting of the only relevant pages extracted from the Fund's 2000 edition SPD. Those pages make no reference to the "$14,000" provision first *adopted* by the Board in May, 1997. (Doc. 19, ¶23 & Doc. 20,

¶23).  Accordingly, if a Participant has to read both the SPD *and the Plan with Amendments* in order to learn the Plan's description of the "circumstances which may result in . . . loss of benefits," then the SPD is of no use at all.

### G.  A "suspension" of a "Disability Pension" not a "cessation" of "disability benefits" and the effect of the <u>Heinz</u> case.

Along with the admissions noted above, the Fund has adopted inapplicable Plan language, the most prominent of which ignores the fact that the Fund "*suspended*" Plaintiff's "Disability *Pension*." (See Exhibit 1). In doing so, the Fund engages in semantics and ignores the very words used in its June 1, 2007 "suspension" letter when it states in its Answer that "there was a *cessation* of Plaintiff's disability *benefits* on June 1, 2007 . . . ." (Doc. 20, ¶10, bottom p. 3; emphasis added).

Repeatedly in the Fund's Answer and Counterclaim to the First Amended Complaint, it characterized what are "Disability <u>Pension</u>" benefits as mere "disability benefits." Plaintiff speculates that the Fund did so in the hope of avoiding the application of the Plan's "Notices" provision, at §6.7 (e) (1) of Amendment No. 7, because it only applies "[u]pon commencement of <u>pension</u> benefit payments," and not to a disability <u>benefit</u>. Plaintiff also speculates that the Fund's effort is linked to the fact that *some* employee benefit plans provide or 'place' a disability benefit in the "Welfare Benefit" portion of its overall plan and not in the pension plan. Those disability benefit plans (often an insurance company administered product) are not afforded the same protections as pension plans under ERISA *or its related case law*. In other words, there exists an ERISA's distinction between pension benefits and ancillary benefits (or welfare benefits) along with distinct protections associated with each. (Doc. 40, p. 7, Magistrate Cudmore's Order of November 29, 2010). See also Exhibit 7,

Request for Admissions, documents I & K which included analysis by the Fund's "outside" D.C. counsel, O'Donaghue and O'Donaghue (Exhibit 7 ("L"), recognizing the same distinction.

At ¶2(G) of the Fund's Amended Response (Exhibit 6) to Plaintiff's Request for Admissions, the Fund's responses included the following:

> Defendant admits that Sections 1.31, 3.3 and 4.3 of Amendment No. 5 to the 1999 Restated Plan adopted November 28, 2005, do not apply to the ***pension credits*** earned by Plaintiff prior to August 1999 (or any other ***pension credits*** earned by Plaintiff).

In the event that the Fund *may continue* here with the same "disability benefit," mischaracterization or simply with any other erroneous reference to a Plan provision post-dating the "commencement" of Plaintiff's August, 1999, Disability Pension, more needs to be said. Specifically, Plaintiff's basis for his 2(G) Request noted above is found in Central Laborers' Pension Fund v. Heinz, 541 U.S. 739 (2004). In *Heinz* both lead counsel here were counsel of record before this Court (CDIL 99-1388) and the 7th Circuit. Following the Fund's initial filing of a motion for summary judgment in *Heinz*, this Court suggested the parties file cross-motions for judgment on the pleadings which proved dispositive. Pursuant to ERISA's anti-cutback rule, *Heinz* sets the ground rules which determine whether an amendment to a pension plan applies to the already *accrued* benefits (Pension Credits) of a plan participant such as Plaintiff. *Heinz* held in part:

> '[a] participant's benefits cannot be understood without reference to the conditions imposed on receiving those benefits, and an amendment placing materially greater restrictions on the receipt of the benefit `reduces' the benefit . . . .'
> [541 U.S. 745].

And since the Fund's Plan has continuously evolved ('94 Restated Plan with 8 Amendments & '99 Restated Plan with at least 12 Amendments, the 12th adopted 8/17/09), those ground rules must be addressed in order to correctly focus on the Plan language

applicable to Plaintiff's accrued benefits (Pension Credits) earned before August, 1999.

Plaintiff summarizes the Fund's obligation to Plaintiff pursuant to *Heinz* as follows:

> *Heinz* requires the Fund to *first* determine the time period(s) in which Mr. Tompkins' Pension Credits were earned which here is prior to Mr. McAnarney's August 19, 1999 letter giving notice of the Fund's approval of Mr. Tompkins' "Disability Pension."

> *Next, Heinz* requires the Fund to apply Plan language which was adopted by the Board during the same time period or periods in which Mr. Tompkins' Pension Credits were earned *but only* in the event a successive Plan amendment has placed materially greater restrictions on the receipt of the pension benefit due Mr. Tompkins.

.       See also Magistrate Judge Cudmore's November 29, 2010 Order (Doc. 40, pp. 6-9).

