## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| **DONALD J. TOMPKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-4004** |
| | ) | |
| **CENTRAL LABORERS'** | ) | |
| **PENSION FUND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CENTRAL LABORERS' PENSION FUND'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant, CENTRAL LABORERS' PENSION FUND, ("the Fund" or

"the Pension Fund" hereafter), by its attorneys, Cavanagh & O'Hara LLP, and for its Motion For

Summary Judgment provides as follows:

## INTRODUCTION

As a consequence of asserting that he was suffering a "total and permanent disability,"

Plaintiff, Donald J. Tompkins, as a participant in the pension plan ("the Plan") maintained by

Defendant Central Laborers' Pension Fund, applied for, and received, disability pension benefits

commencing in August 1999 from the Fund. Subsequent to August 1999, the provisions of the

Plan governing the receipt of disability benefits were amended, including the addition of a

provision that provided that a recipient of disability benefits may earn up to $14,000 per calendar

year in non-Laborer or other non-Building Trades Crafts employment and may still be

considered totally and permanently disabled by the Fund's Trustees. Plaintiff was not

1

affirmatively notified of said "$14,000 provision" by the Fund and alleges that he was unaware of such provision.

In 2005, Plaintiff began working in full-time (40 hours/week) in gainful employment as a warehouseman manager for Willman Construction Company, a contributing employer to the Pension Fund. His duties included driving a truck to deliver construction materials. Despite a provision in the Fund's Plan that recipients of disability benefits must report any employment to the Fund, Plaintiff failed to do so. Plaintiff worked full-time as a warehouseman manager in 2004, 2005 and 2006. He has been working full-time in other gainful employment as a lead maintenance person for Jumer's Casino/Hotel in Peoria, Illinois, for the past two years.

In June 2007, when it discovered that Plaintiff had been, and was, engaged, in full-time employment, the Fund notified him that he was no longer considered "totally and permanently disabled" and, therefore, no longer eligible for disability benefits. The Pension Fund terminated Plaintiff's disability payments and sought to recoup the disability payments made to him from and after the date he began full-time employment.

Plaintiff appealed the termination of his disability benefits pursuant to the Plan's review procedures. The Fund's Trustees denied his appeal on April 21, 2008, and sent a letter of denial to Plaintiff explaining the reasons for the denial. A copy of said letter of denial is attached hereto and labeled Exhibit A.

In response, Plaintiff sued the Fund alleging (1) that the Fund's interpretation of the Plan provisions as they pertain to disability benefits is contrary to the plain meaning thereof; (2) that the Fund prejudiced Plaintiff's rights by failing to notify him of the Plan rules, including the "$14,000 provision," such that the termination of Plaintiff's disability benefits should be voided,

2

and the overpayment sought by the Fund should be "discharged"; and (3) that the Fund violated

the anti-cutback rule of ERISA (29 U.S.C. § 1054(g)(2)) by amending the Plan provisions

pertaining to disability benefits.

The Fund has denied Plaintiff's allegations and, in turn, filed a counterclaim against

Plaintiff, alleging that Plaintiff has defrauded the Fund in drawing disability benefits when he

was able-bodied, while disregarding the Plan rules to timely report his employment to the Fund.

The Fund now moves for summary judgment with respect to all counts of Plaintiff's Amended

Complaint.

### THE FUND'S PROPOSED UNDISPUTED MATERIAL FACTS

1.   The Fund is a pension fund established and administered pursuant to 29 U.S. C.

§§ 1001 *et. seq.* [Defendant's Counterclaim, ¶ 13; Plaintiff's Answer to

Counterclaim, ¶ 3]

2.   The Fund is a not-for-profit, multiemployer ERISA fund with its administrative

office located in the City of Jacksonville, County of Morgan, State of Illinois, and

governed by a Board of Trustees with equal representation from management and

labor union. The Fund is a defined benefit pension plan, and is a tax-qualified

trust under the Internal Revenue Code. [Affidavit of Sharon E. West, ¶ 3]

3.   Plaintiff, at all times pertinent, was a participant in the Fund's Pension Plan.

[Plaintiff's Amended Complaint, ¶ 3; Defendant's Answer, ¶ 3]

4.   At the time Plaintiff originally applied for, and received, disability benefits, the

Fund was administered pursuant to the Central Laborers' Pension Fund Summary

Plan Description revised and effective July 1, 1995, and the Restated Plan Rules

and Regulations – Amended and Restated Effective October 1, 1994, a true and accurate copy of which is attached to the Affidavit of Sharon E. West (Exhibit B hereto) in booklet form under the heading "First Restated Plan," plus Amendment No. 2 dated April 30, 1996; Amendment No. 3 dated July 22, 1996; Amendment No. 4 dated November 25, 1996; Amendment No. 5 dated May 19, 1997; Amendment No. 6 dated March 11, 1998; and Amendment No. 7 dated November 10, 1998, all attached to the Affidavit to Sharon E. West under the heading "First Restated Plan" and labeled Exhibit B-5. [*See*, Affidavit of Sharon E. West, ¶ 18]

5. A copy of the aforesaid booklet containing Central Laborers' Pension Fund Summary Plan Description revised and effective July 1, 1995, and the Restated Plan Rules and Regulations, Amended and Restated Effective October 1, 1994 – was distributed by mail by the Fund to all participants in 1995, including to the Plaintiff. [Dep. of Sharon E. West, pp. 170-171; Dep. Of Plaintiff, p. 27 – Excerpts attached as Exhibit C under the heading "Excerpts in support of ¶ 5 of the Fund's Proposed Undisputed Material Facts"]

6. In August, 1999, based upon documentation submitted by Plaintiff and his physician at the time, the Fund  determined Plaintiff to be eligible for "Total and Permanent Disability" benefits from the Pension Fund. [Plaintiff's Amended Complaint, ¶ 13; Defendant's Answer,  ¶ 13]

7. Section 6.3 of Article 6 of the aforesaid Restated Plan Rules and Regulations provide that the Fund's Trustees have discretion to interpret the Plan. [Booklet in "First Restated Plan" attached as Exhibit B-5 to Affidavit of Sharon E. West, ¶

4

18]

8.      The aforesaid Summary Plan Description and Restated Plan Rules and

        Regulations also provide in pertinent part as follows:

> Only the full Board of Trustees is authorized to interpret the Pension Plan
> described in this booklet. No employer or union nor any representative or
> any employer or union, in such capacity, is authorized to interpret this
> Plan nor can any such person act as an agent of the Trustees. The Trustees
> reserve the right to amend, modify or discontinue all or part of this Plan
> whenever, in their judgment, conditions so warrant. [Inside cover of
> Booklet in "First Restated Plan" attached to Affidavit of Sharon E. West, ¶
> 18]

