# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| DONALD J. TOMPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.        09-cv-4004 |
| | ) | |
| CENTRAL LABORERS' PENSION | ) | |
| FUND, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

Before the Court are the parties' cross-Motions for Summary Judgment (Docs. 41 & 42).  Both motions have been fully briefed and are ready for determination by this Court.  For the following reasons, Defendant's Motion for Summary Judgment (Doc. 42) is GRANTED in part and DEFERRED in part, and Plaintiff's Motion for Summary Judgment (Doc. 41) is DENIED.

### BACKGROUND[1]

Defendant is a not-for-profit, multi-employer ERISA fund, established and administered pursuant to 29 U.S.C. § 1001 *et. seq.*, and governed by a Board of Trustees with equal representation from management and labor unions. (Doc. 42 at 3).  Plaintiff began working as a laborer in Laborers' Local 309, Rock Island, Illinois, in November of 1978.  (Doc. 41 at 2).  Plaintiff was a Participant in Defendant Fund as a result of such employment.  (Doc. 41 at 2).

---

[1] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted.  Facts that are omitted are immaterial.

In July of 1999, Plaintiff filed an application for a "Disability Pension" with Defendant, which included a "Statement of the Attending Physician" documenting Plaintiff's Chronic Asthmatic Bronchitis, as well as an "Employee's Statement" which attributed his condition to working with cement dust for twenty-two years. (Doc. 41 at 11). On August 19, 1999, Defendant sent Plaintiff a letter approving Plaintiff as eligible for "Total and Permanent Disability" benefits.[2] (Doc. 41 at 11; 42 at 4). The letter indicated that Plaintiff's monthly benefit would be $2,115.43 ($1,955.43 + $160 Supplemental Pension), and that it was retroactive to January 1, 1999. (Doc. 41 at 11).

At the time Plaintiff applied for, and received, these disability benefits, Defendant Fund was administered pursuant to the Central Laborers' Pension Fund Summary Plan Description revised and effective July 1, 1995, and the Restated Plan Rules and Regulations – Amended and Restated Effective October 1, 1994, ("First Restated Plan") plus Amendment No. 7, dated November 10, 1998.[3] (Doc. 42 at 3-4). Section 3.10 of the Plan, as amended by Amendment No. 7 and in effect at the time Plaintiff received his award of disability benefits, defined "Total and Permanent Disability." (Doc. 42 at 6). The Section provided as follows:

> A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or

---

[2] The Court will refer to Plaintiff's "Total and Permanent Disability" benefits as both "disability benefits" and "Disability Pension." This interchangeable use is based upon context, and neither reference indicates the Court's position as to whether the benefits were a pension benefit or a welfare benefit for purposes of the anti-cutback rule.

[3] Other governing Amendments were also in place at the time, however, as Plaintiff points out, only Amendment No. 7 is relevant to the instant disposition.

other Building Trades Crafts employment in the construction industry for renumeration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of Non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, *the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes of Section 3.10.*[4] Such disability must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder.

(Doc. 42 at 6-7).[5] The First Restated Plan's language, including the above provision, was not mailed or otherwise provided to Plaintiff or any other Pension Fund Participants (Doc. 41 at 15; 42 at 7), although Plaintiff was required to sign a Retirement Declaration at the time he first received his benefits. (Doc. 19 ¶ 42; 42 at 21). Plaintiff received his disability benefits every month through May of 2007. (Doc. 41 at 11).

On June 1, 2007, Defendant sent Plaintiff a letter suspending his disability benefits ("Termination Letter"). (Doc. 42 at 8; Doc. 1-2 at 13). According to the Termination Letter, Defendant had received information indicating that Plaintiff received compensation for full-time employment at Wilman Construction during

---

[4] The italicized language will hereinafter be referred to as the "$14,000 provision."

