UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| DONALD J. TOMPKINS, | ) |
| Plaintiff-Counterdefendant, | ) ) ) |
| v. | ) ) Case No. 4:09-cv-4004-SLD-BGC |
| CENTRAL LABORERS' PENSION FUND, | ) ) ) ) |
| Defendant-Counterclaimant. | ) ) |

ORDER

In 1999, after participating in the Central Laborers' Pension Fund (the "Fund") for over 20 years, Donald J. Tompkins ("Tompkins") applied for and began receiving "total and permanent disability" benefits. These benefits were terminated by the Fund on June 1, 2007, after the Fund discovered that he had been working full-time since July 2005. According to the Fund, Tompkins' ability to work full-time demonstrated that he was no longer totally and permanently disabled. Tompkins challenged the termination of his benefits under the Employment Retirement Income Security Act (ERISA) in this action. In response, the Fund filed a counterclaim alleging that Tompkins committed the tort of fraudulent concealment by failing to disclose that he began full-time employment in July 2005. Tompkins' three affirmative counts were resolved in favor of the Fund on summary judgment.

Presently before the Court is the Defendant-Counterclaimant Central Laborers' Pension Fund's counterclaim for the tort of fraudulent concealment. For the reasons set forth herein, the Court, having considered all of the evidence adduced at trial, hereby grants judgment in favor of Plaintiff-Counterdefendant Donald J. Tompkins and against the Fund on the counterclaim.

I.   FINDINGS OF FACT

    A.  Background

1. Tompkins is and was, at all relevant times, a citizen of Rock Island County, Illinois.

2. The Fund is a pension fund administered pursuant to a pension Plan (the "Plan") and the provisions of the Employment Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 et *seq*.

3. In November of 1978, Tompkins, through his employment with certain participating employers, began working in Laborers' Local 309 and became a participant in the Fund through that employment.

    B.  The Plan Provisions

        i.  The July 1, 1995 Summary Plan Description and First Restated Plan

4. At some time after July 1, 1995, and prior to 1999, the Fund created a booklet containing a Summary Plan Description, revised and effective as of July 1, 1995 ("July 1, 1995 Summary Plan Description"), and the Fund's Restated Plan Rules and Regulations – Amended and Restated Effective October 1, 1994 ("First Restated Plan").  (*See* Fund's Ex. 1)

5. The July 1, 1995 Summary Plan Description, which provides a lay interpretation of the formal terms of the First Restated Plan, provided a description of a "Disability Pension" for participants that become permanently and totally disabled.  (*See* Fund's Ex. 1 at 1, 15, 21-22, 37.)

6. The July 1, 1995 Summary Plan Description included the following:

**If I retire with a Disability Pension, May I work?**

If you are a disability pensioner, your pension will be suspended for any months in which you have earnings from any employment or gainful pursuit.  You must report all and any earnings to the Trustees in writing within 15 days after the end

2

of the month in which you had such earnings.  If you fail to report as required, you will be further penalized for 12 more months.

(Fund's Ex. 1 at 37.)

7.     The First Restated Plan included provisions regarding eligibility for a Disability Pension due to becoming totally and permanently disabled (Section 3.7), the amount of the Disability Pension (Section 3.8), the payment terms for a Disability Pension (Section 3.9), the Plan's definition of "total and permanent disability" as of July 1, 1995 (Section 3.10), the necessary proof of total disability needed to qualify for a Disability Pension (Section 3.11), and the options available to a disability pensioner if he ceases to be totally and permanently disabled (Section 3.12).  (Fund's Ex. 1 at 63-65.)

8.     The First Restated Plan defined Total and Permanent Disability, in part, as follows:

> **Section 3.10.  Total and Permanent Disability Defined.**
>
> A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit whether as a Laborer or in any other occupation or employment of any kind.  The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder.
>
> A Disability Pensioner shall report any and all earnings from any employment or gainful pursuit to the Pension Fund Office in writing within 15 days after the end of each month in which he had such earnings.  If a Disability Pensioner fails to make timely reports as required by this section, he shall be disqualified for benefits for up to 12 months in addition to the duration of such employment for each such violation.