Plaintiff also notes that he addressed the same "Pension" versus "benefit" distinction in

Plaintiff's "Motion To Determine the Sufficiency of an Answer or Objection Pursuant to Rule

36(a)(6)." (Doc. 31, at pp. 6 & 7). There Plaintiff noted, in relevant part, as follows:

> Second, Plaintiff simply proposes that the above response ["The Fund <u>denies</u> that the holding in the cited *Heinz* case is applicable to disability benefits."] by CLPF is insufficient because here, as repeatedly in CLPF's Answer and Counterclaim to the First Amended Complaint, CLPF continues to characterize what are "Disability <u>Pension</u>" benefits in Plaintiff's First Amended Complaint as mere "disability benefits." In this rare setting, there exists an ERISA's distinction between pension benefits and ancillary benefits along with distinct protections associated with each. Furthermore, CLPF's Amendment No. 5 to the 1999 Restated Plan, adopted on November 28, 2005, "established a new category of disability benefits entitled 'Occupational Disability Benefit'. . ." in a revised §1.31 (quoting admission in Response 2(B)(v)). **Accordingly, the distinction between "disability benefits" and "Disability Pension" benefits is not mere hairsplitting. It may well be, as CLPF responds above in D(i), that "the holding in the cited *Heinz* case" <u>is not</u> "applicable to disability benefits" <u>but is</u> applicable to a "Disability Pension."** In support of that distinction between "disability benefits" and a "Disability Pension," Plaintiff has attached to this Motion three other subpoenaed documents from The Segal Company, found at Plaintifff's Request for Admission at paragraph 1(G), (I) & (K).  * * *  There the purposeful ERISA distinction between pension benefits and ancillary benefits is discussed, supporting Plaintiff's request for a determination that CLPF's Response in not sufficient unless CLPF uses the complete phrase "Disability Pension" benefits. Also noteworthy is the fact that common in both the "1994" & "1999" Restated Pension Plans, are 6 distinct Pensions: "Regular Pension, Early Pension, Disability Pension, Service Pension,

> Deferred Pension and Reciprocal Pension." Additionally, CLPF's 5/19/97
> Amendment No. 5 to the <u>1994 Restated</u> Plan, also added a Temporary
> Supplemental Pension (generally paid until Medicare eligibility), which Plaintiff
> also received ($160.00/mo; see Comp. Ex. 3). In CLPF's Response to Request
> paragraph 2(B)(iv), it admits that the 11/28/2005 Amendment No. 5 to the <u>1999
> Restated</u> Plan "established a new category of disability benefits entitled
> 'Occupational Disability Benefit' . . . ."  In addition, specifically defined words or
> phrases in CLPF's Plan documents are capitalized and accordingly, capitalized Plan
> words or phrases are critically important, rendering CLPF's Response insufficient.
> [Bolded emphasis added].

In short, the Fund cannot in this instance appropriate the wording of the November, 2005 Amendment No. 5's "Occupational Disability Benefit" and selectively apply the words "disability benefit" to Plaintiff's August, 1999 "Disability Pension."

Accordingly, a question of law is presented regarding the Fund's failure in August of 1999 to give Plaintiff notice regarding "the Plan rules governing suspension of pension benefits." That notice is mandated by both the Pension Plan itself and ERISA. In sharp contrast, the Fund's suspension letter dated June 1, 2007, *did* attach a copy of §1.31 which included the "$14,000" provision.

Finally, Plaintiff notes an important distinction with regard to the appropriate remedy for the Fund's failure to "notify the Pensioner of the Plan rules governing suspension of pension benefits." That failure to notify in August, 1999 voids the Fund's "suspension" of Plaintiff's Disability Pension and requires the Fund to make him whole. That would be consistent with the 7th Circuit's reasoning & concept of "restoring the status quo" because the Fund "failed to comply," with a Plan notice provision. The 7th Circuit has recognized a distinction between an "initial denial of benefits" (which could lead to a do-over) and a suspension of benefits already awarded and in pay status. The Tompkins suspension is the equivalent of the latter. <u>See</u> <u>Schneider v. Sentry Group Long Term Disability Plan</u>, 422 F.3d 621, 629-30 (2005) (vacating the suspension of benefits and reinstating retroactively those benefits).

WHEREFORE, the Plaintiff respectfully prays that this Court grant Plaintiff's Motion for Summary Judgment on Count 2 or alternatively, Summary Judgment on Count 1 and consistent with the "exact relief sought" and itemized in the above Introduction at 1 C.

Respectfully submitted,

By: ___s/ Gery R. Gasick_____
      Plaintiff's Attorney

GERY R. GASICK
Attorney at Law
411 Hamilton Blvd., Suite 1604
Peoria, IL 61602
Tel/Fax: (309) 674-0202/674-7303
E-mail: atty.g.gasick@comcast.net

## CDLR 7.1 (B) (4) (c) CERTIFICATE REGARDING THE TYPE VOLUME LIMITATION

I hereby certify that "Section (1)(c)" of this Motion for Summary Judgment, namely the Argument Section per CDIL 7.1(D)(5), complies with the "type volume limitation" in that said Argument Section "does not contain more than 7,000 words [containing 5,654 words] or 45,000 characters [containing 33,091 characters]." Counsel relies upon "the word or character count of the word processing system used to prepare the Argument Section of this motion.

By: ___s/ Gery R. Gasick_____
      Plaintiff's Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2011, I electronically filed Plaintiff's Motion for Summary Judgment and that said electronic filing with the Clerk of the Court used the CM/ECF system which will send notification of such filing to the following: **Patrick J. O'Hara and John T. Long.**  I further hereby certify that there are no non CM/ECF participants.

By: ___s/ Gery R. Gasick_____
      Plaintiff's Attorneys