9.      The provision for Total and Permanent Disability benefits in the Fund's Plan in

        August 1999 was Section 3.10, Article 3 of the Restated Plan Rules and

        Regulations effective October 1, 1989 and Amended and Restated Effective

        October 1, 1994 which stated in pertinent part as follows:

**Section 3.10.  Total and Permanent Disability Defined**

> A Total and Permanent Disability shall mean that the Employee is totally
> and permanently unable as a result of bodily injury or disease to engage in any
> further employment or gainful pursuit whether as a Laborer or in any other
> occupation or employment of any kind. The Trustees shall be the full and final
> judges of Total and Permanent Disability and of entitlement to a Disability
> Pension hereunder
> A Disability Pensioner shall report any and all earnings from any
> employment or gainful pursuit to the Pension Fund Office in writing within 15
> days after the end of each month in which he had such earnings. If a Disability
> Pensioner fails to make timely reports as required by this section, he shall be
> disqualified for benefits for up to 12 months in addition to the duration of such
> employment for each such violation.  [Booklet in "First Restated Plan" attached to
> Affidavit of Sharon E. West, ¶ 18]

10.     The Plan was amended "effective October 1, 1996" and signed on May 19, 1997,

        to replace language in the former Section 3.10, and provided in pertinent part as

        follows:

**Section 3.10 Total and Permanent Disability**

A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes of Section 3.10. Such disability must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder. [Affidavit of Sharon E. West, ¶ 7]

11.     The Plan was amended "effective October 1, 1998" and signed on November 10, 1998, to replace language in the former Section 3.10, which new section contained the operable language at the time Plaintiff commenced receipt of disability benefits in August, 1999. The following paragraph from the new Section 3.10 was not changed from the previous paragraph stated above and provided in pertinent part as follows:

**Section 3.10 - Total and Permanent Disability**

A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes of Section 3.10. Such disability

6

must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder. [Affidavit of Sharon E. West, ¶8]

12.      The amended Plan language, including that set forth in Paragraphs 10 and 11

above, was not mailed to the Pension Fund participants. [Affidavit of Sharon E.

West, ¶ 9]

13.      The Plan was amended "Effective October 1, 1999" and signed September 9,

2002 replacing Section 3.10 with Section 1.31 which provided in pertinent part as

follows:

**Section 1.31 Total and Permanent Disability**
A "Total and Permanent Disability" shall mean that, in the opinion of a licensed medical practitioner selected or approved by the Trustees,  the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled. Such disability must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder. [Affidavit of Sharon E. West, ¶ 10]

14.      The Plan was amended "effective October 1, 2004" and signed November 28,

2005, replacing language in Section 1.31 that provided in pertinent part as

follows:

**Section 1.31 Total and Permanent Disability and Occupational Disability**

(a)      Total and Permanent disability: For purposes of Section 3.3(a) ("Disability

Pension"), a Total and Permanent Disability shall mean that, in the opinion of a licensed medical practitioner selected or approved by the Trustees, the Participant, as a result of bodily injury or disease not resulting from an intentional self-inflicted injury, is totally and permanently able neither to :

(1)     engage in any further employment or gainful pursuit as a laborer or other building trades crafts employment in the construction industry for remuneration or profit, regardless of the amount, nor

(2)     engage in further employment or gainful pursuit of non-laborer or other non-building trades crafts employment for which the employment is considered full-time or a primary source of income.

A Total and Permanent Disability must be considered total and permanent and expected to continue during the remainder of the Participant's life. The Trustees shall have sole and exclusive authority to determine whether a Participant has suffered a Total and Permanent Disability. [Affidavit of Sharon E. West, ¶ 11]

15.     On June 1, 2007, after the Fund's accountant/auditor reported that upon an

ERISA compliance audit of a contributing employer, the Fund discovered that

Plaintiff was employed for Willman Construction from and after July, 2005, in a

full-time, 40 hour/week capacity. The Fund sent a letter to Plaintiff terminating

his eligibility for "Total and Permanent Disability" benefits effective June 1, 2007

and demanding reimbursement of such disability benefits that had been paid to

him from and after July 2005, a copy of which letter is attached to Plaintiff's

Amended Complaint as Exhibit 7.  [Plaintiff's Amended Complaint, ¶ 19;

Defendant's Answer, ¶ 19]

16.     The letter of June 1, 2007 from the Fund to the Plaintiff (Exhibit 7 attached to

Plaintiff's Amended Complaint cited above) – using the term "suspension" to

describe the termination of Plaintiff's disability benefits – informed Plaintiff that

he could appeal the determination of the Fund pursuant to Pension Plan Section

8

7.6, a copy of which was attached thereto, and which Section is entitled "Review of Denied Disability Pension Claim." [Affidavit of Sharon E. West, ¶ 4; Administrative Record Exhibit C2]

17.     By letter dated February 25, 2008, Plaintiff appealed the determination of the Fund, invoking Pension Plan Sections 7.8(f) entitled "Suspension of Benefits" and 7.4, entitled "Review of all Denied Non-Disability Claims, Regardless of the Date Filed, and Disability Pension Claims Filed Before January 1, 2002," instead of Pension Plan Section 7.6. [Affidavit of Sharon E. West, ¶ 4; Administrative Record Exhibit C7]

18.     The entire administrative record considered on review by the Fund, including all submissions by Plaintiff, is attached to the Affidavit of Sharon West and labeled Administrative Record. [Affidavit of Sharon West, ¶ 4; Administrative Record]

19.     On April 21, 2008, Plaintiff and his counsel personally appeared before the Board of Trustees of the Fund and were allowed to present such additional information and arguments in furtherance of Plaintiff's administrative appeal.[Affidavit of Sharon E. West, ¶ 12]

20.     Plaintiff did not submit any documentation or present any evidence or argument consisting of medical or vocational information regarding his current (2004 and subsequent) ability or inability to perform full-time employment. [Affidavit of Sharon E. West, ¶ 13]

21.     The Board of Trustees, during the periods when such provisions were in effect, consistently construed the "$14,000 provision" of the Pension Plan – Section 3.10

and/or Section 1.31 – to apply only to disability benefit recipients who were working (and capable of working only) on a part-time basis; at no time has the Board of Trustees applied said provision to recipients who have recuperated sufficiently from disability to be able to perform full-time gainful employment. [Affidavit of Sharon West, ¶ 14]

22.     The Board of Trustees has consistently invoked Section 7.3 and Section 7.4 of the Plan for disability issues prior to January 1, 2002, and invoked Section 7.5 and Section 7.6 ("Review of Denied Disability Pension Claim") of the Plan for review of all disability benefit determinations and denials – both initial determinations and terminations of said benefits – subsequent to January 1, 2002, and has never invoked the suspension rules or review procedures/provisions for "disqualifying employment" applicable to vested pension recipients who had previously retired and then returned to employment. [Affidavit of Sharon E. West, ¶ 15]