[5] The relevant section has been amended twice since the time Plaintiff was determined eligible for benefits, first on September 9, 2002, and again on November 28, 2005. (Doc. 42 at 7-8). In its letter terminating Plaintiff's benefits, Defendant cited to §1.31 of the Restated Plan, which was made effective October 1, 1999, by the September 9, 2002 amendment. However, both parties now agree that the applicable version is section 3.10, as placed into effect by Amendment No. 7. (Doc. 42 at 14; 46 at 27).

calendar years 2005 and 2006.  (Doc. 1-2 at 13).[6]  The Termination Letter further states that such information had led them "to believe that you no longer meet the Fund's definition of 'total and permanent disability'" and therefore that his Disability Pension would be suspended effective June 1, 2007.  (Doc. 1-2 at 13).  The Letter informed Plaintiff that Defendant also believed he had been overpaid during the months of July 2005 – May 2007 in the amount of $48,654.89, and that it would seek to recover this amount through its "recovery process."   (Doc. 1-2 at 13). Finally, the Termination Letter stated that Plaintiff was entitled to appeal the suspension of his benefits pursuant to §7.6 of the Plan.  (Doc. 1-2 at 13).[7]

On February 25, 2008, Plaintiff appealed the determination of Defendant Fund, invoking Plan Sections 7.8(f) and 7.4.  (Doc. 42 at 9).[8]  On April 21, 2008, Plaintiff and his counsel personally appeared before the Board of Trustees of the Fund and were allowed to present additional information and arguments in furtherance of Plaintiff's administrative appeal.  (Doc. 42 at 9).  Plaintiff did not submit any documentation or present any evidence or argument consisting of medical or vocational information regarding his current ability or inability to perform full-time employment.  (Doc. 42 at 9). Instead, Plaintiff argued three issues on appeal: 1) his 2005 work was of the "non-Laborer" variety and he earned below

---

[6] The information indicated that Plaintiff began working 40 hours a week for Wilman Construction around July 1, 2005, and that he had earned $10,550.00 in 2005 and $22,100.00 in 2006.   (Doc. 42-1 at 2; 42-3 at 19).

[7] Section 7.6 is entitled "Review of Denied Disability Pension Claim."

[8] Section 7.8(f) is entitled "Suspension of Benefits" and 7.4 is entitled "Review of all Denied Non-Disability Claims, Regardless of the Date Filed, and Disability Pension Claims Filed Before January 1, 2002."  (Doc. 42 at 8-9).  Plaintiff contends that he invoked the correct procedure for appealing rather than the one Defendant cited to in its Termination Letter.  (Doc. 46 at 8).

$14,000 in compensation such that he should have still been considered "totally and permanently disabled" for 2005; 2) the overpayment provisions should only apply *after* Plaintiff earned $14,000 for the year and should not go into effect until his salary exceeded that amount; and 3) Plaintiff was not properly notified of the requirements to remain "totally and permanently disabled" in accordance with ERISA and the plan documents. (Doc. 42-3 at 20-29). Defendant denied Plaintiff's appeal on April 21, 2008 and by letter dated April 25, 2008 ("Letter Denying Appeal"), informed Plaintiff of the Trustee's unanimous decision. (Doc. 42 at 11; Exh. A at 1).

In its Letter Denying Appeal, Defendant states that "a fundamental and ongoing requirement for continued eligibility to receive a Disability Pension is the Pensioner's Total Disability Status," and that therefore its determination centered upon whether Plaintiff's physical condition since July 1, 2005 was such that he would meet the definition of "Total and Permanent Disability." (Doc. 42-1 at 3). The Letter goes on to state that because Plaintiff had demonstrated the ability to work full-time since July 1, 2005, he no longer met that definition, and therefore that his Disability Pension was properly terminated. (Doc. 42-1 at 3). The Letter also considered Plaintiff's proposed interpretation of the Total and Permanent Disability provision, and found that it "would undermine the fundamental purpose of the Plan's Disability Pension: to provide steady income to those Participants who are unable to work on account of a medical condition which, at the time the Participant became eligible for the Disability Pension, the Trustees determined

would 'continue during the remainder of the Participant's life.'" (Doc. 42-1 at 4). The Letter concluded by informing Plaintiff that he may bring a civil action as a result of the denial of his claim pursuant to 29 U.S.C. § 1132(a). (Doc. 42-1 at 8).