(Fund's Ex. 1 at 64.)

9.     The Fund mailed copies of the booklet containing the July 1, 1995 Summary Plan Description and First Restated Plan to plan participants at some point after July 1, 1995, and prior to Tompkins application for disability benefits in July 1999.

10. At the time the Fund mailed copies of the booklet to its participants, Tompkins was a contributing participant in the Plan but had not been receiving any form of pension benefits, and there is no direct evidence that Tompkins was actually aware of any of the relevant provisions of the July 1, 1995 Summary Plan Description or the First Restated Plan.

      ii. Amendment No. 5, adopted May 19, 1997

11. The Plan's definition of Total and Permanent Disability in section 3.10 was amended by Amendment No. 5. Amendment No. 5 was adopted by the Fund on May 19, 1997. Section 3.10 of Amendment No. 5 set forth amendments to the Plan that included a "$14,000 provision" to total and permanent disability (italicized):

> **Section 3.10 is deleted in its entirety and replaced with the following:**
>
> **Section 3.10. Total and Permanent Disability Defined.**
>
> A Total and Permanent Disability shall mean that the employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, *the Participant may earn up to $14,000 per calendar year in the non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes of section 3.10*. Such disability must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder.
>
> A Disability Pensioner shall report any and all earnings from any employment or gainful pursuit to the Pension Fund Office in writing within 15 days after the end of each calendar year for which he had such earnings. If a Disability Pensioner fails to make timely reports as required by this section, he shall be disqualified for disability benefits for up to 12 months in addition to the duration of such employment for each such violation.

(Fund's Ex. 2.)

4

12.    Section 3.11 of Amendment No. 5 imposed an obligation on participants to provide the Fund with authorization for the release of a participant's Social Security earnings:

**Section 3.11 is deleted in its entirety and replaced with the following:**

> . . . the Participant must furnish, at the request of the Trustees, an annual release whereas the Trustees may obtain Social Security information for any given year or years to establish proof of continued Total and Permanent Disability.

(Fund's Ex. 2.)

13.    The Fund did not mail or otherwise provide a copy of Amendment No. 5 to Tompkins, and there is no direct evidence that Tompkins ever received or was made aware of the terms set forth in Amendment No. 5.

### iii.  Amendment No. 7, adopted November 10, 1998

14.    The Plan's definition of Total and Permanent Disability in section 3.10 was also amended by Amendment No. 7, which was adopted by the Fund on November 10, 1998. Amendment No. 7 also included the "$14,000 provision" change to the definition "Total and Permanent Disability" as set forth in Amendment No. 5.  In relevant part, Amendment No. 7 included the following:

**Section 3.10, Total and Permanent Disability Defined, is deleted in its entirety and amended to read as follows:**

**Section 3.10 – Total and Permanent Disability Defined:**

A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of Non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income.  For such non-Laborer or other non-Building Trades Crafts employment, provided a physician, selected by the Trustees, considers the disability to be total and permanent, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled for purposes of Section 3.10.  Such disability

5

must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder.

A Disability Pensioner shall report any and all earnings from any employment or gainful pursuit to the Pension Fund Office in writing within 15 days after the end of each calendar year for which he had such earnings. If a Disability Pensioner fails to make timely reports as required by this section, he shall be disqualified for disability benefits for up to 12 months in addition to the duration of such employment for each such violation.

If disability benefits were paid for a month for which benefits were later determined should not have been paid, the overpayment shall be recoverable through deductions from future pension payments in an amount not to exceed 25 percent of the monthly pension amount (before deductions), except that the Plan may withhold up to 100 percent of the first monthly pension payment made upon the beginning of future pension payments. If a Participant dies before recovery of overpayments has been completed, deductions shall be made from the benefits payable to his Beneficiary or Spouse, subject to the 25 percent limitation on the rate of reduction.