23.     On November 28, 2005, the Pension Plan adopted Amendment No. 5 providing for two categories of disability benefits: (1) for "Total and Permanent Disability," (which maintained the same definition of "total and permanent disability" as set forth in the Plan previously, but eliminated the "$14,000 provision"); and (2) for "Occupational Disability," (which provided for ½ the "total and permanent disability" benefits to be paid to a participant who applies and is deemed disabled and not capable of working as a laborer or in another building trades craft in the construction industry). [Affidavit of Sharon E. West, ¶ 16]

24.     Plaintiff has never applied to the Pension Fund for "Occupational Disability"

benefits, but instead continues to claim he is entitled to "Total and Permanent Disability" benefits. [Affidavit of Sharon E. West, ¶ 17]

25.    The Pension Plan denied the appeal of Plaintiff on April 21, 2008 and by letter dated April 25, 2008, informed Plaintiff of the Trustees' decision , a copy of which letter is attached to Plaintiff's Amended Complaint as Exhibit 17 and attached hereto as Exhibit A.  [Plaintiff's Amended Complaint, ¶ 47; Defendant's Answer, ¶ 47]

26.    Copies of the restated plan of the Central Laborers' Pension Fund ("Revised and Effective July 1, 1995") and ("Amended and Restated Effective October 1, 1999), along with their respective amendments, are attached to the Affidavit of Sharon E. West under the respective partitioned headings as "First Restated Plan" (Exhibit B-5) and "Subsequent Amended and Restated Plan" (Exhibit B-6) [Affidavit of Sharon E. West, ¶ 18]

## ARGUMENT

## I.  WHEN SUMMARY JUDGMENT MAY BE GRANTED

Pursuant to Fed.R.Civ.P. 56(a) a claimant may seek summary judgment 20 days after service of the Complaint on the Defendant.  Judgment shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Fed.R.Civ.P. 56(c)).

The movant bears the burden of establishing that there exists no genuine issue of material fact.  *Celotex Corp. V. Catrett*, 477 U.S. 317, 323, (1986).  If the movant meets his burden, then

it is incumbent upon the nonmovant to present specific facts that show the existence of a genuine

issue for trial.  *Id.* at 324. Interpretation of an ERISA plan is a subject particularly suited to

disposition by summary judgment.  *Grun v. Pneumo Abex Corp.* 163 F.3d 411, 419 (7th Cir.,

1998) citing *Metalex Corp. v. United Corp.* 863 F.2d 1331, 1333 (7th Cir. 1998).

### II. STANDARD OF REVIEW APPLICABLE TO AN ERISA PENSION PLAN

The instant case depends entirely upon the content of the Plan at issue and of the

administrative record reviewed by the Fund's Board of Trustees. Plaintiff concedes that the Plan

grants the Fund's Trustees discretionary authority to apply and interpret the terms of the Plan.

*See,* Paragraph 8 of Plaintiff's Amended Complaint. Therefore, pursuant to the authority of

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), [*see, also, e.g., Hess v. Reg-Ellen

Mach. Tool Corp. Employee Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007)], a

reviewing court applies a deferential "arbitrary and capricious" standard in determining the

appropriateness of a pension plan's decision.

The Seventh Circuit Court of Appeals (the "Seventh Circuit" hereafter) has ruled that

under the arbitrary-and-capricious standard, a pension plan need only show that its decision "has

rational support in the record." *Davis v. Unam Life Ins. Co. of America*, 444 F.3d 569, 576 (7th

Cir. 2006). Indeed, the Seventh Circuit Court has articulated the minimum level of

reasonableness required to uphold a decision of ERISA plan trustees when the plan grants the

trustees the discretion to interpret and apply the plan. In *Russo v. Health, Welfare & Pension

Fund*, 984 F.2d 762, 766 (7th Cir.1993), the court observed that "'[a]lthough it is an

overstatement to say that a decision is not arbitrary or capricious whenever a court can review

the reasons stated for the decision without a loud guffaw, it is not much of an overstatement,'"

12

(quoting *Prokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985). The deferential

"standard only requires that the Trustees' decision make sense." *Russo*, 984 F.2d at 766. If the

decision by the Trustees is based on a reasonable interpretation of the terms of the plan and an

adequate consideration of the relevant factual circumstances, a court cannot disturb that decision

even though the claimant's interpretation could have been permissible under the Plan." *Id.*  In

other words, courts "do not interfere with  the [plan's] decision unless [it] 'not only made the

wrong call, but...a "downright unreasonable" one.'" *James v. General Motors Corporation*, 230

F.3d 315 (7th Cir. 2000) (citing and quoting *Chojnacki v. Georgia-Pacific Corp.*, 108 F.3d 810,

816 (7th Cir.1997) quoting *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir. 1990).

## III. THE FUND HAS NOT ACTED IN AN ARBITRARY AND CAPRICIOUS MANNER

Plaintiff attempts to overcome the deference historically afforded ERISA pension plan

trustees by the Seventh Circuit by asserting in his Amended Complaint that Section 1.31 of the

Plan is susceptible to only one meaning and that the Fund "controvert[ed] the plain meaning of

the Plan" in terminating Plaintiff's Total and Permanent disability benefits upon discovering that

he was working in full-time employment. *See*, Paragraphs 9 and 36 of Plaintiff's Amended

Complaint. Paragraphs 24 through 35 of Plaintiff's Amended Complaint set out a convoluted and

complex description of ***Plaintiff's*** interpretation of the Plan, but fails to explain how the

pertinent language of the Plan is not susceptible to the reasonable construction and application

relied upon by the Fund's Trustees in these circumstances. Clearly, despite Plaintiff's

declarations to the contrary, the Trustees' construction and application of the Plan are rational

and entitled to deference by this Court.

Plaintiff contends in his Amended Complaint that he should have been allowed, pursuant

to the "$14,000 provisions" in the amendments of May 19, 1997, and September 9, 2002,

referenced above in the "Fund's Proposed Undisputed Material Facts," to perform full-time

employment in a Non-Laborer capacity and still receive "Total and Permanent Disability"

benefits under the Plan (1) because the annual $14,000 exemption "was the equivalent of 'full

time' employment in October, 1996 (sic)" (when the $14,000 exemption was purportedly

incorporated into the Plan, even though the amendment was not signed until 1997) because the

Federal Minimum Wage was at such rate at that time that a person earning $14,000 could be

working full-time for minimum wage; and (2) since he was not adequately informed by the Plan

of the $14,000 threshold, his rights were prejudiced because he was thereby deceived by the

Fund into working in a full-time capacity, not knowing that such activity could result in

termination of his "Total and Permanent Disability" benefits. Both of Plaintiff's contentions are

contrary to applicable law.