On February 12, 2009, Plaintiff invoked that right and filed a Complaint (Doc. 1) initiating the instant lawsuit. Plaintiff filed an Amended Complaint on December 21, 2009 (Doc. 19). In his Amended Complaint, Plaintiff alleges that 1) Defendant's termination of his Disability Pension controverted the plain meaning of the Plan by failing to apply the "$14,000 provision" to Plaintiff's full-time employment as a "non-Laborer" (Count I); 2) Defendant did not properly notify Plaintiff of the Plan rules governing the suspension of his Disability Pension benefits (Count II); and 3) Defendant is in violation the anti-cutback rule of ERISA (29 U.S.C. § 1054(g)(2)). (Count III).[9] Following discovery, on January 31, 2010, Plaintiff filed his Motion for Summary Judgment, seeking judgment as a matter of law as to Counts I and II of his Amended Complaint. (Doc. 41). On February 1, 2011, Defendant filed its own Motion for Summary Judgment, seeking judgment in its favor on all three counts of Plaintiff's Amended Complaint. (Doc. 42).

## DISCUSSION

### I.    Legal Standard

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

---

[9] On December 21, 2009, Defendant filed a Counterclaim against Plaintiff for fraudulent concealment. (Doc. 18). Defendant's Counterclaim is not at issue in the cross-motions for summary judgment.

matter of law." FED. R. CIV. P. 56. In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. *Id.*

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts," such matters must be left for the jury. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). The interpretation of an ERISA plan is a subject particularly suited to disposition by summary judgment. *See Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th Cir. 1998).

## II. Standard of Review of ERISA Plan

The Court's review of a denial of benefits is performed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the terms of the plan provide for such discretion, judicial review of the administrator's decisions is limited to an arbitrary-and-capricious standard. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006). Under such standard, an administrator's decision will be upheld so long has it has "rational support in the record." *Id.* (*quoting Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 409 (7th Cir. 2004). That is, "an administrator's decision will not be overturned unless it is downright unreasonable." *Id.* (internal quotations omitted).

Here, the parties agree that the Plan grants Defendant's Trustees discretionary authority to interpret and apply the terms of the Plan. (Docs. 41 at 16; 42 at 12).[10] As such, the Court must engage in an arbitrary-and-capricious level of review. Plaintiff, however, argues that a heightened standard of review is appropriate because Defendant has acted in bad faith and is operating under a conflict of interest. (Doc. 41 at 17-25).[11]

---

[10] Section 6.3 of Article 6 of the First Restated Plan provides that Defendant Fund's Trustees have discretion to interpret the Plan. (Doc. 42 at 4).

[11] Plaintiff also argues that the plain meaning of the Plan is at odds with Defendant's interpretation. (Doc. 41 at 16-22). However, because this argument deals with review under the arbitrary-and-capricious standard rather than whether the arbitrary-and-capricious standard should apply in the first place, the Court will consider this argument after it determines the appropriate standard of review.

**A. Defendant's Alleged Bad Faith**

Plaintiff points to language in the Supreme Court case of *Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (2010), for the proposition that "[u]nder trust law, a trustee may be stripped of deference when he does not exercise his discretion 'honestly and fairly.'" Plaintiff then appears to argue that the Defendant in this case did not exercise its discretion "honestly and fairly" – i.e. in bad faith, because it failed to disclose to him three documents Plaintiff believes to be relevant to the denial of his benefits. (Doc. 41 at 19). These documents include 1) an internal memo sent from one of Defendant's consultants in 1997 stating that "the general consensus is that the current definition [of total and permanent disability] is too restrictive, even with the change that allows a participant to work in non-construction employment and earn up to $14,000 per year;" 2) a letter sent that same year from the same consultant stating that "a disabled participant can earn up to $14,000 per year in non-construction type of work and continue to be eligible to receive disability payments from the Pension Plan;" and 3) a DRAFT Amendment to the 1999 Restated Plan, which considered incorporating the following language: "For such non-Laborer or non-Building Trades Crafts employment *that is not considered full-time and a primary source of income*, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled." (Doc. 41 at 20-21 (emphasis added)). Plaintiff states that these documents support his interpretation that the "$14,000 provision"

applies to full-time, as well as part-time, work in non-Laborer employment, and that it was bad faith for Defendant not to reveal them to him prior to or during his April 21, 2008 Appeal hearing. (Doc. 41 at 21).[12]