(Fund's Ex. 3.)

15. The Fund did not mail or otherwise provide a copy of Amendment No. 7 to Tompkins, and there is no direct evidence that Tompkins ever received or was made aware of the terms set forth in Amendment No. 7.

                iv. The 2000 Edition of the Summary Plan Description

16. The Fund created a Summary Plan Description for Members in the Construction Industry – 2000 Edition ("2000 Summary Plan Description"). (Tompkins' Ex. I.)

17. The section of the 2000 Summary Plan Description detailing the Plan's Disability Pension does not mention any obligation or duty on beneficiaries to report employment earnings. (*See* Tompkins' Ex. I at 13-14.)

v. The Second Restated Plan

18. On September 9, 2002, the Fund adopted the Fund's Restated Plan Rules and Regulations as Amended and Restated Effective October 1, 1999 ("Second Restated Plan"). (Fund's Ex. 4 at 103.)

19. The Second Restated Plan reorganized the Plan such that the sections regarding Total and Permanent Disability, previously located in Section 3.11 of Amendment No. 5 and Section 3.10 of Amendment No. 7, were reorganized into Section 1.31 of the Second Restated Plan. (*See* Fund's Ex. 4 at 10.)

20. Section 1.31 of the Second Restated Plan includes the following relevant terms:

**Section 1.31 – Total and Permanent Disability**

A "Total and Permanent Disability" shall mean that, in the opinion of a licensed medical practitioner selected or approved by the Trustees, the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of Non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. For such non-Laborer or other non-Building Trades Crafts employment, notwithstanding the restrictions of Section 7.8, the Participant may earn up to $14,000 per calendar year in non-Laborer or other non-Building Trades Crafts employment and be considered totally and permanently disabled. Such disability must be considered total and permanent and will continue during the remainder of the Participant's life. The Trustees shall be the full and final judges of Total and Permanent Disability and of entitlement to a Disability Pension hereunder.

A Disability Pensioner shall report any and all earnings from any employment or gainful pursuit to the Pension Fund Office in writing within 15 days after the end of each calendar year for which he had such earnings. If a Disability Pensioner fails to make timely reports as required by this Section 1.31, the Trustees may determine that he shall be disqualified for disability benefits for up to 12 months in addition to the duration of such employment for each such violation.

If disability benefits were paid for a month for which benefits were later determined should not have been paid, the overpayment shall be recoverable through deductions from future pension payments in an amount not to exceed 25% of the monthly pension amount (before deductions), except that the Plan may

7

>withhold up to 100% of the first monthly pension payment made upon the beginning of future pension payments. If a Participant dies before recovery of overpayments has been completed, deductions shall be made from the benefits payable to his Beneficiary or Spouse, subject to the 25% limitation.
>
> *   *   *
>
>. . . the Participant must furnish, at the request of the Trustees, an annual release whereas the Trustees may obtain Social Security earnings information for any given year or years to establish proof of continued Total and Permanent Disability. . . .

(Fund's Ex. 4 at 10-11.)

21. The Fund never mailed the Second Restated Plan to the participants of the Plan, and there is no evidence that Tompkins was ever made aware of any of the relevant provisions of the Second Restated Plan prior to termination of his benefits on June 1, 2007.

### vi. The Second Amendment No. 5, adopted November 28, 2005

22. On November 28, 2005, the Plan's provisions regarding Total and Permanent Disability were amended by a second Amendment No. 5 ("Second Amendment No. 5"). (Fund's Ex. 5.)

23. The Second Amendment No. 5 redefined "Total and Permanent Disability" and included a newly created category of disability benefits based on an "Occupational Disability." (Fund's Ex. 5.)

### C. Tompkins' Disability Benefits

#### i. Tompkins' Application for Disability Benefits

24. Tompkins completed his application for a Disability Pension with the assistance of an individual affiliated with his union and, on July 16, 1999, filed the application with the Fund (Tompkins' Ex. 1).