First, Plaintiff fails to explain why he would be entitled to the version of Section 1.31 that

was enacted after Plaintiff started receiving disability benefits; *see*, ¶¶ 8-13 of The Fund's

Proposed Undisputed Material Facts. The amendment that was in effect ***at the time Plaintiff***

***applied for, and began receiving, disability benefits*** was the amendment signed on November

10, 1998, which expressly provided that the "$14,000 provision" applied "provided a physician,

selected by the Trustees, considers the disability to be total and permanent..."; *see*, ¶ 9 of The

Fund's Proposed Undisputed Material Facts.  Plaintiff has never alleged (nor is there any basis to

allege) that any physician selected by the Trustees has ever found Plaintiff's disability to be total

and permanent. (Note that when Plaintiff quotes this provision in Paragraph 23 of his Amended

Complaint, the requirement of the opinion of a physician of the Trustees' selection has been

elided by Plaintiff.)

Second, even assuming that Plaintiff can elect to apply whichever Plan amendment he deems most favorable to him, Plaintiff is simply wrong to imply – as he clearly does by purporting to invoke the concept of "plain language" in his Complaint – that Section 1.31 (or Section 3.10), in any version of the Plan or amendments, is susceptible to only the singular meaning that Plaintiff ascribes to it. This same tack was attempted by a claimant in the recent case of *Kunz v. Buchanan*, (not reported in F.Supp.2d), 2006 WL 2735393 (N.D.Ill., 2006). In *Kunz*, a claimant alleged that an ERISA pension fund violated ERISA and deprived him of pension rights because the board of trustees in that case interpreted the phrase "unit of government" contained in the Plan meant only units of local government, not units of the federal government. (The different interpretations meant a difference in the rate of a claimant's pension benefits.) The Court, applying the applicable deferential, arbitrary and capricious standard, determined that the plan's decision should not be overturned "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the [plan board of trustees] has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem."  *Sisto v. Ameritech Sickness & Accident Disability Plan*, 429 F.3d 698, 700 (7th Cir. 2005) (quoting *Houston v. Provident Life & Accident Insurance Co.*, 390 F.3d 990, 995 (7th Cir. 2004) (quoting *Hess v. Hartford Life & Accident Insurance Co.*, 274 F.3d 456, 461 (7th Cir. 2001))). The Court rejected the plaintiff's argument that "the plain language is unambiguous and may only be reasonably construed as referring to all types of governmental units." Instead, the Court accepted the pension fund's contention its interpretation was not unreasonable. Ultimately,

the Court ruled:

> [t]here is no compelling reason to construe the pertinent language as either being limited to local governmental entities or as including federal governmental entities as well. Under the circumstance, there was no abuse of discretion because it was reasonable for the Trustees to adopt the construction limiting the term to local governmental entities.

In the instant case, the Fund's Board of Trustees has applied a consistent construction to the following provision from Section 1.31 of the Plan:

> For such non-Laborer or other non-Building Trades Crafts employment,..., the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled.

The Trustees have always interpreted this provision to apply only to part-time employment, inasmuch they consider the *raison d'etre* of the "Total and Permanent Disability" benefit of the Plan to be to provide benefits to someone who is disabled and unable to engage in meaningful, full-time work. Also, the Trustees have consistently interpreted the Plan to mean that in order to be eligible in the first instance (and to continue to be eligible) for the "Total and Permanent Disability" benefit, a claimant must be unable to engage in gainful, full-time employment and that such inability is expected to be permanent. If a recipient of "Total and Permanent Disability" benefits happens to recuperate and again becomes able to engage in full-time employment, then he is no longer eligible to receive the benefit, irrespective of whether he actually earns $14,000 (or earns nothing, for that matter).

Plaintiff is attempting to parlay the "$14,000 provision" into some sort of right by which an able-bodied person can continue to receive "Total and Permanent Disability" benefits. While Plaintiff's strained interpretation (linked to his idiosyncratic analysis of the provision in relation to the Federal Minimum Wage statutes in the 1990's) can be charitably characterized as clever, it

16

fails to support the contention that the Trustees' interpretation of the provision is unreasonable or that such construction by the Trustees violates the "plain meaning" of the Plan. As in *Kunz*, the appropriate standard is whether the Pension Fund's adoption of a construction limiting the scope of the provision to part time employment is reasonable, and clearly such a construction cannot be deemed irrational or unreasonable. It matters not that Plaintiff has proffered what he thinks – or even what the Court may think – is an alternate reasonable reading of the provision; it only matters that the Pension Fund's construction is not "downright unreasonable." *Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir. 1990).

As the Seventh Circuit Court has stated in *Morton v. Smith*, 91 F.3d 867, 871 (1996):

> Common, ordinary words often have more than one common, ordinary meaning. When a common, ordinary word with multiple meanings appears in a plan, it must be construed. A trustee with the discretion to construe generally is not prevented from construing such a word; he or she is only prevented from giving that word an uncommon, extraordinary meaning. This principle defines the manner in which trustees must exercise their discretion; it does not establish a limit of that discretion. It is really a specific way to define what constitutes a reasonable construction.

Also as stated in *Morton v. Smith* at 872:

> We do not doubt that [plaintiff's interpretation] is one reasonable way [to construe the words in question], and if we had to assume authority for construing [plaintiff's] benefit on our own, we might adopt it. But we are being deferential here, and there is another reasonable way to [construe the words in question]...Consequently, we can imagine one scenario in which a reasonable person would have made the same decision as the trustees.

Thus, the Board of Trustees' construction of the word "employment" in the "$14,000 provision" as signifying only part time employment is reasonable, and well-within its scope of discretion, and entitled to the deference by this Court.

**IV. WHEN PLAINTIFF RESUMED FULL TIME EMPLOYMENT, HE WAS NO LONGER**

**ELIGIBLE TO RECEIVE BENEFITS BASED ON "TOTAL AND PERMANENT" DISABILITY**

A Plan participant who demonstrates to the satisfaction of the Trustees that he meets the definition of Total and Permanent Disability (and satisfies other requirements not at issue here) is entitled to receive disability benefits from the Fund.  However, while the Plan's retirement benefits which provide lifetime benefits, a participant receiving disability benefits from the Fund will lose eligibility to receive them if, prior to age 63, the participant ceases to be totally and permanently disabled. *See*, Section 3.12 of First Restated Plan (Exhibit B-5); Section 3.3(d) of Subsequent Amended and Restated Plan (Exhibit B-6),   Thus, if prior to age 63, a participant's medical condition improves to the point that he no longer meets the Plan's definition of Total and Permanent Disability, then he is no longer eligible to receive disability benefits from the Plan.  The factual record indicates that this is exactly what occurred with the Plaintiff.