Defendant responds that applicable federal regulations make clear that it was under no obligation to provide Plaintiff a draft of a Plan amendment, considered but not enacted some three years prior to the claims hearing. (Doc. 45 at 12). The Court agrees. Defendant was under no obligation to provide Plaintiff with a draft amendment which it considered but did not adopt. Section 2560-503-1(j)(3) of Title 29 of the Code of Federal Regulations requires that a plan provide a claimant who has been denied benefits with copies of all documents, records, and other information *relevant* to the claimant's claim for benefits; such information is relevant if it: "(i) was relied upon in making the benefit determination; [or] (ii) was submitted, considered, or generated in the course of making the benefit determination, regardless of whether such . . . information was relied upon in making the benefit determination." 29 C.F.R. § 2560-603-1(m)(8). Plaintiff does not show how the DRAFT Amendment was relevant to Defendant's determination that he was no longer permanently and totally disabled. Notably, the DRAFT Amendment was not adopted, and therefore was not binding or relied upon in anyway. Accordingly, the Court finds that Plaintiff has not demonstrated any bad faith on the part of Defendant such that it should be stripped of the deference it is otherwise owed under the Plan.

---

[12] While Plaintiff references all three documents, his whole argument is based upon Defendant's failure to disclose the DRAFT Amendment. (See Doc. 41 at 20-22).

### B. Conflict of Interest

Plaintiff also argues that this Court must engage in a more rigorous review of Defendant's decision to terminate Plaintiff's disability benefits because it was operating under a conflict of interest. (Doc. 41 at 22). Plaintiff claims that there is an inherent conflict of interest which must be taken into account by this Court because Defendant's Board both evaluated claims and at the same time was concerned about the cost of its retirement plan. (Doc. 41 at 22). Plaintiff points to various evidence of Defendant's "conflict," including a 2004 power point presentation which was sent to Defendant's executive director and other officials stating that "due to poor investment performance, the Fund needs to adjust benefits until the investment loss has been funded" and a January 28, 2010 letter to Participants and Beneficiaries in which it gave notice that due to "declines in financial markets in recent years" the Fund was in the "Yellow Zone" or "endangered status" for the 2009 Plan Year. (Doc. 41 at 24-25).

However, even if these two pieces of evidence were sufficient to establish that the Board was concerned with its financial status when it decided to terminate Plaintiff's Disability Pension benefits, the Court finds that such an inquiry is less demanding in this case. Here, Defendant is a not-for-profit, multi-employer ERISA Fund, governed by a Board of Trustees with equal representation from management and labor unions. (Doc. 42-2 ¶ 3). In *Manny v. Central States, Southeast and Southwest Areas Pension*, 388 F.3d 241 (7th Cir. 2004), the Seventh Circuit held that a conflicts analysis was not necessary when the plan at issue was a multi-

employer welfare plan, whose trustees consisted of an equal number of union and employer representatives, the union representatives had no discernible incentive to rule against the applicant, and the trustees were unanimous in their ruling. *Id.* at 243. At first glance, that appears to be the case here. (See Doc. 42-1 at 2 ("the Trustees determine unanimously to deny Mr. Tompkins appeal.")). However, Plaintiff argues that here, unlike in *Manny*, the evidence indicates that the union trustees did have an incentive to rule against him, namely the fact that the Plan was in financial trouble. Accordingly, the Court will keep this potential conflict in mind while reviewing Defendant's decision under an "arbitrary and capricious" lens. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (holding that a potential conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion."); *Manny*, 388 F.3d at 243 ("holding that the "arbitrary and capricious" standard is a range, not a point, and that judicial review will be "more penetrating the greater is the suspicion of partiality.").

### III. Count I

In Count I of his First Amended Complaint, Plaintiff alleges that the plain meaning of the Plan mandates that his Disability Benefits should not have been suspended until *after* he earned $14,000 in a given calendar year. Plaintiff maintains that the plain meaning of § 3.10 is that a Participant may remain "totally and permanently disabled" if he earns up to $14,000 in a calendar year, so long as he is engaged in non-Laborer or other non-Building Trades Crafts employment, even if his employment is full-time. Accordingly, Plaintiff argues that Defendant

controverted the plain meaning of the Plan when it found him to no longer be totally and permanently disabled based upon his full-time work in 2005, wherein he earned less than $14,000. Plaintiff also argues that in *every* calendar year, he should be allowed to earn up to $14,000, and that his disability benefits payments should only be suspended for each year after he has surpassed that mark.