25. Tompkins' application for Disability Pension benefits included Tompkins' "Employee's Statement" where he self-identified as having an "Occupational Disability" that was due to working around cement dust for twenty-two years. (Tompkins' Ex. 1 at 3.)

26. Tompkins' application for benefits also included a "Statement of the Attending Physician" documenting Tompkins' Chronic Asthmatic Bronchitis and indicating that he could not engage in any work as a laborer in the construction field with dusty environments. (Tompkins' Ex. 1 at 4.)

27. On August 4, 1999, the Fund sent a letter to Tompkins' doctor seeking additional information regarding the diagnosis of Chronic Asthmatic Bronchitis. (Tompkins' Ex. 2.)

28. The Fund's letter to Tompkins' doctor provided the following definition of Total and Permanent Disability:

> **TOTAL AND PERMANENT DISABILITY DEFINED:** A Total and Permanent Disability shall mean that the Employee is totally and permanently unable as a result of bodily injury or disease to engage in any further employment or gainful pursuit whether as a Laborer or other Building Trades Crafts employment in the construction industry for remuneration or profit, regardless of the amount, or unable to engage in further employment or gainful pursuit of non-Laborer or other non-Building Trades Crafts employment for which the employment is considered full-time and a primary source of income. Such disability must be considered total and permanent and will continue during the remainder of the Employee's life.

(Tompkins' Ex. 2.)

29. In response to the Fund's letter, Tompkins' doctor indicated that Tompkins met the definition of Total and Permanent Disability provided in the letter. (Tompkins' Ex. 2.)

30. On August 16, 1999, as a condition of receiving benefits, Tompkins signed a Retirement Declaration that included Tompkins' statement: "I have reviewed and understand the Central Laborers' Pension Fund's Plan Rules and Regulations." (Fund's Ex. 7.)

31. On August 19, 1999, the Fund sent Tompkins a letter approving his eligibility for "Total and Permanent Disability" benefits in the amount of $2,115.43 per month, retroactive to January 1, 1999.

32. At the time Tompkins applied for, and received, Disability Pension benefits the Plan was administered pursuant to the July 1, 1995 Summary Plan Description and the First Restated Plan, plus Amendment No. 7, which modified the definition of Total and Permanent Disability and included the $14,000 provision.

33. The Fund began paying Tompkins disability benefits in 1999 and paid them continuously through June 1, 2007.

34. Around the same time Tompkins filed for disability benefits through the fund, he also applied for Social Security Disability Insurance Benefits and for benefits through the Northern Illinois Annuity Fund. (Fund's Ex. 6.)

35. In Tompkins' application for benefits from the Northern Illinois Annuity Fund, dated August 16, 1999, Tompkins disclosed that he was "totally and permanently disabled" and provided a proof of disability form from his doctor. (Fund's Ex. 6.)

    ii. Tompkins' Employment in 2001 and 2002

36. In January 2004, the Fund discovered that Tompkins had unreported earnings from employment in 2001 and 2002.

37. After discovering Tompkins' 2001 and 2002 employment, the Fund relied on Section 1.31 of the Second Restated Plan to require Tompkins to sign a release so that the Fund could obtain Tompkins' Social Security earnings from 2001 and 2002.

38. Tompkins fully cooperated with the Fund's request for a release of his Social Security earnings from 2001 and 2002. (Tompkins' Ex. 4.)

39. The Fund discovered that Tompkins had earned $7,144.00 in 2001 and $4,037.50 in 2002.

40. The Fund asked Tompkins to provide a written explanation regarding the type of work he had performed in 2001 and 2002 (Tompkins' Ex. 5), and Tompkins responded that he worked "8-10 hours per week in a climate controlled workshop repairing *Paslode* nail guns" and that he also performed "light office duties which include filing, answering the telephone, and faxing work orders." (Tompkins' Ex. 6.)

41. After becoming aware of Tompkins' 2001 and 2002 earnings and his explanation regarding those earnings, the Fund did not terminate his disability benefits at that time.