Effective June 1, 1999, Plaintiff began receipt of disability benefits because the Trustees determined that he met the Plan's definition of "Total and Permanent Disability."  These benefits were terminated effective June 1, 2007, following the discovery during an audit of one of the Fund's contributing employers that Plaintiff had been employed on a full-time basis since July 1, 2005. Fund's Proposed Undisputed Material Facts, ¶ 15

Significantly, in the appeal to the Trustees available to the Plaintiff under the Plan rules, he failed to submit any medical reports or other medical evidence to describe his physical limitations subsequent to his return to full-time employment.  Similarly, in his Amended Complaint, he asserts nothing about physical limitations on his ability to work.  Instead, his claim is based on his contention that as long as he does not *actually* earn $14,000 or more in a year, regardless of his ability to be able to do so now, he is entitled to the continued receipt of disability benefits based on

18

a determination by the Trustees in 1999 that he met the Plan's definition of "Total and Permanent Disability."  His interpretation of the applicable Plan provision is so unreasonable, if it had been made by the Trustees, it would have been properly characterized as arbitrary and capricious. Accordingly, Plaintiff's contention is simply without merit.

## V. PLAINTIFF RECEIVED NOTICE OF THE PLAN PROVISIONS REGARDING DISABILITY BENEFITS

Plaintiff avers that the Fund's "1999 incorrect notice to Plaintiff of 'Plan rules governing suspension' establishes that the [Pension Plan] has breached its fiduciary duties by failing to 'discharge [its] duties with respect to a plan...in accordance with the documents governing the plan and by breaching its fiduciary duties of 'care, skill, prudence and diligence.'" [Plaintiff's Amended Complaint, ¶ 46].

Despite Plaintiff's assertions, the Pension Plan's 1999 notice was not incorrect.  The "notice" – a Retirement Declaration form [Exhibit 16 attached to Plaintiff's Amended Complaint] – refers to "Disqualifying Employment" and "suspension of benefits."  As explained herein, those terms apply more aptly to regular pension benefits, not disability benefits.

Moreover, the notice in question does not purport to be an exhaustive "do's and don'ts" of the Pension Plan, but pertains primarily to Disqualifying Employment that is relevant only to recipients of pension benefits, not disability benefits. Nor does the notice purport to address the subject matter of disability benefits specifically in any way. It does provide, however, that the person signing the document is declaring and acknowledging that he "will be bound by all the rules and regulations of the Pension Plan" and further states, over Plaintiff's signature, that "I have reviewed and understand the Central Laborers' Pension Fund's Plan Rules and

Regulations." [See, Exhibit 16 attached to Plaintiff's Amended Complaint.] Therefore, Plaintiff cannot assert that he was incorrectly notified of the provisions of the Plan.  Indeed, it is clear that Plaintiff is simply asserting that the Fund failed to divine that Plaintiff would interpret the Plan provisions to mean that his disability benefits would stop only if he engaged in "Disqualifying Employment, and then failed to notify Plaintiff that *his* anomalous interpretation was incorrect. As hereafter argued, such an expansive and unprecedented notion of an action for breach of fiduciary duty is untenable under Seventh Circuit precedent.

As previously stated, Plaintiff cannot simply declare that his interpretation of the "$14,000 provision" trumps the reasonable construction placed thereon by the Trustees of the Fund. Moreover, even assuming *arguendo* that the Fund's notification was "incorrect," (which the Fund vehemently denies), Plaintiff has not alleged – and could not factually allege – that the Fund intended to deceive Plaintiff.  The Seventh Circuit Court has steadfastly ruled that in order to demonstrate a violation of a fiduciary duty with respect to providing accurate information to an ERISA fund participant, the claimant must prove that the fiduciary set out to disadvantage or deceive the claimant. *Vallone v. CNA Financial Corporation*, 375 F.3d 623, 641 (7th Cir. 2004). In *Vallone*, the Seventh Circuit Court discussed the U.S. Supreme Court's ruling in *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065 (1996) that an employer breaches its fiduciary obligation by lying to employees in order to induce them to surrender their benefits. "Specifically," the Court stated at 642 in *Vallone*, "while there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable. *See Frahm*, 137 F.3d at 959."  Of the same import is the Court's ruling in *Brosted v. Unam Life Insurance Company of America*, 421 F.3d 459, 466 (2005) ("...this court held in *Vallone v. CNA Financial*

*Corporation*, 375 F.3d 623, 642 (7th Cir. 2004), that a breach of fiduciary duty claim premised on

a misstatement requires an intent to deceive"; *Herman v. Central States, Southeast and*

*Southwest Areas Pension Fund*, 423 F.3d 684, 695 (7th Cir. 2005) ("[a]bsent in this case is the

sort of 'deliberate misleading' to which we referred, in *Sprague v. General Motors Corp.*, 133

F.3d 388, 405 (6th Cir. 1998), *cert. denied*, 524 U.S. 923 (1998), as distinguishing a breach of

fiduciary duty"). Tellingly, the Seventh Circuit went on to state in *Herman* at 695:

> We note that the Supreme Court has cautioned against using the action for breach
> of fiduciary duty under ERISA to litigate "ordinary benefit claims"; "[W]e should
> expect that where Congress elsewhere provided adequate relief for a beneficiary's
> injury, there will likely be no further equitable relief, in which case such relief
> normally would not be 'appropriate.'" [*citing Varity*, 516 U.S. at 514-15, 116
> S.Ct. 1065]

Clearly this is Plaintiff's strategy here. He has been rebuffed in his unwarranted attempt

to continue to receive disability benefits when it was discovered by the Fund that he had been

working full-time, and now wants to transform that denial of benefits into an additional action

for breach of fiduciary duty. Such strategy, as stated by both the Supreme Court and the Seventh

Circuit Court of Appeals, is ill-considered and unfounded.

Plaintiff also asserts that the Pension Fund breached its fiduciary duty by providing

Plaintiff, at the time that he became eligible for the "Total and Permanent Disability" benefits of

the Pension Fund, a "RETIREMENT DECLARATION" that was – as noted by Plaintiff – "the

typical 'Disqualifying Employment' post-October 1998 notice for a Service-Only or Regular

Pension." [*See*, ¶ 42 of Plaintiff's Amended Complaint]. Plaintiff complains that "this notice did

not provide 'the Plan rules governing *suspension*' of Plaintiff's Disability Pension nor any

information unique to the Disability Pension, specifically alerting Plaintiff" to the "$14,000

provision." [*Id.*] [Emphasis added.]