Section 3.10 reads as follows:

A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for renumeration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of Non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes of Section 3.10.

(Doc. 42 at 6-7). The second sentence of this provision specifically states "*For such Non-Laborer employment*" directly after referring to Non-Laborer employment that is full-time and a primary source of income. Plaintiff argues that this language unambiguously indicates that the "$14,000 provision" applies to full-time Non-Laborer employment. Defendant counters that the "for such" language only refers to the *type* of work at issue, i.e. Non-Laborer employment, as opposed to the more specific "*full-time* Non-Laborer" employment. (Doc. 45 at 14). While the Court would be inclined to interpret the provision in the same manner as Plaintiff, because of the deferential standard of review, this inclination is irrelevant. All that

matters is that the language is susceptible to more than one reasonable interpretation, and Defendant's interpretation is not unreasonable. *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006).

The Seventh Circuit has held that under the arbitrary and capricious standard of review, a plan's decision should be upheld "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Sisto v. Ameritech Sickness and Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2006) (quoting *Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 995 (7th Cir. 2004)). Here, Defendant has proffered a reasonable explanation for its interpretation that once a participant is engaged in full-time employment, regardless of whether or not he reaches the $14,000 threshold, he is no longer considered "totally and permanently disabled" for that year, or for future years. Defendant's rationale is that a participant is only "permanently and totally disabled" if he is incapable of full-time employment due to his disability. Once a participant has shown that he is capable of such employment and is no longer suffering from a disability, he can no longer be considered "totally and permanently disabled," even if he subsequently terminates his other employment.[13] Such reading is also consistent with § 3.12 of

---

[13] Moreover, Defendant indicates that it has always interpreted § 3.10 to apply to part-time employment, such that it cannot be said that it began to interpret it in this way out of the potential desire to "save money," as alleged by Plaintiff in his conflict of interest argument. (See Doc. 42 at 16; 42-2 at 6).

the First Restated Plan, which provides that if a participant is no longer entitled to disability benefits, he may apply for an Early Retirement Pension. Accordingly, in deference to Defendant's interpretation of its own Plan, the Court finds that it was justified in terminating Plaintiff's disability benefits beginning in July 2005, when Plaintiff began to work full-time. Therefore, Plaintiff's Motion for Summary Judgment as to Count I is DENIED, and Defendant's Motion for Summary Judgment as to Count I is GRANTED.

## IV.    Count II

Section 1102(a)(1)(D) of Title 29 of the United States Code provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (D) in accordance with the documents governing the plan." In Count II of his First Amended Complaint, Plaintiff alleges that Defendant "failed to follow Plan language in 1999 by *incorrectly* notifying the Plaintiff of 'the Plan Rules Governing Suspension.'" (Doc. 19 at 16).[14] Relying upon ERISA's § 1104(a)(1)(D) "plan document rule," Plaintiff alleges that at the time Plaintiff was awarded Disability Pension benefits in August of 1999, the Plan had a provision entitled "Notices" under the Section title "Suspension of Benefits," found in § 6.7(e)(1) of Amendment No. 7 of the First Restated Plan (effective October 1, 1998) ("§ 6.7(e)(1)"), which provided as follows: "Upon commencement of pension benefit payments, the Trustees shall notify Pensioner of the Plan rules governing suspension of pension benefits, including identity of the industries and area covered

---

[14] As a remedy, Plaintiff claims, "that failure voids [Defendant's] suspension and the full amount of the claimed overpayment of $48,654.89."

by the Plan." (Doc. 19 ¶ 39; 45-5 at 3). It is Plaintiff's position that because Defendant failed to notify Plaintiff of the terms governing a finding of "Total and Permanent Disability" found in § 3.10 of the Plan, including its "$14,000 provision," it breached its fiduciary duty to abide by the plan documents and give Plaintiff notice of the rules governing the potential suspension of his benefits. (Doc. 19 ¶ 43; 42 at 4-5). Plaintiff also claims that by failing to provide the proper notice to Plaintiff regarding his continued entitlement to Disability Pension benefits, Defendant breached its fiduciary duties of "care, skill, prudence, and diligence" as established by 29 U.S.C. § 1104(a)(1)(B). (Doc. 19 ¶ 46; 46 at 21).[15]

### A. Plan Documents Rule

Defendant does not deny that it failed to give Plaintiff documents containing the "$14,000 provision" in August of 1999 when it found that he was entitled to receive Disability Pension benefits. (Doc. 45 at 3). However, Defendant argues that it did not violate the "plan documents rule" thereby because, according to Defendant, the notice requirement in § 6.7(e)(1) dealt only with "disqualifying employment" suspensions of regular pension benefits, and not disability benefits such as those awarded to Plaintiff. (Doc. 45 at 17).