42. There is no evidence that the Fund informed Tompkins why it was investigating his 2001 and 2002 earnings. Nor is there any evidence that the Fund took any affirmative steps to inform Tompkins of the duty imposed by the Plan to report any earnings to the Fund and that he was not in compliance with that duty with respect to his 2001 and 2002 earnings.

    iii. Termination of Tompkins' Benefits

43. In May, 2007, the Fund's accountant reported to the Fund that it discovered through an audit of Willman Construction (a contributing employer to the Fund) that Tompkins had been employed full-time by Willman Construction since July 2005.

44. When hired by Willman Construction, Tompkins filled out a questionnaire on which he was asked "Are you disabled?" and to which he answered "No." (Fund's Ex. 9 at 7.)

45. Tompkins did not report his earnings from his employment at Willman Construction to the Fund.

46. There is no direct evidence that Tompkins knew of the reporting requirements imposed by the Plan prior to June 1, 2007.

11

47. The Fund's accountant discovered Tompkins employment at Willman Construction "through the Excel retirement program provided by the Fund" (Tompkins' Ex. 7 at 14), which includes a list of participants' Social Security numbers for comparison against the Social Security numbers reported by contributing employers.

48. Through the audit, the Fund discovered that Tompkins had been working full-time at Willman Construction since July 2005. (*See* Tompkins' Ex. 7 at 15.)

49. On June 1, 2007, the Fund sent Tompkins a letter informing him of the Fund' belief that, due to his full-time employment at Willman Construction, he no longer met the definition of "total and permanent disability" as set forth in Section 1.31 of the Second Restated Plan. (Tompkins' Ex. 7 at 13.)

50. Included with the June 1, 2007, termination letter, the Fund for the first time provided Tompkins with a copy of Section 1.31 of the Second Restated Plan that included the $14,000 provision.

51. The Fund determined that Tompkins' entitlement to Total and Permanent Disability benefits ceased as of his commencement of full-time employment at Willman Construction in July, 2005, resulting in an overpayment to him in the amount of $48,654.89.

52. Tompkins appealed the suspension of his Disability Pension to the Fund, but his appeal was rejected.

53. Tompkins continued working at Willman Construction until November 4, 2008.

54. Since November 2008, Tompkins has been employed by Jumer's Casino and Hotel.

D. Procedural Posture

55. Tompkins' Complaint alleged that the Fund interpreted the Plan in an arbitrary and capricious manner and breached its fiduciary duties by failing to provide Tompkins with

notice of the terms of the Disability Pension he received from January 1999 through May 2007, and, consequently, that it was unlawful for the Fund to terminate those benefits upon discovering that Tompkins began full-time employment at Willman Construction July 2005.

56. The Fund filed a counterclaim of fraudulent concealment alleging: (1) that Tompkins concealed full-time employment from July 2005 through May 2007 at Willman Construction; (2) that Tompkins knew his full-time employment at Willman Construction would have caused his total and permanent disability benefits to be terminated by the Fund; (3) that Tompkins concealed the fact of this full-time employment with fraudulent intent; (4) that the Fund could not have otherwise discovered Tompkins' full-time employment in a timely manner; (5) that the Fund relied on Tompkins' alleged concealment and continued to pay him disability benefits; and (6) the Fund was damaged in the form of overpayments to Tompkins in the amount of $48,654.89.

57. In addition to seeking to recoup the overpayments to Tompkins, the Fund is also seeking an award of punitive damages and attorneys' fees for its fraudulent concealment counterclaim.

58. This Court's summary judgment Orders ruled that the Fund's determination to terminate Tompkins' disability benefits was not unlawful (*see generally* Order & Opinion, ECF No. 49) and rejected other arguments raised by Tompkins (*see generally* Order & Opinion, ECF No. 53).

59. After summary judgment, the only claim remaining in the case was the Fund's counterclaim for fraudulent concealment.

60. The Court held a two-day bench trial on the Fund's counterclaim for fraudulent concealment on March 22, 2012, and March 23, 2012.