Plaintiff here is attempting to parlay the colloquial use of the word "suspension" by Executive Director Barry McAnarney in his letter to Plaintiff dated June 1, 2007 [Exhibit 7 attached to Plaintiff's Amended Complaint]. In such letter, Mr. McAnarney states "your [Plaintiff's] Disability Pension will be suspended effective June 1, 2007," and thereafter states that "[y]ou [the Plaintiff] are entitled to appeal the suspension of your Disability Pension pursuant to the procedure set forth in Pension Plan Section 7.6, a copy of which is enclosed." [*Id.*] The suspension or cessation of disability benefits to Plaintiff was not a "suspension of benefits" *as that term relates to the very different concept of pension benefit suspension when a retired pensioner engages in "disqualifying employment.*" Plaintiff's disability benefits were terminated -- or suspended pending termination, if you will -- due to his ineligibility to continue to receive such benefits, *i.e., because he was physically able to perform full-time work, not because he chose to work after retirement*. The Pension Plan was denying Plaintiff eligibility to receive such benefits from and after July, 2005, based upon his full-time employment. Section 7.6 of the Pension Plan is entitled "Review of Denied Disability Claim" and said Section is the appropriate provision of the Plan for disability determinations and denials.

Plaintiff claims that Section 7.6 of the Plan is applicable only to the initial denial of disability claims [*see*, ¶ 45 of Plaintiff's Complaint], and further asserts that inasmuch as Plaintiff suffered a "suspension" of his disability benefits, then Section 7.8(f) of the Plan is the applicable section governing Plaintiff's situation.

Plaintiff is simply wrong. Again, he is attempting to bootstrap the use of the word "suspension" in the June 1, 2007 letter from the Plan's Executive Director to invoke provisions of the Plan that are simply inapplicable to his situation. Plan Section 7.8 is entitled "Suspension

of Benefits" and clearly defines the circumstances when retirement pension benefits – as opposed to disability benefits – are suspended. Such suspensions result from regular retirees engaging in "Disqualifying Employment." It is a concept that is strictly applied by the Plan to pension benefits, not disability benefits.

Plaintiff's invocation of the "Suspension of Benefits" section of the Plan is plainly inapposite. For example, subsection (h) of Plan Section 7.8 ("Suspension of Benefits") provides that "[p]ension benefits shall resume the first day of the month after the last month in which the Participant worked in Disqualifying Employment..."  This provision simply makes no sense when applied to a disability benefit context and underscores the inapplicability of this Plan Section to disability benefit scenarios. Clearly, disability benefits are based not on whether a person is or is not actually working in [disqualifying] employment, but instead is based on whether a person is sufficiently limited in his ability to work so as to be eligible under the plan for disability benefits. Thus, when a person, who previously has been deemed disabled, recuperates to the extent that he has the ability to perform full-time work, whether or not he chooses to engage in employment is irrelevant, *because he is not eligible to continue to receive disability benefits under the Plan.* Thus, disability benefits for such a person would not under any circumstances "resume the first day of the month after the last month in which [he] worked in Disqualifying Employment" because the person would still be physically **able** to work, and therefore, would not be eligible for disability benefits.

The only appropriate section of the Plan for review of disability benefit denials (whether initially or after the claimant recuperates sufficiently to be able to perform full-time work) is Section 7.6 ("Review of Denied Disability Pension Claim"), exactly the one set forth in the

Executive Director's letter to Plaintiff dated June 1, 2007 [Exhibit 7 attached to Plaintiff's

Amended Complaint].[1]

## VI. DISABILITY BENEFITS ARE NOT SUBJECT
## TO ERISA'S ANTI-CUTBACK RULE

The distinction between pension benefits and disability benefits is important here. It is a

distinction that Plaintiff refuses to accept (as demonstrated by his insistence that disability

benefits – like regular pension benefits – are protected by the "anti-cutback rule" of 29 U.S.C. §

1054(g)(1)).

Following the Fund's involvement in the U.S. Supreme Court case of *Central Laborers'*

*Pension Fund v. Heinz*, 541 U.S. 739 (2004), the Fund's professionals grappled with the issue as

to whether the Fund's disability benefits were "protected benefits" pursuant to Section 411(d)(6)

of the Internal Revenue Code subject to the anti-cutback rule of ERISA, 29 U.S.C. § 1054(g)(1).

Although the Fund's professionals debated the issue in the aftermath of *Heinz*, reviewing Courts

before and after *Heinz* have definitively resolved the issue, consistently holding that disability

benefits that are part of retirement or pension plans are ***not*** accrued benefits subject to the anti-

cutback rule, but are instead welfare benefits.

The courts' analysis in these case begins with reference to the provision in ERISA

defining a welfare plan: 29 U.S.C. § 1002(1). That provision states that an "employee welfare

---

[1]It should be noted here, too, that Plaintiff's insistence that his appeal rights to contest a "suspension" of disability benefits were, and are, governed by Plan Section 7.8(f), as opposed to Section 7.6, is a curious stance. Section 7.8(f)(2) explicitly states that a "Pensioner shall notify the Plan in writing within 15 days after starting work of any type that is or may be considered Disqualifying Employment under the Provisions of the Plan," a requirement that is analogous to that found in the provisions of the Plan expressly dealing with disability benefits. Plaintiff acknowledges that he never reported any of his earnings to the Fund.

24

benefit plan," or "welfare plan," is defined as

> Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, *to the extent* that such plan, fund, or program was established or is maintained for the purpose of providing...*benefits in the event of* sickness, accident, *disability*, death or unemployment...[Emphasis added]

As the Court in *Anderson v. Suburban Teamsters of Northern Illinois Pension Fund*, 588 F.3d

641, 651, (9th Cir. 2009) noted,

> ...The "to the extent" language evidences Congress's intent that the definition encompass *any portion* of a plan in which the employee's disability triggers the right to the benefit.

The Court in *Anderson* ruled – consistently, as it further noted, with similar rulings in its sister

circuits of the Second, Sixth, and Eleventh Circuits – that disability pension benefits are not

subject to the anti-cutback rule because they are welfare benefits, not pension benefits. *See, e.g.,*

*Green v. Holland*, 480 F.3d 1216 (11th Cir. 2007).

The same distinction was well-described in the case of *Robinson v. Sheet Metal Workers'*

*National Pension Fund, Plan A,* 441 F. Supp.2d 405 (D.Conn. 2006), at 417-418:

> Under ERISA, an employee benefit plan may be one of two general types – an "employee pension benefit plan," also known as a "pension plan;" or an "employee welfare benefit plan," also known as a "welfare benefit plan." 29 U.S.C. § 1002(3) (2006). Section 1002 provides that a plan is a pension plan "to the extent that [it]...provide[s] retirement income to employees, or...results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A). A plan is a welfare benefit plan "to the extent that such plan...was established or is maintained for the purpose of providing for its participants or their beneficiaries...medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment" (as well as several other types of benefits that are not relevant for present purposes). 29 U.S.C. § 1002(1). The distinction between a pension plan and a welfare benefit plan is critical to this case because, while the anti-cutback rule protects pension plans from diminution in benefits, it does not protect welfare plans. *See* 29 U.S.C. § 1051(1) (2006) (providing that the portion of ERISA that includes Section 1054(g)'s anti-cutback rule does not apply

to "an employee welfare benefit plan."