Defendant points to the context of §6.7(e)(1) to support its position that the notice requirement therein had nothing to do with disability benefits. (Doc. 45 at 18-19). Section 6.7 of Amendment No. 7 begins with: "(a) An employee shall have

---

[15] Plaintiff also argues that the Summary Plan Description provided by Defendant was inadequate and therefore failed to comply with 29 U.S.C. § 1022. (Doc. 41 at 28; 46 at 21). However, a claim for relief pursuant to § 1022 was not raised in Plaintiff's First Amended Complaint, and therefore is not properly before the Court at this juncture. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

his pension suspended for any period of Disqualifying Employment as defined below." (Doc. 46-2 at 12).[16] The Section goes on to define "Disqualifying Employment" for an employee who, before the age of 53, retired after October 1, 1998 (such as Plaintiff) as: "(i) Employment with an Employer in any capacity in the construction industry (either as a union or non-union construction worker), or (ii) Employment which results in *any type of compensation* for services rendered, as defined by the Internal Revenue Service, which is subject to Social Security taxes and/or self-employment taxes, but only with respect to benefits accrued after September 30, 1998." (Doc. 46-2 at 12-13 (emphasis added)). Defendant contrasts this provision with § 3.10, governing Total and Permanent Disability Benefits, which provides, in part: "For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, Participant may earn up to $14,000 per calendar year in non-Laborer or non-Building Trades Craft employment and be considered totally and permanently disabled for purposes of [this section]." (Doc. 42 at 6-7). Accordingly, it appears that a Participant earning disability benefits under the Plan may earn up to $14,000 in certain areas of work and still be qualified for his

---

[16] The Court notes Plaintiff's argument that the definition of "Disqualifying Employment" set out in subsections (a), (b), and (c) of §6.7 was not meant to apply in the context of subsection (e) because the term is capitalized in the former and not in the latter. The Court finds this argument unpersuasive. Not only do the Defendant' Trustees, who have discretion to interpret the terms of their own Plan, believe that the distinction has no relevance, *see Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 662 (7th Cir. 2005), but other Plan sections, which specifically reference the defined term "Disqualifying Employment" also fail to capitalize it as such. (See § 6.6 of the First Restated Plan ("To be considered retired, a Participant must . . . not be engaged in *disqualifying employment as defined in Section 6.7(a) and (b).*" (emphasis added)). (Doc. 42 Exh. B Part 1 at 99).

benefits, while § 6.7 states that any income whatsoever will result in a suspension of pension payments.[17]  Therefore, if § 6.7 were to be read as applicable to disability benefits, § 3.10 would be rendered meaningless, a result that is to be avoided in contract interpretation.  *See Dribeck Importers, Inc. v. G. Heileman Brewing Co.*, 883 F.3d 569, 573 (7th Cir. 1989).  Thus, according to Defendant, § 6.7 as a whole, and §6.7(e)(1) specifically, have no relevance to disability benefits and therefore do not require the type of notice set out therein.

The Court agrees with Defendant's interpretation, especially in light of the deference it must afford to Defendant's interpretation of its own Plan.  *See Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 662 (7th Cir. 2005).  It is not unreasonable to read §6.7(e)(1) as applying solely to regular pension benefits, as opposed to the disability pension benefits that Plaintiff was earning, such that the notice requirement encapsulated therein does not apply to Plaintiff.  The Court finds relevant not only the provisions pointed out by Defendant regarding the definition of "Disqualifying Employment," but also § 6.7(g) which deals with the "Resumption of Benefits."  Pursuant to § 6.7(g), a Plan Participant could resume receiving benefits, following suspension thereof, so long as the Participant notified