E. Witness Testimony

61. The trial included testimony from Tompkins and Fund employees, Ms. Sharon West, the Director of the Pension Department, and Mr. Dan Koeppel, the Fund's Executive Director.

i. Tompkins

62. Despite attempts at impeachment by the Fund's counsel, Tompkins provided credible testimony at trial regarding the material facts of the Fund's assertions of fraudulent concealment.

63. Tompkins testified that he periodically received documents from the Fund by mail that he would sometimes skim, but that he did not read such documents in detail.

64. Tompkins conceded that, if the Fund had mailed him the booklet containing the July 1, 1995 Summary Plan Description and First Restated Plan, he probably would have received it, though he had no specific recollection of ever actually receiving the booklet or reviewing it and, even if he had received it, testified that he likely would not have read it in detail.

65. While Tompkins admitted he was generally aware that Rules and Regulations governing his disability benefits existed, prior to receiving the termination letter on June 1, 2007, Tompkins was not aware of the specific Plan Rules and Regulations governing his disability benefits, including a pensioner's duty to report earnings to the Fund and the Plan's definition of "Total and Permanent Disability" as set forth in Plan Amendment No. 7 and Section 1.31 of the Second Restated Plan.

66. Tompkins believed that his total and permanent disability benefits meant only that he was totally and permanently unable to work in construction, but that he could otherwise work in non-construction, dust-free environments that would not affect his medical condition.

67. Tompkins based his belief on his right to work in non-construction employment, in part, on his prior experience with the Fund in 2004 regarding his employment earnings in 2001 and 2002, and that the Fund did not terminate his benefits at that time despite being aware that he was working and did not self-report his earnings.

68. Prior to receiving the termination letter from the Fund, Tompkins did not know that his full-time work at Willman Construction would be used by the Fund to terminate his disability benefits.

69. Tompkins was not aware that the Fund's decision, on the one hand, to terminate his benefits due to his employment at Willman Construction beginning in 2005 while, on the other hand, not terminating his benefits due to his earnings in 2001 and 2002 was based on the distinction that the Willman Construction employment was full-time and the previous employment was part-time.

70. Tompkins explained that he marked "No" in response to the question "Are you disabled?" on the Willman Construction questionnaire because he thought the question only pertained to his ability to perform the job that he was applying for, which was not a laborer or building trades craft job.

    ii. West

71. West provided credible testimony regarding the operations of the Fund.

72. West testified that the Fund includes approximately 17,000 participants, 6,500 retirees, and 465 individuals receiving disability benefits.

73. West testified that the Fund relies on self-reporting by beneficiaries, periodic audits of employers that participate in the Plan, and the right to request a participant's Social Security earnings in order to police participants' compliance with the Plan's limitations on disqualifying or prohibited employment.

74. West admitted that requesting Social Security earnings is more reliable than self-reporting for determining whether a retiree is engaged in disqualifying or prohibited employment.

75. West testified that it costs $15 per person to request an annual earnings report from the Social Security Administration for a single year and another $2 per person for each additional year.

76. West testified that audits of contributing employers occur every 3 to 5 years, and that due to cost and administrative burdens it would not be practicable for the Fund to perform annual audits on every employer.

77. West also testified that even though the Fund periodically requested the release of Social Security earnings for each of the Fund's retirees, making such a request of all retirees on an annual basis would be cost prohibitive and impose an unreasonable administrative burden on the Fund.

78. West testified that it cost the Fund approximately $120,000 when the Fund requested the release of Social Security earnings for each of the Fund's retirees in 2011.

79. West further testified that the Fund would have ceased paying Tompkins' disability benefits earlier than June 1, 2007, if it would have discovered his full-time employment at Willman Construction earlier because, according to the Fund's interpretation, any full-time employment demonstrates that a beneficiary is no longer totally and permanently disabled.

      iii. Koeppel

80. Koeppel also provided credible testimony regarding the operations of the Fund.

81. Koeppel testified that during the time Tompkins was receiving his disability benefits, a Total and Permanent Disability beneficiary could work in part-time, non-laborer employment up to $14,000 per year and still be considered totally and permanently disabled.