In interpreting Section 1002(1), which defines a "welfare benefit plan," the Second Circuit has held that the anti-cutback rule does not apply to any plan, or portion of a plan, that provides disability benefits. *Rombach v. Nestle USA, Inc.*, 211 F.3d 190, 193 (2ⁿᵈ Cir. 2000)...Indeed, in *Rombach*, the Second Circuit held that a disability benefit was not a pension benefit, despite the fact that the plan itself described the disability benefit as a "pension" and the disability benefit was part of a master plan that also included a variety of retirement pensions, such as early retirement pensions and normal retirement pensions. *Rombach*, 211 F.3d at 194 ("[I]t does not matter that Nestle called the disability retirement pension portion of its plan a 'pension benefit' and made it part of its master 'pension plan.'"). To the *Rombach* court, a disability benefit is a welfare benefit because "it was a benefit triggered by disability." *Id*. ("[U]nder the plain language of the statute, 'to the extent' that [the] Pension Plan provides benefits that are triggered by disability, that portion of the plan is a welfare plan under § 1002(1).")...

...As noted above,...the court in *Rombach* rejected the proposition that a disability plan would become a pension plan merely because the plan administrator chose to describe it as such. *Rombach*, 211 F.3d at 194. ***In short, it is not the label, but rather the substance that controls. Therefore, whatever it was called, the [plan's] benefit's "meaning and function remained clear; it was a benefit triggered by disability."*** [Emphasis added.]

This analysis was expressly upheld on review by the Second Circuit Court of Appeals in *Robinson* vs. *Sheet Metal Workers' National Pension Fund, Plan A*, 515 F.3d 93 (2008) (where the Court agreed that disability benefit provisions in an ERISA plan may be amended without regard to ERISA's "anti-cutback rule" inasmuch as disability benefits are both welfare benefits and ancillary benefits, rather than accrued pension benefits). This commonsense notion that the substance – not the label – controls is particularly appropriate in the instant case, where Plaintiff is not only attempting to transpose a disability benefit into a pension benefit, but is also attempting to turn the Fund's Executive Director's use of the word "suspension" into a declaration that a cessation of such disability benefits are to be reviewed under the Plan's "suspension of benefits" provisions pertaining to regular pension benefits.

26

## VII. PLAINTIFF RECEIVED NOTICE THAT ONGOING DISABILITY WAS REQUIRED TO REMAIN ELIGIBLE TO RECEIVE DISABILITY BENEFITS[2]

Plaintiff acknowledges that he received a 1995 Summary Plan Description from the Fund when they were mailed to all participants:

> Q.      So I'm not asking you whether you assimilated all this or learned all this, but you're not doubting that you received your packet of the Summary Plan Description –
>
> A.      I received them.
>
> Q.      Is that correct?
>
> A.      Yes. [Plaintiff's Dep., p. 28, attached]

While Plaintiff denies that he received the accompanying Restated Plan Rules and Regulations of the Plan, the fact of the matter is the Summary Plan Description and the Restated Plan Rules and Regulations were sent out in a single, bound booklet. [*See,* Sharon West Dep., pp.170-171 and Exhibit 36 thereof]

Page 21 of the 1995 Summary Plan Description provides as follows:

**What is the Amount of the Disability Pension?**
The amount of the Disability Pension is the same as the Regular Pension and depends on the number of Pension Credits you earned and the contribution rates at which your credit was earned. There is no reduction in benefits because you are younger than age 63.

***Disability benefits are payable for life, assuming, of course, that you remain totally and permanently disabled***. Your Disability Pension starts upon the receipt of your completed application but no earlier than the first day of the sixth month of your continuous total and permanent disability. Although payments are made retroactively to the date of your disability, in no event will more than 36 months of retroactive payments be made. MEDICAL EVIDENCE

---

[2] For purposes of the following two sections, excerpts from depositions hereafter cited are collectively attached seriatim as Exhibit D under the heading "Excerpts in support of the Fund's Motion For Summary Judgment." Each such attachment is separated by a blank sheet of paper.

SATISFACTORY TO THE TRUSTEES OF TOTAL AND PERMANENT
DISABILITY IS REQUIRED.

See Sections 3.10, 3.11 and 3.12, pages 64 for the exact Plan provisions
defining "total and permanent disability" how to obtain proof of your disability
and how benefits may be suspended or terminated.[Emphasis added.]

Thus, Plaintiff was notified that, in order to continue to be eligible for Disability Benefits, he

must remain totally and permanently disabled. Moreover, Section 3.10 of the Restated Plan

Rules and Regulations of the Plan, accompanying the Dep. of Sharon West, (a provision that is

expressly referenced in the above-quoted excerpt of the Summary Plan Description), states in

pertinent part as follows:

A Disability Pensioner shall report any and all earnings from any employment or
gainful pursuit to the Pension Fund Office in writing within 15 days after the end
of each month in which he had such earnings. If a Disability Pensioner fails to
make timely reports as required by this section, he shall be disqualified for
benefits for up to 12 months in addition to the duration of such employment for
each such violation.

Also, when he submitted his written application for disability benefits with the Fund on

July 14, 1999, on the Fund's pre-printed form, Plaintiff signed the document with the following

language immediately above his signature:

***I agree to be bound by all the Rules and Regulations of the Pension Fund*** and
will personally endorse all Pension Checks received by me. [Emphasis added;
Exhibit 3A of Plaintiff's Dep., attached]

And, Plaintiff signed a Retirement Declaration on August 16, 1999 [Exhibit 3B of Plaintiff's

Dep., attached] containing the following declaration:

I have reviewed and understand the Central Laborers' Pension Fund's Plan Rules
and Regulations. I agree to be bound by all such Rules and Regulations, including
those outlined above regarding Disqualifying Employment.

There is no mistaking, then, that Plaintiff was expressly aware of the existence of the

rules and regulations pertinent to his initial eligibility and to continuing eligibility for receipt of

disability benefits. Further, there is no mistaking that Plaintiff was consciously indifferent to the

contents of those rules and regulations:

> Q.      You've acknowledged here on July 14th, '99, that you just read, that said
> you agree to be bound by all the rules and regulations.
>
> A.      Yes.
>
> Q.      Okay. You knew that the "rules and regulations," that term, referred to
> something. Right?
>
> A.      Yes.
>
> Q.      You understood that your Disability Pension Benefits were governed by
> rules and regulations. Isn't that correct?
>
> A.      Yes. Yes.
>
> Q.      All right. And what I'm asking is did you understand that the rules and
> regulations referred to Plan documents that stated Restated Plan Rules and
> Regulations?
>
> A.      Yes.
>
> Q.      Okay. Now, at that time did you inquire about what those rules and
> regulations were?
>
> A.      No.
>
> Q.      Okay. Did you ask for a copy of the rules and regulations?
>
> A.      No.
>
> Q.      Did anybody prevent you from asking for such?
>
> A.      No. [Plaintiff's Dep., pp. 80-81, attached]

* * * * *

> Q.      Okay, did you make any effort at the time in August of 1999 to find out
> what those other rules are?