---

[17]  The Court finds unpersuasive Plaintiff's argument that his benefits were "suspended" pursuant to § 7.6(d).  While the term "suspend" may have been used in Defendant's Termination Letter to Plaintiff, this does not necessarily implicate the invocation of this subsection.  Moreover, the definition of "Suspension of benefits" in subsection (d) is "non-entitlement to benefits *for the month.*"  (Doc. 46-2 at 13 (emphasis added)).  As will be discussed below, disability benefits based upon "Total and Permanent Disability" could not be stopped on a month-to-month basis based upon work in "disqualifying employment."  Rather, if a Participant was no longer deemed "totally and permanently disabled" pursuant to § 3.10 – because he was capable of performing full-time work, he could apply for an Early Retirement Pension.  (See § 3.12 First Restated Plan, Doc. 42 Exh. B. Part I at 65).

the Plan that his "Disqualifying Employment" had terminated. (Doc. 46-2 at 14-15). This is contrasted with § 3.12 of the First Restated Plan, which provides that after a Participant is found to be no longer totally and permanently disabled he may apply for an Early Retirement Pension, which presumably would then be governed by the rules of § 6.7. (Doc. 42 B-5 Part I at 65). Such a distinction makes sense in that once a Participant is no longer "totally and permanently disabled" he may not resume such status by simply stopping the employment in which he has engaged. The applicability of this distinction to §6.7(e) is especially relevant in that § 6.7(e) itself refers to a situation in which "benefits have been suspended and payment resumed." (Doc. 46-2 at 13). Accordingly, the Court finds that § 6.7(e) is not applicable to disability benefits based upon a determination of "Total and Permanent Disability" and therefore Defendant did not violate the "plan documents rule" by failing to provide Plaintiff notice of the "$14,000 provision" at the time it commenced his benefits.

## B. Fiduciary Duties of Care, Skill, Prudence, and Diligence

Plaintiff also alleges that Defendant breached its fiduciary duties of care, skill, prudence, and diligence by providing him with incorrect or insufficient notice of the terms of his disability benefits. (Doc. 19 ¶ 46). On August 16, 1999, Plaintiff signed a "Retirement Declaration" which is the typical "Disqualifying Employment post-October 1998 Notice for a Service-Only or Regular Pension." (Doc. 19 ¶ 42; 42 at 21). This Retirement Declaration did not provide the Plan rules governing Plaintiff's Disability Pension, nor any information unique to the Disability Pension,

including the "$14,000 provision." (Doc. 39 Exh. 16). Plaintiff therefore claims that this notice was "incorrect."[18] In addition, Plaintiff alleges that in January 2004, Defendant discovered that Plaintiff had earned $7,144.00 in 2001 and $4,037.50 in 2002, however it did not at that time suspend his disability benefits. (Doc. 19 ¶ 44). Plaintiff therefore claims that Defendant's "failure to give Plaintiff correct notice . . . in 1999 along with the lack of suspension for those 2001 and 2002 earnings, misled the Plaintiff to justifiably rely upon the fact that his performance of 'non-Laborer or other non-Building Trades Crafts employment' was permitted without jeopardizing any portion of his Disability Pension." (Doc. 46 at 24).

The Seventh Circuit has held that a breach of fiduciary duty exists if fiduciaries "mislead plan participants or misrepresent the terms or administration of a plan." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 640 (7th Cir. 2004) (quoting *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993)). However, "while there is a duty to provide accurate information under ERISA, negligence in fulfilling that duty is not actionable." *Id.* at 642 (holding that an employer must have set out to disadvantage or deceive its employees in order for a breach of fiduciary duty to be made out). Accordingly, while it may not have been wise for Defendant to provide Plaintiff with a "Retirement Declaration" containing a notice regarding disqualifying employment which, according to Defendant, was not

---

[18] Defendant claims that the Retirement Declaration was applicable to Plaintiff insofar as it required Plaintiff to sign the following declaration: "I have reviewed and understand the Central Laborers' Pension Fund's Plan Rules and Regulations." (Doc. 42 at 28).

completely applicable to him, there is no evidence that Defendant did so out of a desire to deceive Plaintiff.