82. Koeppel testified that the Fund used regular U.S. mail, the Fund's website, email, and semi-annual newsletters to communicate with Plan participants.

83. Koeppel further testified that while the Summary Plan Descriptions are meant to distill the Plan's Rules and Regulations into more easily comprehensible language, the actual Rules and Regulations govern how the Fund applies the Plan to beneficiaries.

II. CONCLUSIONS OF LAW

1. Defendant-Counterclaimant's claim of fraudulent concealment requires proof of five elements: (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury. *Trustees of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002).

2. The Defendant-Counterclaimant has the burden of proving fraudulent concealment by clear and convincing evidence. *See Bixby's Food Sys., Inc. v. McKay*, 193 F. Supp. 2d 1053, 1065 (N.D. Ill. 2002) (citing *Stromberger v. 3M Co.*, 990 F.2d 974, 978 (7th Cir. 1993)).

3. Circumstantial evidence may be used to prove fraudulent intent. *See Mueller Indus., Inc. v. Berkman*, 399 Ill. App. 3d 456, 470, 927 N.E.2d 794, 808 (Ill. App. Ct. 2010)

("Although direct evidence of fraudulent intent is rare, circumstantial evidence may give rise to an inference of such intent.").

4. The Court concludes that there is no evidence that Tompkins had knowledge of the Plan's "$14,000 provision" that governed his entitlement to ongoing disability benefits before June 1, 2007.

5. The Court concludes that there is no direct evidence that Tompkins had knowledge of the reporting requirements imposed on disability beneficiaries. The Court recognizes that Tompkins represented in his benefit application that he "reviewed and underst[ood] the Central Laborers' Pension Fund's Plan Rules and Regulations." However, the Fund admitted that it never provided Tompkins with the Plan terms in effect at the time he made this representation and the Fund never informed Tompkins that he was in violation of his reporting obligations in connection with his earnings from 2001 and 2002. Thus, the Court believes that Tompkins remained unaware of any reporting requirements imposed by the Plan on disability beneficiaries prior to June 1, 2007.

6. The Court has considered all the evidence and has determined that the circumstantial evidence offered by the Fund does not lead to a reasonable inference that Tompkins acted with fraudulent intent. To the contrary, the evidence demonstrates that Tompkins never knew of the "$14,000 provision" governing his ongoing entitlement to total and permanent disability benefits. Additionally, the Fund's conduct regarding Tompkins' 2001 and 2002 earnings supported Tompkins' belief that he could work in non-laborer employment without penalty under the Plan. Moreover, since the Fund never advised him of the duty to report the 2001 and 2002 earnings and did not otherwise penalized him for failing to do so, it is not unreasonable to conclude that the Fund's inaction in this regard would have led Tompkins to

believe that he had no obligation to disclose his earnings to the Plan.  Accordingly, there is no basis to conclude that Tompkins had knowledge of the relevant Plan terms, which is a necessary requisite to any inference that he acted with the intent to deceive the Plan regarding those terms.

7.   The evidence adduced at trial did not clearly and convincingly establish that Tompkins intended to induce a false belief in the Fund in order to fraudulently deceive the Fund into paying him benefits during his full-time employment at Willman Construction from July 5, 2005, through June 1, 2007.

8.   The Defendant-Counterclaimant's counterclaim of fraudulent concealment fails because the Defendant-Counterclaimant was unable to prove a necessary element of its fraudulent concealment claim.

III.   CONCLUSION

For the reasons set forth above, the Court finds in favor of Plaintiff-Counterdefendant Donald J. Tompkins and against Defendant-Counterclaimant Central Laborers' Pension Fund on the fraudulent concealment counterclaim asserted by the Fund.

Entered this 30th day of March, 2012.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