29

A.    No.

Q.    At any time between August of 1999 and the filing of your lawsuit, did you inquire what those rules were?

A.    No. [Plaintiff's Dep. 92, attached]

The rules and regulations required Plaintiff to report any earnings to the Fund. Plaintiff worked full-time from July 2005 to November 2007 for Willman Construction (as a warehouseman manager, driving a truck to deliver construction materials). Plaintiff, again, was indifferent to any obligation to follow such rules and regulations:

Q.    Well, have you to date reported those earnings to Central Laborers' Pension Fund?

A.    No.

      MR. GASICK [Plaintiff's counsel]: No, we're stipulating he never did.

Q.    All right. And you do acknowledge that the rules were – when you went on Disability Pension Benefits that the rules were that you were required to report those to the Central Laborers' Pension Fund either at the end of the month in which the earnings were made or thereafter at the end of the calendar year?

A.    I was not aware of that at that time.

Q.    All right. But you're aware of it now –

A.    Yes.

Q.    – isn't that correct?

A.    Yes.

Q.    And so as you look back, you could see that you did not comply with the rules. Isn't that correct?

A.    Yes. [Plaintiff's Dep. 107-108, attached]

The Plaintiff's refusal to follow the Fund's rules and regulations continues to date. Plaintiff has been employed full-time as a lead maintenance person for Jumer's Casino/Hotel for the last two years [Plaintiff's Dep. pp. 43-44, attached], but Plaintiff has declared himself exempt from complying with the rules and regulations of the Fund in reporting his earnings therefrom:

Q.      Now, in terms of your work at Jumer's, have you reported any of those earnings to the Central Laborers' Pension Fund?

A.      No.

Q.      Okay.

A.      I feel as though I'm no longer a participant.

Q.      All right. So you don't feel that you are bound by the rules and regulations of the –

A.      Yes, I –

Q.      – Central Laborers' Pension Fund anymore. Isn't that correct?

A.      Yeah. [Plaintiff's Dep. 112-113, attached]

## VIII. CONCLUSION

\* \* \* \* \*

*Q.      All right. And what would you have done differently, then, if you had known about the $14,000 provision with respect to your subsequent employment?*

*A.      I wouldn't have made $14,000. All they had to do was send me a letter saying we disagree with what you're doing and I would have stopped it.*

*Q.      So your understanding is – What you could have done – Your understanding is the eligibility requirements for Disability*

31

> *Pension Benefits in Central Laborers'*
> *Pension Fund is that you would have been*
> *able to work 40 hours a week in a job –*
>
> A.   *Up to $14,000.*
>
> Q.   *– and all you had to do was quit at $14,000*
> *and you could continue receiving Disability*
> *Pension Benefits. Is that correct?*
>
> A.   *Correct.*
>
> Q.   *And so you could have been able-bodied*
> *and just sat there at home collecting those*
> *disability checks despite the fact that you*
> *were able to work –*
>
> A.   *Until I could work up to the $14,000.*
>
> Q.   *– okay – is that correct?*
>
> A.   *In the right environment, yes.*
>
> — Excerpt from Deposition of
> Plaintiff Donald Tompkins,
> August 12, 2010, pp. 116- 117,
> attached.

Notwithstanding the fact that the legal issues that Plaintiff raises are without merit and, therefore, should result in denial of Plaintiff's claims against the Fund, this Court should also be mindful of the overall substantive position Plaintiff and his counsel (apparently straight-faced) are taking. As demonstrated by the above-quoted excerpt from his deposition, Plaintiff's position is so meretriciously cynical as to defy commonsense or decency. Plaintiff and his counsel have convinced themselves that a recipient of disability benefits, whose initial eligibility was based upon a finding of total and permanent disability from meaningful/gainful employment, can subsequently recuperate from such disability to the extent that the recipient can (and does) work

full-time at a regular, gainful job, and still continue to draw disability benefits from the Fund.

How? According to Plaintiff and his counsel, Plaintiff was not timely informed that the Trustees

of the Fund enacted a provision that provided that a recipient of a disability pension from the

Fund may earn up to $14,000 per calendar year and may still be considered totally and

permanently disabled. Therefore, they reason, Plaintiff was not appropriately notified by the

Fund as to how Plaintiff could game the system, *i.e.*, by stopping his full-time employment at the

point at which he earns $14,000, and sit at home collecting disability checks. So now Plaintiff

and his counsel want the U.S. District Court to aid him in his endeavor.

The Fund respectfully requests that the Court find, as a matter of law, that Plaintiff is not

entitled to relief, and requests that the Court grant the Fund's Motion For Summary Judgment

against Plaintiff with respect to all counts of Plaintiff's Amended Complaint.

Respectfully submitted,
CENTRAL LABORERS' PENSION FUND
Defendant/Counter-Plaintiff

By: /s/ Patrick J. O'Hara
        One of its Attorneys

CAVANAGH & O'HARA LLP
Patrick J. O'Hara
407 East Adams Street
P.O. Box 5043
Springfield, IL 62705
(217) 544-1771 -Telephone
(217) 544-9894 - Facsimile
patrick@cavanagh-ohara.com

**RULE 7.1 CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies in accordance with Local Rule 7.1(B)(4)(b)(2) that

Defendant's motion for summary judgment complies with the Type-Volume limitation specified

in Local Rule 7.1(B)(4)(b)(2) inasmuch as the motion contains 6,627 words, excluding the

sections of the motion excluded from such calculation by Local Rule 7.1(D)(5).


　　　　　　　　　　　　　　　　　　　　__s/ Patrick J. O'Hara____


Patrick J. O'Hara
Cavanagh & O'Hara LLP
407 East Adams Street
Springfield, Illinois 62701
(217)544-1771 - Telephone
(217)544-9894 - Facsimile
patrick@cavanagh-ohara.com
Counsel for Central Laborers' Pension Fund

**CERTIFICATE OF SERVICE**


I hereby certify that on February 1, 2011, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filings(s) to the following:


Gery Gasick
ATTY.G.GASICK@comcast.net

Respectfully submitted,
CENTRAL LABORERS'
PENSION FUND,


__s/   Patrick J. O'Hara_____


Patrick J. O'Hara
Cavanagh & O'Hara LLP
407 East Adams Street
Springfield, Illinois 62701
(217)544-1771 - Telephone
(217)544-9894 - Facsimile
patrick@cavanagh-ohara.com
Counsel for Central Laborers' Pension Fund