Moreover, there is no evidence of an intent to deceive by Defendant's failure to suspend Plaintiff's benefits due to his 2001 and 2002 earnings. When Defendant discovered these earnings in 2004, it asked Plaintiff to provide it with a written explanation regarding the type of work he had been performing. (Doc. 1-2 at 9). In response, Plaintiff stated that he worked "8-10 hours per week" repairing nail guns and performing light office duties. (Doc. 1-2 at 12). Considering Plaintiff was neither engaged in full-time employment nor as a "Laborer or other Building Trades Crafts employment in the construction industry," Defendant had no reason to terminate his disability benefits at that time.[19] Accordingly, Plaintiff has not shown that Defendant set out to disadvantage or deceive Plaintiff regarding the terms of his disability benefits, and any negligence on the part of the Defendant in this regard is not sufficient to hold it liable for breach of fiduciary duty. Therefore, Plaintiff's claim that Defendant breached its fiduciary duties pursuant to ERISA by not providing him proper notice of the terms of his disability benefits fails as a matter of law, and Plaintiff's Motion for Summary Judgment as to Count II is DENIED and Defendant's Motion for Summary Judgment as to Count II is GRANTED.

---

[19] The Court highlights the contrast Plaintiff's reported 8-10 hours per week in 2001 and 2002 with the 40 hours a week he worked in 2005 and 2006.

## V. Count III

In Count III of his Amended Complaint, Plaintiff seeks "ERISA Injunctive Relief" to prevent Defendant from applying specific Plan provisions that work as a forfeiture to Plan benefits and/or violate the "Anti-cutback Rule." (Doc. 19 at 20). Specifically, Plaintiff maintains that § 7.1 and § 3.3(d) of Defendant's 1999 Restated Plan work as a forfeiture; and that §§ 3.3(b), 3.7, and 4.3(b) violate the anti-cutback rule of ERISA and also work or facilitate a forfeiture. (Doc. 19 at 24). Plaintiff has not moved for summary judgment as to Count III. According to Plaintiff, "Count [III] seeks injunctive relief under ERISA in the event specific Plan provisions *(unrelated to Counts [I and II])* are found to work a forfeiture of Plan benefits and/or violate the anti-cutback rule under ERISA." (Doc. 41 at 1-2) (emphasis added). Defendant, on the other hand, moves for summary judgment as to Count III, as well as Counts I and II; however it never specifically addresses Plaintiff's claims. (See Doc. 42).

While Defendant addresses the anti-cutback rule in arguing that it does not apply to disability benefits such as those it alleges Plaintiff had been receiving, (Doc. 42 at 24-26), its argument misses the fact that several of the provisions Plaintiff claims violate the anti-cutback and forfeiture rules are not in any way related to his own prior benefits, and specifically refer to regular pension benefits. (*See, e.g.*, § 3.7 ("The pension amount to which a Participant is entitled shall be determined under the terms of the Plan as in effect at the time Participant separates from Covered Employment;" § 7.1 ("A pension must be applied for in

writing with the Trustees in advance of the date pension payments shall commence. However, in the case of a Disability Pension, pension payments shall commence retroactively to the disability commencement date. *Otherwise, no retroactive payments for months prior to submission of an application shall be made.*" (emphasis added); Plaintiff alleges in his Complaint that the non-retroactivity of pension payments, other than disability pension payments, works as a forfeiture (Doc. 19 ¶¶ 51-53)). Accordingly, the Court finds that the parties have insufficiently briefed the matter such that the Court is not competent to rule upon it at this time. However, because the question appears to be one that should be decided as a matter of law, the Court believes that Oral Argument is appropriate. Therefore, Defendant's Motion for Summary Judgment as to Count III is DEFERRED and Oral Argument on the matter is set for August 22, 2011 at 10:00 a.m. in Courtroom D of the Peoria Courthouse.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 41) is DENIED, and Defendant's Motion for Summary Judgment (Doc. 42) is GRANTED in part and DEFERRED in part. Defendant's Motion for Summary Judgment is GRANTED as to Counts I and II. This case is set for Oral Argument on Monday, August 22, 2011 at 10:00 a.m. in Courtroom D of the Peoria Courthouse for arguments pertaining to Count III of Plaintiff's Amended Complaint. IT IS SO ORDERED.

Entered this <u>3rd</u> day of August, 2011.

                                                      s/ Joe B. McDade
                                                 JOE BILLY McDADE
                                      United States Senior District Judge